IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA,

     *Plaintiff,*

       v.

STATE OF LOUISIANA, *et al.,*

     *Defendants.*

CIVIL ACTION NO.
3:11-CV-470-JWD-RLB

## CORRECTED MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

Plaintiff, UNITED STATES OF AMERICA, respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

## I. INTRODUCTION

The United States brought this action to enforce the State of Louisiana's obligations under the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 2501-2511, relating to voter registration agencies required to be designated under Section 7 of the Act, 52 U.S.C. § 20506.  As set forth below, the undisputed material facts establish that Louisiana, its Secretary of State, and various public officials and agencies have violated Section 7 by failing to provide voter registration opportunities and assistance to eligible applicants for and recipients of public assistance and State-funded disabilities services in Louisiana.

This Memorandum first discusses the factual underpinnings and procedural history of this case, including a general description of the roles and responsibilities of the agencies and officials named in the Complaint.  *See infra* at 4–6.  It also addresses the procedural history of and the decisions issued in *Scott v. Schedler*, No. 2:11-cv-926, 2013 WL 264603 (E.D. La. Jan. 23, 2013), *aff'd in part, vacated and remanded in part,* 771 F.3d 831 (5th Cir. 2014), a related

NVRA enforcement action filed by private plaintiffs in the Eastern District of Louisiana.  *See infra* at 6–11.  As further background, this Memorandum discusses generally the NVRA and the various obligations it imposes on states such as Louisiana, *see infra* at 12–13, focusing in particular on the obligations imposed by Sections 7 and 10 of the statute.  *See id.*

After incorporating the accompanying Statement of Undisputed Materials Facts filed in support of the United States' motion for summary judgment and discussing the legal standard that applies to such motions, *see infra* at 14–15, the Memorandum then proceeds to address Defendants' continued legal failings with regard to their NVRA obligations as they relate to voter registration agencies.  While acknowledging that Defendants have adopted some new policies and practices in an attempt to comply with the statute and the injunction issued in the *Scott* case, and that Defendants are more compliant with the NVRA today than when this case and the *Scott* case were filed in 2011, the United States proceeds to discuss the undisputed evidence (both before and after the issuance of the injunction in *Scott*) that shows the ways that Defendants' acts and omissions have failed to bring the State of Louisiana into full compliance with Section 7.  The evidence of violations before the injunction in *Scott* is part of the record that sufficiently establishes liability and is of continuing relevance to the nature and scope of a remedial order.

First, the United States demonstrates that Louisiana has failed to designate all of the offices that Section 7 requires be designated as voter registration agencies, including in particular the Commodity Supplemental Food Program ("CSFP"), a federally funded public assistance program operated by Defendant Louisiana Department of Health and Hospitals ("DHH"), which serves more than 60,000 Louisianans monthly.  *See infra* at 16.

2

Next, the Memorandum discusses the specific instances where Louisiana's designated voter registration agencies fail to offer the required voter registration opportunities and distribute the required forms to individuals applying and renewing for benefits or services or changing their address of record, *see infra* at 17–23; where such agencies fail to provide the same degree of assistance as they do with regard to completion of their own forms, *see infra* at 23–**Error! Bookmark not defined.**; and where they fail to accept and transmit completed voter registration forms, *see infra* at 23–25.  For some of the agency components, the evidence presented is limited to violations that existed at the time of the Complaint but predate the injunction issued in *Scott*; for some others, the Memorandum offers evidence of post-*Scott* or current noncompliance with Section 7.  The Memorandum then addresses the role and responsibilities of Local Governing Entities with regard to NVRA compliance and Defendants' responsibilities relating to those entities, *see infra* at 26–28 (arguing that DHH is liable for any NVRA-related failures on the part of its LGE contractors).

Thereafter, the Memorandum discusses significant failings on the part of the Office of the Secretary of State with regard to NVRA implementation, arguing that as the State's chief election official, the Secretary of State is responsible for ensuring compliance with the statute and ultimately is liable for failing to coordinate state responsibilities under the NVRA in a manner that fully addresses the failures on the part of state agencies to implement the statute properly and completely.  *See infra* at 29–32.

Finally, the Memorandum contends generally that Defendants remain liable in this case for their previous NVRA noncompliance prior to the judgment in *Scott*, as well as for the ongoing violations cited herein.  The United States concludes by arguing that, on the basis of

Defendants' longstanding and continuing noncompliance with Section 7, the imposition of declaratory and injunctive relief is both necessary and appropriate.

## II.   PROCEDURAL BACKGROUND

The United States filed the Complaint in this action on July 12, 2011, seeking declaratory and injunctive relief to address the State of Louisiana's violations of the requirements imposed by the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20501 to 20511. Compl. (ECF No. 1).  The NVRA authorizes the Attorney General to bring civil actions on behalf of the United States for such declaratory or injunctive relief as is necessary to carry out the statute.  52 U.S.C. § 20510(a).  In its Complaint, the United States named as a Defendant the State of Louisiana, which, as a state, is subject to the requirements of the NVRA, 52 U.S.C. §§ 20505(4), 20503(a), 20506.  The United States also named as a Defendant Louisiana Secretary of State J. Thomas Schedler ("Schedler" or "SOS"), in his official capacity, as the state's chief election official responsible for coordinating Louisiana's responsibilities under the NVRA.  *See* 52 U.S.C. § 20509; La. Rev. State §§ 18:18, 36:741.

In addition, the United States specifically named as Defendants DHH and the Louisiana Department of Children and Family Services ("DCFS"), as well as their respective individual secretaries, in their official capacities.[1]  DHH is the state body responsible for administering such federal public assistance programs as Medicaid, the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"), and the Commodity Supplemental Food Program ("CSFP").  DHH also administers a variety of State-funded disabilities services programs

---

[1] The original Complaint named then-Secretary of DHH Bruce D. Greenstein and then-Secretary of DCFS Ruth Johnson, in their official capacities.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the current Secretary of DHH, Rebekah Gee, and the current Secretary of DCFS, Susan W. Sonnier, are substituted automatically.

through a number of offices, including the Office for Citizens with Developmental Disabilities

("OCCD"); the Office of Behavioral Health ("OBH"); the Office of Aging and Adult Services

("OAAS"); and the Louisiana Commission for the Deaf ("LCD").  *See* La. Rev. Stat. §§

36:251(B), 36:258(B); 36:259(S).  DCFS is the state body responsible for administering a variety

of federal public assistance programs such as the Supplemental Nutrition Assistance Program

("SNAP"), formerly known as the Food Stamp program, La. Rev. Stat. § 36:477; the Temporary

Assistance to Needy Families ("TANF") Program, formerly known as the Aid to Families with

Dependent Children and currently known in Louisiana as the Family Independence Temporary

Assistance Program ("FITAP"), La. Rev. Stat. § 46:231.2; and the Kinship Care Subsidy

Program ("KCSP"), La. Rev. Stat. § 46:237.

Although the United States specifically named as Defendants the two state governmental

departments responsible for administering the largest of Louisiana's public assistance and State-

funded disabilities services programs, the Complaint explicitly referenced its application to

"other state and local agencies not specifically named  . . . [that] administer public assistance

programs and or State-funded programs primarily engaged in serving persons with disabilities

. . . ."  *See* Compl. ¶ 12 (ECF No. 1).  Given that it is the State itself that has the ultimate

responsibility to comply with the NVRA, and that the SOS, as chief election official, is

responsible for coordinating Louisiana's compliance with the NVRA, all of the necessary

Defendants are before the Court to effectuate relief as to all Louisiana entities (named or

unnamed) that have responsibilities under Section 7.  *See Harkless v. Brunner*, 545 F.3d 445, 452

(6th Cir. 2008) (each of the 50 states, not their respective political subdivisions, has the ultimate

accountability under the NVRA); *United States v. New York*, 700 F. Supp. 2d 186, 197

(N.D.N.Y. 2010) (United States may bring action for declaratory and injunctive relief under the

NVRA against the state and its officials, even where no individual has been deprived of rights secured by the statute); Order of Dec. 12, 2011 at 10 (ECF No. 53) (duty to designate voter registration agencies pursuant to Section 7 of the NVRA falls jointly on State and SOS as chief election official).

    **A.**    ***History of Related Federal Litigation (Scott v. Schedler)***

      On April 19, 2011, private plaintiffs filed a suit in the Eastern District of Louisiana against the SOS and the secretaries of DCFS and DHH for violations of Section 7 of the NVRA. *Scott v. Schedler*, No. 2:11-cv-926 (E.D. La. filed Apr. 19, 2011). *Scott* was resolved in two stages. First, on cross-motions for partial summary judgment, the district court rejected the defendants' argument that Louisiana's public assistance agencies may limit NVRA-mandated voter registration opportunities solely to those clients who appear at those agencies in person. Instead, it entered partial summary judgment in the plaintiffs' favor, finding that "the plain language of Section 7(a)(6)(A) indicat[es] that it applies to both remote and in-person transactions," *Ferrand v. Schedler*, 2012 WL 1570094, at *10 (E.D. La. May 3, 2012), and that the defendants' argument would "frustrate[] the plain intent of the NVRA." *Id.* at *11. Thus, it held that "mandatory voter registration agenc[ies] must distribute with each application, recertification, renewal, or change of address a voter registration form as required in Section 7(a)(6) of the NVRA regardless of whether the [application, renewal, or change of address] transaction is done in person or remotely." *Id.* at *12.[2]

      The remainder of the *Scott* case proceeded to trial in October 2012. In findings of fact and conclusions of law issued on January 23, 2013, the district court framed the issues before it

---

[2] The United States had filed a Statement of Interest arguing that Defendants' argument was contrary to the NVRA's plain language and would undermine Congress's intent that states offer comprehensive voter registration opportunities through public assistance and disabilities services offices. *See Scott,* No. 2:11-cv-926, ECF No. 157.

as "(1) whether the Plaintiffs have standing and (2) whether the Defendants violated and are in continuing violation of the National Voter Registration Act ('NVRA')." *Scott v. Schedler*, 2013 WL 264603, at *1 (E.D. La. Jan. 22, 2013). After finding that both plaintiffs had standing, the district court made liability findings against each defendant.

With respect to DHH, the court found that prior to April 2011 "DHH engaged in numerous NVRA violations." *Scott*, 2013 WL 264603, at *10. Specifically, the district court found that:

> (1) DHH did not provide voter registration services with any remote transactions prior to July 2011; (2) DHH did not provide voter registration services with address changes; (3) DHH did not require staff to distribute voter registration forms unless the client checked the 'yes' box; (4) DHH Medicaid application and renewal forms did not include a voter registration question; (5) DHH's "Motor Voter Form" lacked a disclaimer that registering to vote will not affect the "amount" of assistance received; (6) DHH's WIC program [the Special Supplemental Nutrition Program for Women, Infants, and Children] did not advise clients of the disclaimers required by the statute; and (7) while DHH checked benefits application forms and followed up for missing information, it did not do so with voter registration forms.

*Id.*

With respect to DCFS, the district court concluded that "DCFS was not in compliance with the NVRA as of April 2011." *Id.* at *13. Specifically:

> (1) DCFS did not provide voter registration services with every remote transaction; (2) DCFS did not provide voter registration services with every renewal of benefits prior to October 31, 2010; (3) DCFS did not require its staff to distribute a voter preference form at every change of address transaction; (4) DCFS policy did not require that voter registration services be provided during any remote change of address transaction; (5) DCFS change of address forms, such as the CCAP 10 and the OFS 4SR, did not contain voter registration questions; (6) DCFS policy did not expressly require that voter registration be provided with the CCAP [Childcare Assistance Program], KCSP [Kinship Care Subsidy Program], and DSNAP [Disaster Supplemental Nutrition Assistance Program] programs; (7) DCFS policy gave employees discretion to give voter registration forms to clients, or to advise the client about the SOS's website; (8) DCFS did not require staff to distribute voter registration forms unless the client checked "yes."

*Id.*

With respect to the Louisiana Secretary of State, the district court held that Secretary Schedler "must coordinate [the statute's] responsibilities for the state of Louisiana under the NVRA" and that Secretary Schedler, "as Louisiana's chief election officer, is ultimately responsible for the compliance for the State of Louisiana under the NVRA." *Id.* at \*16.  The court further found that the Secretary of State had engaged in no oversight or monitoring of NVRA compliance within the State, explaining that "[o]ther than publishing a manual on NVRA compliance and conducting sporadic and faulty training sessions, the SOS has done nothing to ensure that the State comply with its NVRA obligations." *Id.*  The court explained that what little training had been provided "ha[d] been inconsistent and inaccurate," that the Secretary of State had no requirements on how often it was to provide training, and that for nearly three years, "the SOS did not conduct any NVRA training whatsoever for DCFS." *Id.* at \*14.

The *Scott* district court noted that while the defendants had made significant efforts to come into compliance with the NVRA by revising numerous non-compliant forms and policies, "Defendants [were] only in substantial compliance, and not full compliance" with the NVRA's requirements at the time of trial. *Id.* at \*17.  Because of this, the district court concluded that there was "some potential danger that future violations may occur." *Id.*  The district court therefore entered a permanent injunction, which directed the Secretaries of DHH and DCFS "to maintain in force and effect his or her policies, procedures, and directives, as revised, relative to the implementation of the National Voter Registration Act with respect to all qualifying programs under his or her administration." *Scott*, No. 2:11-cv-926 (E.D. La.), Permanent Injunction at 3 (ECF No. 437).   Both agencies were further directed that "as to any program for which the Secretary has not achieved substantial [NVRA] compliance," to "implement such

8

policies, procedures, and directives as to each program no later than March 15, 2013, and certify such compliance to the Court." *Id.* The district court likewise ordered the Secretary of State to maintain in force all revised, compliant policies, and to certify substantial compliance as to any outstanding issues by March 15, 2013. *Id.* The injunction contained no further reporting or monitoring requirements.

DHH and DCFS filed certifications of compliance with the *Scott* district court regarding their public assistance programs on March 15, 2013, as did the Secretary of State. *Scott*, No. 2:11-cv-926 (E.D. La.) (ECF Nos. 463, 464, and 465).[3] Although disabilities services agencies had not been the subject of discovery and litigation in *Scott*—and, indeed, there was no mention of such programs in the *Scott* court's findings of fact and conclusions of law—DHH further certified on April 14, 2013, that certain of its disabilities services offices were in compliance with the NVRA. *Scott*, No. 2:11-cv-926 (E.D. La.) (ECF No. 476). DHH refused to certify compliance as to numerous "human services districts and authorities that provide disability services" based on the contention that these DHH offices are "separate and distinct juridical entities" under state law. *Id.*

Although Secretary Schedler appealed the judgment and the injunction, DHH and DCFS did not. Before the United States Court of Appeals for the Fifth Circuit, the United States participated as *amicus curiae* to brief and argue two important issues of statutory construction. After deciding threshold notice and standing issues, the Fifth Circuit panel decided two discrete legal issues. First, affirming the district court, the Fifth Circuit held that Louisiana's designation of its Secretary of State as the chief election official responsible for coordinating the State's

---

[3] The certifications made by DCFS and DHH contained no information as to what actions had been taken following trial that allowed the agencies to certify their compliance. Instead, these certifications simply declared that the specified programs were now complying with the NVRA. *Scott*, 2:11-cv-926 (E.D. La.) (ECF Nos. 463, 464, and 476).

NVRA responsibilities, pursuant to Section 10 of the NVRA, 52 U.S.C. § 20509, gave Defendant Schedler the obligation to enforce the NVRA with respect to all state agencies.  *Scott v. Schedler*, 771 F.3d 831, 838-39 (5th Cir. 2014) (holding that "coordination" under Section 10 of the NVRA "includes enforcement power," such that "the chief election official's role must be ongoing" in ensuring statewide NVRA compliance).  Second, reversing the district court, the Fifth Circuit held that the NVRA does not require public assistance agencies to distribute voter registration applications to benefits applicants who submit blank declaration forms referenced in Section 7(a)(6)(B).  *Id.*

The Fifth Circuit vacated the district court's partial summary judgment ruling on the remote transactions issue because of its holding that the organizational plaintiff in *Scott* lacked standing to raise this issue.  *Id.* at 841-842.  With respect to Defendant Schedler, the Fifth Circuit remanded the case for the district court to modify the injunction in accordance with its opinion. *Id.*[4]  However, the panel stressed that its opinion did not affect the district court's permanent injunction against DHH and DCFS, which, among other obligations, required them to offer voter registration and related assistance under Section 7.  *See Scott*, 771 F.3d at 842 n.18 ("We note

---

[4] On remand, the District Court issued a modified injunction instructing the SOS to "maintain in force and effect his or her policies, procedures, and directives, as revised, relative to the implementation of the National Voter Registration Act with respect to coordination of the National Voter Registration Act within Louisiana."  Amended Permanent Injunction at 2 (ECF No. 538).  The district court injunction noted that this instruction was to be carried out in accordance with the Fifth Circuit opinion.  *Id.*

Defendant SOS appealed the amended injunction, arguing that it violated Fed. Rule Civ. Proc. 65(d) because it was "couched in terms so vague and uncertain that Schedler" was unable to know what he was enjoined to do.  *Scott v. Schedler*, Case No. 15-30652 (Docketed Jul. 24, 2015), Original Brief of Appellant at10 (Sep. 21, 2015) (Doc. No. 00513204085).  In response, Appellees argued that the amended injunction sufficiently specified that Schedler's coordination and enforcement responsibilities were constrained by the Fifth Circuit ruling.  *Scott*, Case No. 15-30652, Brief of Appellees at 6 (Oct. 26, 2015) (Doc. No. 00513246705).  On December 16, 2015, the Fifth Circuit scheduled oral argument for February 1, 2016.

again that the injunction against the DCFS and DHH is unaffected by this opinion, as it has not been appealed.").[5]

### B.   Subsequent Procedural History

Following the issuance of the Fifth Circuit's merits decision in *Scott v. Schedler,* and pursuant to an Order of this Court, *see* Order of October 21, 2014 (ECF No. 172), on November 20, 2014, the parties filed a joint Status Report in this case setting forth their respective views on the effect of the *Scott* litigation on the instant case and identifying outstanding issues, including a summary of discovery necessary to resolve this case. *See* Status Report (ECF No. 174). In the report, and after conducting a review of the Secretary of State's recently adopted administrative rules relating to mandatory voter registration agencies, the United States identified a number of deficiencies in the State's new program, even after Defendant Schedler's promulgation of the administrative rules. *See id.* at 16-19. Pursuant to a subsequent order, *see* Order of December 10, 2014 (ECF No. 179), on December 31, 2014, the parties submitted additional briefing regarding the effect of the *Scott* litigation. *See* SOS Mem. (ECF No. 184); DCFS/DHH Mem. (ECF No. 185); U.S. Mem.  (ECF No. 189).[6] Since that time, and pursuant to the scheduling orders of this Court, *see* Scheduling Order of Dec. 11, 2014 (ECF No. 180); Rev. Scheduling Order of April 14, 2015 (ECF No. 234); Order of Aug. 18, 2014 (ECF No. 271), the United

---

[5] The SOS has sought to raise the remote transactions issue again in this case, by way of his motion for partial summary judgment. *See* ECF No. 336. The United States will respond to that motion within the time frames set forth in the August 18, 2015, Scheduling Order (ECF No. 271). For now, the United States will simply note that the SOS's published administrative rules require voter registration agencies to offer voter registration services in connection with remote transactions, and DCFS's and DHH's policies likewise require the offering of voter registration services in connection with such transactions.

[6] Defendants also filed motions seeking leave to file motions to dismiss the United States' Complaint, which the United States opposed. *See* ECF Nos. 220, 297. The Court has not yet ruled on those motions, and in any event, Defendants have now filed dispositive motions to dismiss without leave of court, as permitted by the Scheduling Order. *See* ECF Nos. 336, 340, 341, 342. Accordingly, the United States agrees with Defendants that their pending motions for leave should now be denied or dismissed as moot.

States has engaged in extensive discovery in anticipation of filing its Motion for Summary Judgment.

**C.    *The National Voter Registration Act of 1993***

Congress enacted the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b). Congress found that the right to vote is a fundamental right; that federal, state, and local governments have a duty to promote exercise of that right; and that discriminatory and unfair registration laws and procedures can have a damaging effect on voter participation in federal elections and disproportionately harm voter participation by groups including the poor and persons with disabilities. *See id.* § 20501(a); *Harkless v. Brunner*, 545 F.3d 445, 449 (6th Cir. 2008).

Section 4(a) of the NVRA requires each state to establish, in addition to any other method adopted pursuant to state law, procedures for registering to vote in elections for federal office by applying to register to vote when applying for a motor vehicle driver's license, for applying by mail, and by applying in person at an office designated as a voter registration agency pursuant to Section 7 of the statute. 52 U.S.C. § 20503(a).

In defining such agencies, Section 7 requires each state to designate as voter registration agencies "all offices . . . that provide public assistance" and "all offices . . . that provide State-funded programs primarily engaged in providing services to persons with disabilities." *Id.* § 20506(a)(2). The statute likewise mandates that states designate as voter registration agencies additional offices not included within those two particular categories, as determined by the state. *See id.* § 20506(a)(3) (citing as possible examples, public libraries, public schools, and city or county clerks' offices, among others).

12

For each voter registration agency under Section 7, the state must ensure that the following services are made available:  (1) **distribution** of voter registration applications and voter registration declaration forms[7] to each individual who applies for, recertifies for, or submits a change of address relating to the services or assistance offered by that agency; (2) **assistance** to applicants in completing voter registration forms, unless such assistance is refused by the applicant; and (3) **acceptance** of completed voter registration forms for transmittal to the appropriate election official.  *Id.* § 20506(a)(4).  Additionally, if a voter registration agency offers services or assistance in addition to voter registration, and for which an application or eligibility determination process is required, the agency must offer applicants who do not decline to register to vote "the **same degree of assistance** with regard to the completion of the registration application form" as the office provides with completion of its own forms, unless the applicant refuses such assistance.  *Id.* § 20506(a)(6)(C) (emphasis added).

Section 10 of the NVRA requires each sate to designate a state officer or employee as the chief election official responsible for coordination of state responsibilities under the Act.  52 U.S.C. § 20509.  As noted above, in Louisiana, that official is the Secretary of State.  La. Rev. State §§ 18:18, 36:741.

## III.   STATEMENT OF FACTS

For its statement of facts, and pursuant to Fed. R. Civ. P. 56(c)(1) and M.D. La. L. Civ. R. 56, the United States incorporates herein its Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, which is being filed separately.

---

[7] The declaration form must specifically ask whether the applicant wishes to register to vote at the agency, if not already registered to vote at his or her current address, and provide checkboxes for the applicant's response, as well as other information relating to the voter registration services offered at the agency.  *Id.* § 20506(a)(6).

13

**IV.    SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  Under Rule 56(c) of the Federal Rules of Civil Procedure, a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . .  admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law") (internal quotation marks omitted); *In re Treaty Energy Corp.*, 619 F. App'x 443, 445 (5th Cir. 2015) ("Summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") (internal quotations omitted).

When deciding a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Ricci v. DeStefano*, 557 U.S. 557, 586, (2009) (citing *Scott v. Harris*, 550 U.S. 372, 380, (2007) and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).  Moreover, while the moving

14

party must demonstrate the absence of disputed material facts, it "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## V.     ARGUMENT AND CITATION OF AUTHORITY

Prior to the filing of this case and the *Scott v. Schedler* case in 2011, the State of Louisiana was failing at almost every turn to provide voter registration services and related assistance to Louisianans applying for public assistance and State-funded disabilities services, as required by Section 7 of the NVRA.  The *Scott* district court so ruled more than three years ago, finding Defendants liable with respect to the public assistance programs administered by DCFS and DHH, and with respect to the Secretary of State's inadequate coordination of Louisiana's responsibilities under the NVRA in that regard.  *Scott v. Schedler*, No. 2:11-cv-00926, ECF No. 436.  Defendants remain liable in this case for—and are precluded from contesting—their NVRA liability as adjudged by the *Scott* court.  *See infra* at 32–37.

In addition to the violations that the *Scott* court found, and having now had an opportunity of its own to conduct discovery in this case, the United States can support its undisputed evidence of record its claims that Defendants presently are failing and, at all times relevant to this Complaint, "have failed to provide voter registration opportunities as required by Section 7 of the NVRA," particularly as they relate to Louisiana's poorest and most vulnerable citizens.  *Cf.* Compl. ¶ 15.  In other words, the certifications that Defendants filed in the wake of the *Scott* decision, however well-intentioned or aspirational they may have been, simply were inaccurate and insufficient.  To be sure, the scope and nature of Defendants' NVRA noncompliance has changed somewhat over time—and it certainly is true that Defendants are,

generally speaking, more compliant with the NVRA today than they were in 2011.[8]  Defendants

have faced two federal lawsuits over their NVRA practices in the intervening time, with one of

them (*Scott*) already resulting in a finding of liability against them.  However, despite the two

lawsuits and several intervening years since Defendants were made aware of their non-

compliance, Defendants remain in violation of the NVRA.

        As the undisputed material facts demonstrate, and as argued in more detail below, the

United States is entitled to summary judgment as to liability against all Defendants and to

appropriate declaratory and injunctive relief from this Court "as is necessary to carry out [the

NVRA]."  52 U.S.C. § 20510(a).

        **A.**      ***The State and SOS have failed to designate the Commodity Supplemental Food Program as a voter registration agency.***

        The State of Louisiana and its Secretary of State have violated Section 7 of the NVRA by

failing to designate all public assistance offices and programs in the State as voter registration

agencies. The Commodity Supplemental Food Program, for instance, is a public assistance

program, administered at the federal level by the U.S. Department of Agriculture.  *See* U.S.

SUMF ¶ 32.  In Louisiana, the program is administered by a component of DHH, the Nutrition

Services Section of the Office of Public Health's Center for Community and Preventive Health.

*See* U.S. SUMF ¶ 33.  Despite the fact that the program provides public assistance to over 60,000

Louisianans each month, *see* U.S. SUMF ¶¶ 35-36, Defendants have not designated CSFP and its

offices as voter registration agencies; U.S. SUMF ¶ 39 (noting the failure of the SOS to include

the CSFP in his list of mandatory voter registration agencies).  This failure violates Section 7.

*See* 52 U.S.C. § 20506(a)(2).  Therefore, CSFP offices do not provide mandated voter

---

[8] Indeed, as noted below, for some of Defendants' public assistance and disabilities services programs, discovery did not reveal any further NVRA violations since the *Scott* district court's ruling in January 2013. Nevertheless, Defendants remain liable in this case for their pre-*Scott* noncompliance with the statute.

registration opportunities and assistance. *See supra* at 12–13 (discussing the obligation of voter registration agencies to distribute voter registration applications, assist applicants with completing voter registration forms, and transmit completed registration applications, among other responsibilities).

**B.      Defendants violate Section 7 by failing to distribute voter registration declaration forms and voter registration applications in connection with qualifying NVRA transactions.**

As noted above, Section 7(a)(6)(A)-(B) of the NVRA requires that voter registration agencies distribute voter registration application forms and voter registration declaration forms in connection with certain qualifying transactions. *See supra* at 13.  The distribution obligations apply "with *each*" of three NVRA-qualifying transactions: (1) applications for service or assistance; (2) recertifications and renewals for such service and assistance; and (3) changes of address relating to such service or assistance.  The undisputed facts show that Defendants are failing to comply with their distribution obligations in the following ways:

**1.      DCFS**

DCFS does not distribute voter registration applications with every application or renewal application for public assistance benefits.  The majority of public assistance applications (both initial and renewal) occur through the DCFS online application system known as CAFÉ. U.S. SUMF ¶¶ 117, 121.  However, CAFÉ does not include an integrated option for users to download and print a voter registration application; nor does it allow users to request that DCFS mail a voter registration application.  U.S. SUMF ¶ at 118.  Instead, CAFÉ routes users to a website maintained by the SOS where an individual can either register to vote through that website or print out a hardcopy voter registration application.  U.S. SUMF ¶ at 118.  The *Scott* district court specifically found that practice violates the NVRA.  *Scott*, 2013 WL 264603, *13. But despite the *Scott* court's ruling, and the SOS's expressed concerns about DCFS's practices,

17

DCFS continues to violate the NVRA by referring clients to the SOS's website rather than offering required voter registration services.  U.S. SUMF ¶¶ 118, 121.

Likewise, DCFS does not distribute voter registration applications every time a client changes their address with the agency.  CAFÉ is one of the options clients may use to report a change of address.  U.S. SUMF ¶ 121.  But CAFÉ merely routes users to a website maintained by the SOS, in violation of the NVRA.  U.S. SUMF ¶ 125.

In addition, DCFS does not distribute declaration forms and voter registration applications to every adult that applies for benefits using a hardcopy application.  While multiple adults are able to apply for services using a single application, DCFS does not include more than one copy of a declaration form and voter registration form with each benefits application.  U.S. SUMF ¶ 109.

### 2.    Medicaid

Prior to the initiation of this litigation and the *Scott* litigation, Medicaid applications and renewal forms did not contain the required voter registration forms, and Medicaid offered no voter registration services or assistance to clients and applicants who did not appear in person at a parish office or MAC.  U.S. SUMF ¶ 27.

Even as recently as August 2015, Medicaid was still failing to offer voter registration forms and declaration forms to all adult citizens who applied for Medicaid using the standard application form (BHSF Form 1-A); instead, Medicaid offered such forms only to the first-named applicant.  U.S. SUMF ¶¶ 28-29.  Medicaid acknowledges that other adult citizens applying on the same application would have to take the affirmative "extra step" of either requesting additional forms, making copies of the one form provided with the application, or going to the SOS's website, as Medicaid would not take any action to offer voter registration to such individuals.  U.S. SUMF ¶ 29.

18

Furthermore, the one set of voter registration application and declaration forms included with each Medicaid application essentially is obscured behind a wave of optional forms that most Medicaid applicants never need to complete.  U.S. SUMF ¶ 31.  Medicaid acknowledges that its placement of voter registration materials in that location, coupled with the instructions at the end of the 11-page main portion of the Medicaid application—which include the prompt, "Submit completed application"—could easily lead to applicants not even being aware that the voter registration application and declaration forms are available.  U.S. SUMF ¶ 31.  Indeed, Medicaid's own records reveal that the agency typically receives back from its applicants only a very low percentage (historically between 8-15%) of the declaration forms that it distributes.  U.S. SUMF ¶ 30.

### 3.     OCDD

Prior to April 11, 2013, OCDD failed to provide voter declaration forms, voter registration application forms, and related assistance with each initial application for the State-funded developmental disabilities services offered through its Early Steps program, in violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  U.S. SUMF ¶ 59.  Nor was OCDD distributing the required forms and offering assistance in connection with Early Steps qualifying renewal, recertification, and change-of-address transactions.  U.S. SUMF ¶ 59.

Furthermore, prior to February 2011, OCDD's Regional Offices were not consistently providing voter registration applications, voter registration declaration forms, and related assistance with each initial, renewal, or recertification application, or change-of-address transaction, in violation of 52 U.S.C. § 20506(a)(6)(A)-(B). U.S. SUMF ¶ 60.

### 4.     OBH

Prior to February 2011, OBH's Regional Offices were not consistently distributing voter declaration forms and voter registration applications with each initial, renewal, or recertification

19

application, or change-of-address transaction, for the State-funded behavioral health services offered through its Regional Offices, in violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  U.S. SUMF ¶ 67.

Furthermore, OBH currently does not offer declaration forms to all clients who request, by telephonic means, to change their address in connection with receiving OBH services, in violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  U.S. SUMF at ¶ 66.

**5.  LCD**

Prior to February 2011, LCD was not providing voter declaration forms, voter registration application forms, and related assistance with each initial, renewal, or recertification application, or change-of-address transaction, for the State-funded disabilities services provided through its Regional Service Centers, in violation of 52 U.S.C. Section 20506(a)(6)(A)-(B).  U.S. U.S. SUMF ¶ 50.

**6.  OAAS**

Prior to May 15, 2013, OAAS did not provide voter registration applications, voter declaration forms, or related assistance with each initial application for the State-funded disability services offered through its programs, in violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 45.  Nor was OAAS distributing the required forms and offering assistance in connection with qualifying renewal, recertification, and change-of-address transactions.  *See* U.S. SUMF ¶ 45.

**7.  LGEs**

Jefferson Parish Human Services Authority ("JPHSA") currently does not offer voter declaration forms, voter registration application forms, and related assistance to the parents or guardians of minor children or other incapacitated wards who apply, recertify, or renew for, or change their addresses in connection with, its State-funded behavioral health and disabilities

20

services, in violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  U.S. SUMF ¶ 94.  Because minors and

adults declared to be incompetent (referred to in Louisiana as "interdicted persons") are

incapable, under Louisiana law, of entering into any kind of agreements, it is the adult parent or

guardian (in Louisiana, the "curator") of the child or ward who actually is completing the

application that is entitled to the voter registration opportunities under Section 7 of the NVRA.

*See, e.g., Deville v. Fed. Sav. Bank*, 650 So. 2d 195, 197 (La. 1994) ("Unemancipated minors do

not have the capacity to contract."); *Florida v. Stokes*, 944 So. 2d 598, 603 (La. Ct. App. 2006)

("unemancipated minors, interdicts and persons deprived of reason at the time of contracting,

lack legal capacity to contract").

### 8. Disabilities Services Offices

Prior to April of 2013, many of the public colleges and universities that are part of the

University of Louisiana System ("ULS"), the Southern University System ("SUS"), and the

Louisiana State University System ("LSU") were not routinely providing voter registration

applications, voter declaration forms, and related assistance with each initial application for the

State-funded disabilities services offered through their disabilities services offices, in violation of

52 U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 149.  Nor were the disabilities services

offices at these institutions distributing the required forms and offering assistance in connection

with qualifying renewal, recertification, and change-of-address transactions.  *See* U.S. SUMF ¶

149.

Some DSOs at institutions within the ULS, SUS, and LSU systems waited even later than

the spring of 2013 to initiate or implement fully a voter registration program that complies with

the NVRA.  For example, as of at least November 2015, the School of Medicine at the Louisiana

State University Health Sciences Center in New Orleans ("LSUHSC-NO"), did not offer voter

registration applications, declaration forms, and related assistance to students submitting their

initial application for disabilities services.  *See* U.S. SUMF ¶ 151.  Nor was LSUHSC-NO

distributing the required forms and offering assistance in connection with qualifying renewal,

recertification, and change-of-address transactions.  *See* U.S. SUMF ¶ 151.

   As of December 2015, the DSOs at LSU-Baton Rouge and LSU-Alexandria did not

distribute voter registration applications, declaration forms, and related assistance with each

change-of-address transaction by students receiving disabilities services at their institutions, in

violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 153.

   As of December 2015, the DSO at Grambling State University did not routinely distribute

voter registration declaration forms to students applying for State-funded disabilities services, in

violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 155.  Nor did Grambling's DSO

require that a student seeking to change his or her address be offered an opportunity to register to

vote, also in violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 154.

   The institutions that comprise the Louisiana Community and Technical College System

have lagged even further behind with regard to their NVRA compliance.  For example, L.E.

Fletcher Technical Community College ("Fletcher") provided no NVRA related services at all

prior to August of 2013, in violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 160.

Fletcher did not begin offering voter registration with each renewal or recertification until the

spring of 2014, and even now, students receiving disabilities services at Fletcher are not offered

an opportunity to register to vote upon changing their address of record, also in violation of 52

U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 160.  Similarly, South Central Louisiana

Technical College did not begin any NVRA-related activities until March of 2015, again in

violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 157.  Likewise, Central

Louisiana Technical Community College ("Central") did not offer voter registration, voter

declaration forms, and related assistance with each qualifying transaction until at least the spring of 2015, again in violation of 52 U.S.C. § 20506(a)(6)(A)-(B).  *See* U.S. SUMF ¶ 158.

C. ***Defendants violate Section 7 by failing to offer "the same degree of assistance" in completing voter registration applications.***

Section 7 requires voter registration agencies to provide voter registration applicants with the "same degree of assistance" in completing registration forms as they provide in completing their own forms (unless the applicant does not want to be assisted). 52 U.S.C. § 20506(a)(6)(C). For example, if an agency reviews applications for benefits line-by-line to ensure that they are accurate, legible, and complete, Section 7 requires that it likewise review voter registration application forms line-by-line to ensure that they are accurate, legible, and complete, unless the applicant declines to register or refuses assistance.  Defendants violate that requirement.

1. **OAAS**

OAAS currently does not provide the same degree of assistance with completing voter registration forms as with completing its own applications for disabilities services, in violation of 52 U.S.C. § 20506(a)(6)(C).  *See* U.S. SUMF ¶ 46.  For example, when OAAS receives an incomplete voter registration or declaration form by mail, no one at the agency calls the participant to follow up regarding the missing information.  SUMF ¶ 46.  OAAS has no policy addressing incomplete voter registration forms, but simply transmits forms received in person and by mail to the Registrar of Voters.  SUMF ¶ 46.  In contrast, OAAS follows up on incomplete application forms for OAAS services, and OAAS staff receive training on how to gather the necessary information.  SUMF ¶ 46.

2. **LGEs**

At least two LGEs, MHSD and CAHSD, currently do not provide the same degree of assistance with completing voter registration forms as with completing their own applications for

behavioral health or developmental disabilities services, in violation of 52 U.S.C. §

20506(a)(6)(C).  U.S. SUMF ¶¶ 91-92.  For instance, MHSD has a policy and procedure of

helping applicants obtain its services, including behavioral health and developmental disabilities

services, "through every effort we can make."  U.S. SUMF ¶ 91.  Those efforts include assisting

applicants who have submitted incomplete applications for services with obtaining the missing

information.  U.S. SUMF ¶ 91.  By contrast, upon receiving an incomplete voter registration

application from an applicant or client, MHSD's practice is "to make a note of the fact that the

application is incomplete."  U.S. SUMF ¶ 91.  MHSD does not assist the client or applicant with

correcting the application.  U.S. SUMF ¶ 91.

      CAHSD likewise has a policy and procedure of assisting applicants who have submitted

an incomplete application for its services, both by notifying them that their application is

incomplete and by providing guidance for how to obtain the missing information.  U.S. SUMF ¶

92.  Upon receiving an incomplete voter declaration form or voter registration application from a

client or applicant appearing in person, by contrast, CAHSD's practice is to make a notation on

the form or application.  U.S. SUMF ¶ 92.

    **D.**    ***Defendants violate Section 7 by failing to accept completed voter registration***
        ***forms and transmit them properly to the appropriate election official.***

      Under Section 7 of the NVRA, in addition to distributing voter registration application

forms and assisting applicants with those forms, voter registration agencies must "accept[]

completed voter registration application forms for transmittal to the appropriate State election

official." 52 U.S.C. § 20506(a)(4)(A)(iii).  Critically, the statute requires that *each* voter

registration agency accept completed voter registration application forms, whether in person or

by remote means, and timely transmit them to the appropriate election official—in Louisiana, the

local registrar of voters.  A voter registration agency may not simply direct an applicant to

another state agency that accepts completed voter registration application forms and, in doing so, shed one of its core NVRA responsibilities.

      **1.**    **DCFS**

DCFS has failed to accept and transmit all completed voter registration applications it receives to the appropriate registrar of voters.  First, as discussed *supra* at 17, for the more than 90% of DCFS's public assistance applicants and clients who use the CAFÉ system, DCFS simply ignores its acceptance and transmittal duties almost entirely by solely providing a link to the SOS's online voter registration portal, which is a different mode of voter registration altogether.

Additionally, for the other 10% of applicants and clients who send in paper materials to DCFS, the evidence shows that throughout 2013, 2014, and as recently as 2015, the SOS and registrars reported to DCFS that registrars were receiving photocopied voter registration applications from the DCFS document processing center.  U.S. SUMF ¶ 131.  Because, under current Louisiana law, registrars can only accept original applications in paper form, the photocopied applications submitted by DCFS's contractors did not result in valid voter registrations.  U.S. SUMF ¶ 131.

DCFS also continues to hold voter registration applications it receives longer than the 10 or five day deadlines mandated by the NVRA; in some cases, applications have been held as long as six months.  U.S. SUMF ¶ 132; *see e.g.* 52 U.S.C. 20506(d).  In addition, DCFS still fails to ensure that all completed voter registration applications transmitted to registrars of voters are properly marked as originating from a public assistance agency.  U.S. SUMF ¶ 132.

      **2.**    **DHH**

DHH likewise has failed to properly transmit completed voter registration applications to registrars of voters from 2013 through 2015.  The Terrebonne Parish Registrar of Voters, in

particular, has noted that several DHH components—including the Terrebonne Mental Health Department (OBH) and the LaCHIP Processing Office (Medicaid)—have sent in either photocopied voter registration applications without original signatures or have sent voter registration applications to an incorrect address.  U.S. SUMF ¶ 67A.  The SOS noted as recently as June 2015 that registrars continued to receive photocopies of completed voter registration applications from public assistance and disabilities services offices, and that further training would need to emphasize that only original, signed, and completed applications should be transmitted.  U.S. SUMF ¶ 67A.

> **E.      DHH is liable for any failures by LGEs to comply with the NVRA.**

The state legislature, pursuant to Article VI, § 19 of the Louisiana State Constitution, established human services districts and authorities (also called "Local Governing Entities" or "LGEs") to provide for local accountability and management of State-funded behavioral health and developmental disabilities services, and granted to DHH the power to contract with LGEs for the provision of such services.  *See* La. Rev. Stat. §§ 28-904, 919.  U.S. SUMF ¶ 68.  The practical effect of this enactment has been to transfer to the LGEs, in large part, the delivery of DHH's behavioral health and developmental disabilities services, which DHH previously provided through the Regional Offices of its Office for Citizens with Developmental Disabilities ("OCDD") and Office of Behavioral Health ("OBH").  U.S. SUMF ¶ 69.  DHH has argued that, because these LGEs are "statutorily created separate and distinct juridical entities" with the power to sue and be sued, DHH is "neither capable of mandating LGE compliance with the NVRA . . . [or] responsible for their compliance with, and implementation of, the NVRA." DHH/DCFS Resp. Re: Effects of *Scott v. Schedler* at 9 (ECF No. 191); DHH Supp. Resp. to USA 1st Interr. at 2 (attached as Ex. 31); *see Scott*, No. 2:11-cv-926 (E.D. La.) (ECF Nos. 464) (failing to certify whether the LGEs were in compliance with the NVRA as March 14, 2013).

That argument is inconsistent with the NVRA, applicable state law, and DHH's contractual obligations to the LGEs.

DHH, through OBH and OCDD, provides "State-funded programs primarily engaged in providing services to persons with disabilities" and, therefore, is a "voter registration agency" subject to Section 7. U.S. SUMF ¶¶ 51, 58, 61, 65. Separate and apart from its responsibilities under state law and its current contracts with the LGEs, DHH cannot evade Section 7's requirements by delegating to local entities the task of delivering its State-funded behavioral health and developmental disabilities services. Courts have rejected similar such attempts by other states. *United States v. New York*, 255 F. Supp. 2d 73, 78 (E.D.N.Y. 2003) ("It would be plainly unreasonable to permit a mandatory designated agency to shed its NVRA responsibilities because it has chosen to delegate the rendering of its services to local municipal agencies."); *Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008) (rejecting arguments by Ohio state officials that they were not responsible for NVRA implementation because they had delegated their duties to local officials).

Furthermore, the fact that LGEs have become the primary points of entry for DHH's behavioral health and developmental disabilities services does not relieve DHH of its powers and duties under state law. As the party that is ultimately responsible for "policy, development, implementation, and monitoring of the statewide human services system" and for issuing sanctions for noncompliance with the contracts, La. Rev. Stat. § 28-919, DHH has the authority to mandate the LGEs' compliance with the NVRA and, moreover, is required to do so. U.S. SUMF ¶ 69, 77-80. The responsibility to "implement[] . . . and monitor[] . . . the statewide human services system" encompasses ensuring that LGEs are complying with applicable state and federal law, which includes the NVRA. *Id.* In fact, DHH actively monitors the LGEs'

**Deleted:** U.S. SUMF ¶ 69.

compliance with state and federal law, including federal anti-discrimination law, in connection with its annual Accountability and Implementation Plan ("AIP") reviews.  U.S. SUMF ¶¶ 81-83. DHH cannot plausibly maintain that it is capable of, and responsible for, ensuring the LGEs' compliance with some applicable federal laws, but not others.

DHH's current contracts with the LGEs only reinforce its duty to ensure that they are complying with the NVRA.  In a section titled "Ongoing Responsibilities of the DHH," the contracts, which DHH drafted with input from the LGEs, provide that "DHH shall monitor this Contract and conduct compliance monitoring consistent with . . . all applicable statutes, rules, and regulations."  U.S. SUMF ¶ 77.  DHH does not dispute that the NVRA is "an applicable statute[]" with which the LGEs must comply, *see* DHH/DCFS Resp. Re: Effects of *Scott v. Schedler* at 9 (ECF No. 191), but nevertheless denies having any responsibility for conducting "compliance monitoring consistent" with the statute, *see supra* at 26.  DHH's position ignores the plain meaning of this provision, which, as several LGEs have acknowledged, is to require DHH to monitor their compliance with applicable state and federal law, specifically including the NVRA.  *See* U.S. SUMF ¶ 78.  Consistent with this reading and as noted above, DHH has implemented procedures—namely, through its annual AIP reviews—to ensure the LGEs' compliance with other applicable statutes.  U.S. SUMF ¶¶ 81-83.  Nothing prevents it from developing similar procedures specifically relating to NVRA compliance.  By refusing to do so, DHH has shirked its obligations under the NVRA, as well as its responsibility to "implement[] . . .and monitor[] . . . the statewide human services system" under Louisiana law, La. Rev. Stat. § 28-919.  Accordingly, DHH is liable, along with the SOS and the LGEs themselves, for any failures by the LGEs to comply with the requirements of the NVRA.

**F.**     ***The Secretary of State is failing to coordinate Louisiana's responsibilities under the NVRA in a manner that ensures statewide compliance with the Act.***

To the extent that the provisions of Section 10 of the NVRA were ever unclear as to whether the chief state election official's coordination responsibilities included the necessary enforcement authority to ensure statewide compliance with the NVRA, that issue was resolved conclusively by the Fifth Circuit in its published decision in *Scott v. Schedler.  See Scott*, 771 F.3d at 838-39 (holding that "coordination" under Section 10 of the NVRA "includes enforcement power," such that "the chief election official's role must be ongoing" in ensuring statewide NVRA compliance).  Nevertheless the SOS continues to disavow his authority and responsibility to ensure statewide compliance with the NVRA, even after the Governor issued an executive order in July 2015 affirming and clarifying the Secretary's authority.  U.S. SUMF ¶¶ 166-170.

The SOS's position regarding his responsibility to ensure compliance with the NVRA also influences his failure to coordinate Louisiana's responsibilities under the statute—even as this litigation is pending against the State on these very matters.  For example, even though the SOS promulgated a full set of administrative rules relating to mandatory voter registration agencies in an effort to satisfy the requirements of the *Scott* district court's injunction, the SOS never believed those rules to be enforceable, and the SOS willingly allowed DCFS and DHH to flout those rules for more than two years because those agencies repeatedly questioned the SOS's authority to issue the rules.[9]  U.S. SUMF ¶¶ 168-169.  During that time period, the SOS did not

---

[9] Pursuant to this Court's request, the United States reviewed the SOS's administrative rules and preliminarily determined (without waiving any of its current or future claims) that they "appear[ed] to be *largely* NVRA-compliant, in that the policies would, *if correctly followed*, likely provide that voter registration forms and declaration/preference forms are distributed to each applicant and client of a voter registration agency during each application, recertification, and change of address, regardless of whether they qualifying transaction occurs in-person or via remote means (*e.g.,* via internet, by mail, or by telephone).  The policies likewise indicate that agencies are required to offer the same degree of assistance in completing the voter registration forms as is provided in

(Cont'd…)

seek any relief from the Governor to quell any inter-agency disputes relating to the SOS's authority under the NVRA.  U.S. SUMF ¶¶ 168-169.  The former Governor ultimately issued an executive order in July 2015, in an attempt to quell the inter-agency disputes.  U.S. SUMF ¶ 170.

The undisputed evidence of record in this case demonstrates that the SOS has failed to adequately coordinate Louisiana's responsibilities under the NVRA in at least the following ways:

The SOS has failed to identify and designate as voter registration agencies "all offices in the State that provide public assistance," *cf.* 52 U.S.C. § 20506(a)(2)(A).  To this day—more than four years after the initiation of this lawsuit—the SOS has not yet designated the Commodity Supplemental Food Program, administered by DHH, as a voter registration agency.  U.S. SUMF ¶¶ 32-39.

Prior to October 2012, the SOS did not even have a procedure in place to ensure adequate training and monitoring of the state's voter registration agencies and contractors.  U.S. SUMF ¶¶ 163-165.

Even after promulgating administrative rules requiring the appointment of NVRA Department Coordinators, the SOS has not ensured that such coordinators are appointed at the four public college and university systems whose member institutions provide State-funded disabilities services to their students.  U.S. SUMF ¶ 172.  Having a Department coordinator for each of the four university systems would likely help to ensure uniformity of implementation of

---

completing the agency's own application forms, and that agencies must accept and transmit completed voter registration forms to the appropriate registrar of voters for the parish where the applicant resides. Furthermore, the policies mandate that agency employees and agents be regularly trained in NVRA compliance, and that failure to adhere to such training and/or to follow the NVRA policies could result in disciplinary action, including termination." *See* ECF No. 174 at 16-17 (emphasis added).  Unfortunately, as the evidence shows, the SOS's administrative rules have not been followed correctly and therefore have not been effective in ensuring that the State adheres to its responsibilities under Section 7 of the NVRA.

NVRA responsibilities across all member institutions.  In contrast, without the required NVRA Department coordinators, the level of compliance at member institutions within the same university system currently varies widely.

Even after promulgating administrative rules requiring the appointment of NVRA Site Coordinators at each physical location where voter registration is supposed to be offered pursuant to Section 7, the SOS has not ensured that such coordinators are appointed at each of the more than 600 DHH-certified MACs, or at each of the more than 200 DCFS-certified gold- and silver-level community partners.  U.S. SUMF ¶¶ 173-174.  Also, the SOS has failed or refused to give clear guidance to other state agencies as to the general responsibilities of site coordinators (*e.g.*, whether periodic visits to and auditing of particular sites is advisable or required).  U.S. SUMF ¶ 175.

Even after promulgating administrative rules requiring annual training for all individuals (including employees and contractors) who have NVRA responsibilities, the SOS has not ensured that MAC employees and representatives, DCFS community partner employees and representatives, and LGE employees and representatives are annually trained.  U.S. SUMF ¶¶ 16, 173, 178-181.  Under the SOS's rules, the annual trainings are to be conducted either by the SOS or by the applicable NVRA Department Coordinator.  U.S. SUMF ¶ 177.  However, while the SOS's NVRA Coordinator has conducted trainings, she has no adequate system for keeping track of whom she has trained and when or whether she has trained them.  U.S. SUMF ¶ 177.  Additionally, the SOS has not reviewed any of the training materials covering the NVRA from the particular agencies designated under Section 7.  U.S. SUMF ¶ 177.  Because the SOS has no reliable system for ensuring that the annual trainings of NVRA personnel required by the rules

are actually occurring, and because some contractors are only trained once, if at all, the SOS is not properly coordinating his responsibilities to ensure NVRA compliance statewide.

Even after promulgating administrative rules requiring the SOS to maintain and update a list of each physical location where voter registration is to be conducted pursuant to Section 7 of the NVRA, the SOS did not begin to compile such a list until 2014, and that list remains incomplete and infrequently updated.  U.S. SUMF ¶ 176.

The SOS has given advice to voter registration agencies that is directly in conflict with the NVRA, such as when he advised DCFS and DHH that they had no duty to review the voter registration applications received by their agencies for accuracy, legibility, and completeness, even when they have detailed procedures for doing so in connection with processing their own agency applications for benefits and services.  U.S. SUMF ¶ 182.

G.    *Defendants remain liable in this case for their violations of Section 7 of the NVRA prior to the* **Scott** *Judgment.*

The SOS, DCFS, and DHH previously have asserted that as a result of the *Scott* litigation, they should be dismissed from this case.  ECF Nos. 174, 220, 297.  That position is wholly without merit; the Fifth Circuit has long held that the United States' unique enforcement interests cannot be extinguished by private litigation.  *See infra* at 35–37; *see also* USA Mem. Opp. Mot. Leave to File, ECF Nos. 230, 309).  Moreover, for the reasons explained below, the district court's findings in *Scott* actually compel the entry of summary judgment against Defendants in this case for its violations of the NVRA occurring prior to the entry of the *Scott* judgment.  The United States' own evidence of Defendants' conduct during that timeframe further bolsters that liability finding.  Finally, this Court is permitted to take Defendants' pre-*Scott* liability into account (along with the post-*Scott* non-compliance discussed in this Memorandum) when fashioning an appropriate declaratory and injunctive remedy in this case.

### 1.   Defendants are estopped from contesting liability as to public assistance programs occurring prior to the entry of the *Scott* judgment.

The issue of whether DCFS and DHH's public assistance programs were in compliance with the mandates of the NVRA prior to April 2011 has been fully and fairly litigated in the *Scott* case.  The *Scott* district court made explicit findings that DHH and DCFS had violated their obligations under Section 7 in connection with their administration of public assistance programs.  *See supra* at 7–9.  This Court therefore should exercise its broad equitable discretion and, consistent with the well-established principles guiding the application of offensive collateral estoppel, bar DHH and DCFS from contesting the *Scott* district court's findings of NVRA non-compliance.[10]  *See Nations v. Sun Oil Co.*, 705 F.2d 742, 744-45 (5th Cir. 1983) ("Collateral estoppel is an equitable doctrine . . . .  The discretion vested in trial courts to determine when it should be applied is broad.").  Application of "offensive" collateral estoppel in this case—under which "a plaintiff [] seek[s] to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff," *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979)—will serve the doctrine's intended purpose of promoting judicial economy and preventing needless discovery and litigation regarding already-decided issues.[11]  *Id.* at 326.

The *Scott* district court's liability findings against DHH and DCFS, as previously outlined, meet each of the four conditions that the Fifth Circuit has identified regarding when a

---

[10] Both the SOS as well as DHH and DCFS argue an opposite point in their recently filed motion to dismiss, contending that the United States is precluded from maintaining this action in light of the *Scott* ruling.  *See* Mem. Supp. SOS's Mot. Dismiss Lack of Subject Matter Jurisdiction at 2-4 (ECF No. 342-15); Supplemental Mem. Supp. Mot. Dismiss Based on Res Judicata, Collateral Estoppel or Mootness at 3-4 (ECF No. 340-1). The United States will address those arguments fully when it files its responses to Defendants' motions.

[11] Precisely in recognition of these judicial economy principles, and in light of the findings and injunctions already entered by the *Scott* court as to Defendants' public assistance programs and the SOS's NVRA coordination activities prior to 2013, the United States focused the bulk of its discovery efforts with respect to public assistance programs on post-*Scott* conduct, so as to avoid duplicative and unnecessary discovery.

party may be barred from relitigating an issue previously decided by another court of competent jurisdiction.  Those conditions are that "(1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine."  *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995).

With respect to the first requirement, the core causes of action in this case and the *Scott* case involve Defendants' alleged failures to comply with their duties under Section 7.  As to the second factor, there is no question that the status of DHH and DCFS's non-compliance with the NVRA as of April 2011 (when the *Scott* case was filed), with respect to their public assistance programs, was fully and vigorously litigated in the *Scott* case.  The parties in *Scott* took extensive written and document discovery and more than 20 depositions.  The *Scott* trial court's findings regarding non-compliance were made on the basis of a full record, which was supported by more than five hundred trial exhibits submitted by all parties, and extensive briefing of proposed findings of fact and conclusions of law.

The third pre-condition for estoppel against Defendants is likewise met:  the issues as to which estoppel is to be applied were necessary to support the judgment entered.  *Copeland*, 47 F.3d at 1423.  Each of the specific non-compliance findings as to which estoppel is warranted was specifically given by the *Scott* district court as an example of and basis for its overall findings that DHH and DCFS had violated the NVRA.  Accordingly, these non-compliance findings were, on the face of the *Scott* court's post-trial opinion, a "critical and necessary part" of the judgment ultimately entered.  *Id.*

Finally, with respect to the fourth pre-condition, there is no special circumstance that would make it unfair to apply collateral estoppel.  Given the pendency of this case during nearly the entirety of the *Scott* litigation, the SOS, DHH, and DCFS were on full notice that the findings in *Scott* would impact this litigation.

> **2.    The United States' evidence likewise demonstrates pre-*Scott* noncompliance, both as to public assistance and disabilities services programs.**

Information developed in discovery in this case revealed that prior to 2013, most of Louisiana's State-funded disabilities services offices in colleges and universities did not offer their clients the opportunity to register to vote with every application, recertification or renewal, and change of address.  U.S. SUMF ¶¶ 148-160.  As noted above, DHH component programs, particularly those responsible for administering disabilities services, were not routinely offering the voter registration opportunities and assistance that Section 7 requires.  *See, e.g.*, *supra* at 19–20; *see generally* DHH Supp. Resp. to U.S. Req. for Admis. (attached as Ex. 29) (admitting pre-*Scott* non-compliance on the part of LCD, OCDD, OBH, and OAAS).  Finally, the United States has gathered its own evidence indicating that the Louisiana Secretary of State did nothing more than provide sporadic training to officials at voter registration agencies regarding their duties under Section 7.  U.S. SUMF ¶¶ 164-65.

> **3.    The Court may properly consider any additional remedial relief that is appropriate to address the past and present effects of pre-*Scott* noncompliance, irrespective of the *Scott* judgment.**

The United States Attorney General's independent authority and interest in enforcement of the NVRA means that the United States cannot be barred from litigating this case as a result of prior litigation brought by private plaintiffs.  *See Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 692 (7th Cir. 1986) (*en banc*) ("The Government is not barred by the doctrine of *res judicata* from maintaining independent actions asking courts to enforce federal statutes implicating both

public and private interests merely because independent private litigation has also been commenced or concluded."). In enacting the NVRA, Congress gave the Attorney General broad authority to enforce the statute. *See* 52 U.S.C. § 20510(a). That nationwide enforcement authority gives the United States distinct interests in the vigorous and uniform enforcement of the NVRA's requirements. Indeed, the Fifth Circuit has refused to apply principles of *res judicata* and collateral estoppel against the United States following private litigation specifically because "the United States has an interest in enforcing federal law that is independent of any claims of private citizens." *United States v. East Baton Rouge Parish Sch. Bd.*, 594 F.2d 56, 58-59 (5th Cir. 1979); *see also Donovan v. Cunningham*, 716 F.2d 1455, 1462 (5th Cir. 1983) (citing cases recognizing that a Federal government plaintiff is not precluded from "vindicat[ing] a public interest that is broader than the interests" of prior private plaintiffs). Given the United States' independent statutory enforcement authority, neither the successes nor the failures of the private litigants in *Scott* can bar the United States from proceeding here. *Fitzsimmons*, 805 F.2d at 692; *East Baton Rouge Parish Sch. Bd.*, 594 F.2d at 59 (citing *City of Richmond v. United States*, 422 U.S. 358 (1975)); *Sam Fox Pub. Co. v. United States*, 366 U.S. 683 (1961).

Because the *Scott* litigation cannot constrain the United States' ability to prosecute its own independent action against Louisiana for its violations of the NVRA, and because the United States' Complaint encompasses Defendants' continuing violations of the NVRA dating back prior to the filing of the Complaint and continuing to the present, *see* Order of Dec. 1, 2011 at 4 (finding that the United States' Complaint alleges "continuous violation by the State" of the NVRA), this Court must independently consider the *entire* record in this case (including any pre-*Scott* conduct of Defendants) to determine whether the United States is entitled to a liability

judgment and, if so, to determine the appropriate declaratory and injunctive relief that "is necessary to carry out [the NVRA]."

> **H.**   *A declaratory and injunctive remedy is appropriate to redress Defendants' years-long noncompliance with the NVRA and to ensure future compliance.*

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15 (1971).  At the same time, the remedy should also be tailored to the nature of the violation.  Appropriate relief for violations of civil rights statutes must be determined on a case-by-case basis and "aimed toward the twin goals of ensuring no future violations . . . occur and removing any lingering effects of" the past violations.  *United States v. Jamestown Center-in-the-Grove Apartments*, 557 F. 2d 1079, 1080 (5th Cir. 1977) (remanding to district court for entry of stronger remedy in a fair housing case where district court initially merely had enjoined defendant against future noncompliance with the statute and ordered a period of government monitoring and inspection).

The NVRA explicitly provides for the use of declaratory and injunctive relief to effectuate its requirements.  52 U.S.C. § 20510(a).  The Fifth Circuit has long acknowledged that when a statute invokes injunctive relief as a remedial tool, it "contemplates that the full and elastic resources of the traditional court of equity will be available to vindicate the fundamental constitutional rights sought to be secured by the statute."  *Alabama v. United States*, 304 F.2d 583, 590 (5th Cir.) *aff'd,* 371 U.S. 37 (1962); *see also Jamestown Center-in-the-Grove*, 557 F.2d at 1080.

The United States is seeking different and more tailored declaratory and injunctive relief than what the *Scott* court granted to the private plaintiffs in that case—precisely because, as the uncontroverted evidence in this case shows, the *Scott* court's remedial order was not sufficient to

prevent Louisiana's continued noncompliance with the NVRA or to remove the lingering impact of Louisiana's longtime noncompliance with the NVRA prior to the initiation of this action and the *Scott* case.  Thus, in fashioning an appropriate and effective injunctive remedy, this Court must take into account the *entirety* of Defendants' established NVRA violations over the period of time covered by the United States' Complaint.  *See New Orleans S.S. Ass'n v. EEOC*, 680 F.2d 23, 25 (5th Cir. 1982) ("[T]he EEOC may challenge a transaction which was the subject of prior judicial scrutiny in a private suit, if the subsequent challenge seeks different relief.").

Louisiana has the third-highest poverty rate in the nation.  Tim Henderson, *Poverty Rate Drops in 34 States, DC* (Sep. 18, 2015) (interactive map showing state-by-state poverty rates), available at http://bit.ly/1SWB0Xn (last visited Feb. 2, 2016).  Roughly 30% of Louisiana's total population currently receives Medicaid—only one of many available public assistance programs in Louisiana.  U.S. SUMF ¶¶ 6-7.  Similarly, hundreds of thousands of Louisianans receive and qualify for State-funded disabilities services through a number of programs administered by DHH and other state agencies.  U.S. SUMF ¶ 35, 41, 52, 98-101.  Section 7 of the NVRA must be implemented fully in Louisiana to provide effective voter registration assistance to the state's disadvantaged populations, as Congress intended.

Three years after the *Scott* injunction, it is clear that simply requiring Defendants to certify generic compliance with the NVRA, without imposing any mechanism for monitoring how such compliance is achieved and without specifying the particular actions that Defendants must take to remedy those violations, is insufficient.  The United States believes that specific declaratory and injunctive relief tailored to the violations detailed above, as well as period of reporting of NVRA implementation activity by Defendants, to allow for monitoring of the status of NVRA compliance, is necessary to provide full relief in this case.  At this point, the United

**Deleted:** U.S. SUMF ¶ XX.

**Deleted:** ¶ XX

**Deleted:** XX

38

States is seeking simply a liability determination from the Court.  Once the Court reaches its

determinations on liability, the United States requests that the Court allow the parties an

opportunity to submit further briefing on an appropriate remedy.

**VI.    CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court enter

summary judgment as to liability against all Defendants.

Respectfully submitted this 2nd day of February, 2016.

| | Deleted: 1st |
|---|---|

J. WALTER GREEN
United States Attorney
Middle District of Louisiana

**s/ John J. Gaupp**
JOHN J. GAUPP, LBN 14976
Assistant United States Attorney
(Local Counsel)
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
E-mail: john.gaupp@usdoj.gov

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

**s/ Bradley E. Heard**
T. CHRISTIAN HERREN, JR.
MEREDITH BELL-PLATTS
BRADLEY E. HEARD, Trial Attorney
JANIE ALLISON ("JAYE") SITTON
J. ERIC RICH
PATRICK M. HOLKINS
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 305-4196
Fax: (202) 307-3961
E-mail: Bradley.Heard@usdoj.gov

**CERTIFICATE OF SERVICE**

This certifies that I have this day filed the within and foregoing **United States'**

**Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment**

electronically using the CM/ECF system, which automatically sends notice and a copy of the

filing to all counsel of record through the Court's electronic filing system.

This 2nd day of February, 2016.

| | Deleted: 1st |

                              **s/ Bradley E. Heard**
                              BRADLEY E. HEARD
                              Civil Rights Division
                              U.S. Department of Justice
                              Voting Section - NWB
                              950 Pennsylvania Avenue, N.W.
                              Washington, D.C. 20530
                              Telephone:    (202) 305-4196
                              Facsimile:     (202) 307-3961
                              E-mail: Bradley.Heard@usdoj.gov