UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 3:11-cv-00470-JWD-RLB |
| v. | |
| STATE OF LOUISIANA; J. THOMAS SCHEDLER; LOUISIANA DEPARTMENT OF HEALTH AND HOSPITAL; BRUCE D. GREENSTEIN; LOUISIANA DEPARTMENT OF CHILDREN AND FAMILY SERVICES; and RUTH JOHNSON, | |
| Defendants. | |

**ORDER AND RULING ON THE MOTIONS TO DISMISS FILED BY DEFENDANTS AND THE MOTIONS FOR SUMMARY JUDGMENT FILED BY THE SECRETARY OF STATE AND THE UNITED STATES OF AMERICA**

## I.      INTRODUCTION

As his second term neared its end, Thomas Jefferson wrote: "[T]hat government . . . [is] the strongest of which every man feels himself a part."[1] Long after the franchise had expanded to

---

[1] National Archives, Jefferson Papers (Mar. 28, 2016), http://founders.archives.gov/documents/Jefferson/99-01-02-5005. Other founders shared this

more than the free men envisioned by this president and determined to realize its duty to promote

the exercise of this most fundamental right, the United States Congress passed and the President

signed the National Voter Registration Act of 1993[2] ("NVRA," "National Voter Registration

Act," or "Act"),[3] described by the latter as this nation's "newest civil rights law," MICHAEL

WALDMAN, THE FIGHT TO VOTE 170 (2016).

---

view. For example, in defending the United States Constitution ("Constitution"), "Publius"
wrote:

> The definition of the right of suffrage is very justly regarded as a fundamental
> article of republican government. It was incumbent on the convention, therefore,
> to define and establish this right in the Constitution. To have left it open for the
> occasional regulation of the Congress, would have been improper for the reason
> just mentioned. To have submitted it to the legislative discretion of the States,
> would have been improper for the same reason; and for the additional reason that
> it would have rendered [it] too dependent on the State governments . . . .

THE FEDERALIST NO. 52, at 354 (Jacob E. Cooke ed., 1961); *see also* 2 THE RECORDS OF THE
CONSTITUTIONAL CONVENTION OF 1787, at 240 (Max Farrand ed. 1966).

[2] In this ruling and order ("Ruling"), the specific provisions of the Act, set forth in 52 U.S.C. §§
20501–20511 inclusive (formerly 42 U.S.C. §§ 1973gg–1973gg-10), are referred to in this order
and ruling as "Section _" or "§ _" unless otherwise noted.

[3] On September 1, 2014, the NVRA provisions and all U.S. Code provisions relating to voter
registration and elections were transferred to Title 52. No substantive changes were made
through this recodification, and the sections' colloquial titles, which derive from the public bill,
were left unchanged. For helpful reference, the new relevant provisions of the NVRA were
recodified as follows:

| Original Codification | Colloquial Name | Post-September 1, 2014 Codification |
|---|---|---|
| 42 U.S.C. § 1973gg | Section 2 | 52 U.S.C. § 20501 |
| 42 U.S.C. § 1973gg-1 | Section 3 | 52 U.S.C. § 20502 |
| 42 U.S.C. § 1973gg-2 | Section 4 | 52 U.S.C. § 20503 |
| 42 U.S.C. § 1973gg-3 | Section 5 | 52 U.S.C. § 20504 |
| 42 U.S.C. § 1973gg-4 | Section 6 | 52 U.S.C. § 20505 |
| 42 U.S.C. § 1973gg-5 | Section 7 | 52 U.S.C. § 20506 |

On April 19, 2011, pursuant to Section 1983 of the United State Code's forty-second (42) title[4] and as permitted by this law's ninth section, Messrs. Roy Ferrand ("Ferrand")[5] and Luther Scott, Jr. ("Scott") and the Louisiana State Conference of the National Association for the Advancement of Colored People ("NAACP") (collectively, "*Scott* Plaintiffs") sued the Defendants[6] for purported violations of the NVRA in the United States District Court for the Eastern District of Louisiana, their case captioned *Scott v. Schedler*, No. 2:11-cv-00926-JTM-JCW ("*Scott* Matter").[7] In the *Scott* Matter, after multiple hearings and a lengthy trial, the district

| | | |
|---|---|---|
| 42 U.S.C. § 1973gg-6 | Section 8 | 52 U.S.C. § 20507 |
| 42 U.S.C. § 1973gg-7 | Section 9 | 52 U.S.C. § 20508 |
| 42 U.S.C. § 1973gg-8 | Section 10 | 52 U.S.C. § 20509 |
| 42 U.S.C. § 1973gg-9 | Section 11 | 52 U.S.C. § 20510 |
| 42 U.S.C. § 1973gg-10 | Section 12 | 52 U.S.C. § 20511 |

*See also True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 699 n.1 (S.D. Miss. 2014). As many filings in this matter predate this codification, the Parties' citations do not always reflect the relevant provision's present location. Throughout this Ruling, this Court will employ the present codification or, so as to avoid mind-numbing repetition, the various sections' colloquial names.

[4] Section 1983 allows a private party to sue any person who "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. It is considered "the primary statute to bring constitutional claims against local governments and officials." *Sipp v. Giroir*, Civ. No. 13-360, 2015 U.S. Dist. LEXIS 36919, at *10, 2015 WL 1321588, at *4 (E.D. La. Mar. 24, 2015).

[5] Mr. Ferrand subsequently withdrew as a plaintiff. (Doc. 126, No. 2:11-cv-00926-JTM-JCW.)

[6] As explained further below, *see infra* Part II.A, two changes have occurred within the cast of Defendants. First, Louisiana ("LA," "Louisiana," or "State") has now been added. Second, the various agencies' administrative heads have since changed. (*Compare* Doc. 1, No. 11-cv-00470-JWD-RLB, *with* Doc. 1, No. 11-cv-00926-JTM-JCW.)

[7] In this Ruling, citations to documents filed in the *Scott* Matter will include this case number, and case numbers will only be appended to citations to documents filed in other matters' dockets.

court ("*Scott* Court") entered a permanent injunction against Defendants on January 22, 2013

("First Injunction"). After the United States Court of Appeals for the Fifth Circuit reversed this

order in part, the *Scott* Court issued an amended injunction on July 10, 2015 ("Amended

Injunction"). On June 15, 2016, the Amended Injunction, appealed by Schedler, was vacated for

its lack of specificity under Federal Rule of Civil Procedure 65(d),[8] the *Scott* Court's underlying

factual findings still intact.

Based on this same law and many of the same circumstances, this case began on July 12,

2011, with the filing of the Complaint by the United States of America ("US," "United States,"

"Government," or "Plaintiff") pursuant to § 20510(a). At present, four issues must be resolved

by this Court: (1) the relevance of the *Scott* Matter, including the Fifth Circuit's partial

affirmation; (2) the NVRA's reach over transactions at voter registration agencies ("VRAs") that

take place by phone, email, or online ("remote transactions"); (3) the minimal legal standard for

compliance with this voting rights statute; and (4) whether the Defendants have run afoul of the

NVRA and, if so, which remedy is most appropriate based on the evidence so far uncovered. In

other words, jurisdictional and statutory questions have been squarely presented, even as many

facts remain disputed.

Defendants and Plaintiff (collectively, "Parties") have filed the six dispositive motions

now before this Court: (1) the Motion for Partial Summary Judgment ("Schedler's MSJ"), (Doc.

336), filed by J. Thomas Schedler, the Louisiana Secretary of State and a defendant ("Schedler"

or "SOS"); (2) the Motion to Dismiss Based on Res Judicata, Collateral Estoppel or Mootness

---

In contrast, citations to documents filed in this proceeding will not include those identifying
digits.

[8] In this Ruling, any reference to "Rule" or "Rules" is to one or more of the Federal Rules of
Civil Procedure unless otherwise noted.

("DCFS' MTD), (Doc. 340), tendered by two defendants, the Louisiana Department of Children and Family Services ("DCFS") and the Louisiana Department of Health and Hospitals ("DHH");[9] (3) the Motion to Dismiss Pursuant to Rule 12(b)(1) ("LA's First MTD"), (Doc. 341), submitted by LA; (4) the Motion to Dismiss by Secretary of State for Lack of Subject Matter Jurisdiction ("Schedler's MTD"), (Doc. 342); (5) LA's Motion to Dismiss Pursuant to Rule 12(c) ("LA's Second MTD"), (Doc. 345), a second such filing made by LA; and (6) the United States' Motion for Summary Judgment ("US' MSJ"), (Doc. 360) (collectively, "Dispositive Motions").[10] Schedler, SOS, DCFS, DHH, LA, and these entities' varied administrative heads, sued in their official capacities, (collectively, "Defendants"), oppose the US' MSJ. Invoking Rule 12, Defendants seek dismissal of the Complaint for a lack of subject-matter jurisdiction or a failure to state a claim. In their filings, the US and three Defendants—Schedler, joined by DCFS and DHH—request judgment in their favor pursuant to Rule 56.

Each of these six motions has engendered distinct yet interrelated replies and responses. To Schedler's MSJ, the US has responded with the Memorandum in Opposition to Motion for Partial Summary Judgment ("US' Opposition to Schedler's MSJ"), (Doc. 382), to which Schedler has replied with the Memorandum in Reply to Memorandum in Opposition to Motion for Partial Summary Judgment ("Schedler's MSJ Reply"), (Doc. 395). After the US submitted its Surreply Brief in Support of its Opposition to Defendant Schedler's Motion for Partial Summary Judgment ("US' Surreply to Schedler's Reply"), (Doc. 420), Schedler was allowed to file the

---

[9] Since this matter's filing, DHH has changed its name to the Louisiana Department of Health. In this Ruling, the acronym DHH will stand for the relevant entity before and after its title change.

[10] The originally filed MSJ, (Doc. 346), which contained several typographical errors, was later substituted pursuant to this Court's order.

Sur-Sur Reply to United States Surreply Submitted and Attached to Doc 411 ("Schedler's Surreply"), (Doc. 423).

The US has countered DCFS' MTD with the Memorandum in Opposition to Motion to Dismiss Based on Res Judicata, Collateral Estoppel or Mootness ("US' Opposition to DCFS' MTD"), (Doc. 385); DCFS and DHH responded with the Reply to Opposition to Motion to Dismiss ("DCFS' Reply"), (Doc. 407).

LA's First MTD spawned its own series of filings, including the US' Response Brief in Opposition to the State of Louisiana's Motion to Dismiss Pursuant to Rule 12(b)(1) ("US' Opposition to LA's First MTD"), (Doc. 384), and Defendant State of Louisiana's Reply in Support of Its Motion to Dismiss Pursuant to Rule 12(b)(1) ("LA's First Reply"), (Doc. 409).

Schedler's MTD was opposed by the United States' Memorandum in Opposition to SOS's Motion to Dismiss ("US' Opposition to Schedler's MTD"). (Doc. 388.) DCFS and DHH joined the opposition via the Response to Defendant Schedler's Motion to Dismiss for Lack of Subject Matter Jurisdiction ("DCFS' Joinder Response"), (Doc. 389), defended by Schedler's Reply Memorandum to United States' Opposition to Schedler's Motion to Dismiss as Moot ("Schedler's MTD Reply"), (Doc. 415).

LA's Second MTD is supported by the Defendant State of Louisiana's Reply in Support of Its Motion to Dismiss Pursuant to Rule 12(c) ("LA's Second Reply), (Doc. 414), and opposed by the United States' Memorandum in Opposition to the State of Louisiana's Motion to Dismiss Pursuant to Rule 12(c) ("US' Opposition to LA's Second MTD"), (Doc. 394).

The US' MSJ, supported by numerous exhibits, (Docs. 347–56), elicited DHH's Opposition to USA's Motion for Summary Judgment ("DHH's First Opposition to US' MSJ"),[11]

_____

[11] DHH filed a second opposition on March 28, 2016, (Doc. 425), regarding an eventually abandoned claim by the US that the NVRA extended to the U.S. Department of Agriculture's

(Docs. 398, 399);[12] Defendant State of Louisiana's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("LA's Opposition to US' MSJ"), (Doc. 400); and DCFS' Opposition to USA's Motion for Summary Judgment ("DCFS' Opposition to US' MSJ"), (Doc. 402), to which exhibits were separately docketed, (Docs. 403–06). The arguments raised in the US' MSJ were defended by the Combined Reply Memorandum in Support of the United States' Motion for Summary Judgment ("US' MSJ Reply"), (Doc. 444). Inevitably, the arguments in some of these filings mirror the assertions made in others.

Having waded through these papers, and considered the oral argument made by the Parties on May 17, 2016, this Court reaches four conclusions based on existing jurisprudence. First, neither preclusion nor mootness prevent the United States from maintaining this suit against the Defendants. While the *Scott* Court determined much, it did not decisively establish Defendants' requisite compliance with the NVRA and thus absolve them of liability for pre- and post-*Scott* violations.[13] As this case's docket reveals, many of the factual allegations advanced herein either post-date or were left unexplored by the *Scott* Court, and as Defendants' own words attest, at least some purported violations lay beyond the *Scott* Court's purview. Since a finding of preclusion is rarely proper absent unequivocal congruence of fact and law, estoppel does not bar the US' present suit. Equally as importantly, as a matter of law, the US was never so intimately aligned with the *Scott* Plaintiffs as to make the latter the former's virtual representative or

---

Commodity Supplemental Food Program ("CSFP"), (Doc. 443). Logically and legally, any and all filings relevant to that issue are thus no longer relevant to this Court's analysis.

[12] In substantive argument, Documents 398 and 399 are identical. The latter, however, includes supporting exhibits as attachments.

[13] In referring to "pre-*Scott* violations," this Court means any and all violations not actually adjudicated in *Scott* and for which no factual finding was made. *See infra* Part II.C.2.

dominant director. In short, the doctrines of mootness and preclusion cannot foreclose this suit, the US too unique of a litigant and issues unresolved in *Scott* remaining.

Second, as the NVRA not only passes constitutional muster but also lodges responsibility for conformity with its dictates onto forty-four (44)[14] "States," including LA, LA remains bound by its prescriptions. As such, it cannot, by pointing to its assignment of duties to subsidiary agencies and departments that it created, invoke state law as a mean of voiding liability imposed by a plainly written federal law. The same conclusion applies to DHH's attempt to absolve itself of any legal responsibility for the actions of subordinate actors with which it has contracted to perform services covered by the NVRA. Just as a state may not amend a federal statute by such delegation of both action and responsibility and thereby defy the Constitution's Supremacy Clause, neither can its own artificial and subordinate creations, like DHH and DCFS. Defendants, quite simply, must obey what Congress has duly passed and the Constitution unambiguously allows.

Third, in accordance with well-established principles of statutory construction, the NVRA must be read to encompass remote transactions. As Defendants insist, its structure arguably creates a modicum of ambiguity. But a rigorously contextual analysis, wedded to basic semantic and syntactic canons and informed by this law's obvious purposes, renders any other construction unconvincing. Once properly derived, therefore, the NVRA's plain and unambiguous meaning reveals that its ambit extends to transactions done remotely. Defendants look for comfort in a brief excerpt from a congressional report, but no court and no party may so tinker with a statute's enacted text. This Court will honor the statute's plain meaning.

---

[14] For an explanation of this limited coverage, see *infra* note 21.

Fourth, in weighing the merits of a motion for summary judgment, because this Court must disregard all evidence favorable to the moving party that a reasonable jury is not required to believe, two ostensibly discordant conclusions follow. First, this Court cannot conclude with absolute certainty that the US' requested remedy—perpetual monitoring of a sovereign state—is proper. Factual issues regarding the nature and extent of the violations remain, issues which are relevant to the proper remedy. Though the US has requested this recognized and occasionally awarded form of relief, when both a fundamental right and a sovereign's liability for its contravention clash, a court must tread with care and await the chance to consider evidence that has withstood assault. Here, at least for the moment, this Court chooses such caution. Second, because the incontrovertible evidence nonetheless attests to continuing and ongoing violations, this Court must declare Defendants to be in violation of Section 7 of the NVRA. Described by Defendants as "minor" and "isolated," they remain, by definition, violations.

For these reasons, as more fully explained below, this Court DENIES Defendants' Dispositive Motions and GRANTS IN PART and DENIES IN PART the US' MSJ.


## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     CAST OF CHARACTERS

Plaintiff is the United States, suing to enforce the NVRA's statutory guarantees. (Doc. 1 ¶ 4 at 2; Doc. 2 at 1; Doc. 37 at 1; Doc. 38 at 1–3) In particular, "[t]he United States' Complaint seeks declaratory and injunctive relief to remedy Louisiana's previous and ongoing noncompliance with Section 7, and also ensure the state's future compliance with Section 7." (Doc. 38 at 3; *accord* Doc. 1 ¶ 1 at 1, ¶¶ 15–25 at 4–8.) There are six Defendants: (1) LA, a state allegedly subject to the NVRA; (2) Schedler, being sued in his official capacity as the chief

election official responsible for coordinating LA's statutory obligations under the NVRA; (3)

DHH, which bears responsibility for the administration of a variety of public assistance and

disability programs arguably subject to § 20506(a)(2) and (a)(3); (4) Mr. Bruce D. Greenstein

("Greenstein"), seemingly sued in his official capacity as DHH's former Secretary;[15] (5) DCFS,

which bears responsibility for the administration of a variety of public assistance and disability

programs arguably subject to § 20506(a)(2) and (a)(3); and (6) Ms. Suzy Sonnier ("Sonnier"), in

her official capacity as Secretary of DCFS.[16] (Doc. 1 ¶¶ 5–10 at 2–3; Doc. 27 at 4; Doc. 35 at 2–

4; Doc. 59 at 1–2; Doc. 60 at 1–2.) With the exception of LA, the defendants named in this

action and the *Scott* Matter are the same. (Doc. 2 at 2; Doc. 37 at 1.) Nevertheless, as the

Honorable James J. Brady first observed in September 28, 2011, "[t]his action is broader than the

action filed in the Eastern District [of Louisiana]." (Doc. 37 at 4; *accord* Doc. 92 at 1–2.)


**B.      LEGISLATIVE BACKGROUND: NATIONAL VOTER REGISTRATION ACT**

**1.      Constitutional Reach**

The United States Constitution provides: "The Times, Places and Manner of holding

elections for Senators and Representatives shall be prescribed in each State by the Legislature

thereof; but the Congress may at any time by Law make or alter such Regulations, except as to

the place of chusing [sic] Senators" ("Elections Clause"). U.S. CONST. art. I, § 4, cl. 1; *Ariz. State*

---

[15] While Greenstein no longer manages DHH, no motion to substitute has yet been filed. Despite this omission, DHH has in effect substituted Greenstein with Doctor Rebekah Gee ("Gee"), DHH's current secretary. (*See* Doc. 398 at 1 & n.1; Doc. 399 at 1 & n.1.)

[16] Sonnier replaced Ms. Ruth Johnson ("Johnson") as DCFS' head on or about October 12, 2012. (Doc. 140.) She recently departed DCFS. (Doc. 398 at 1 & n.2; Doc. 399 at 1 & n.2.) Once more, though Sonier has not been formally substituted, DCFS has effectively done so in its recent filings. (Doc. 398 at 1 & n.2; Doc. 399 at 1 & n.2.) Ms. Marketa Waters ("Waters") now stands in Sonnier's official shoes. (Doc. 398 at 1 & n.2; Doc. 399 at 1 & n.2.)

*Legis. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2659, 192 L. Ed. 2d 704, 716

(2015);[17] *Smith v. Clark*, 189 F. Supp. 2d 503, 510 (S.D. Miss. 2002). Even as numerous state

restrictions on voting have been upheld, *see, e.g.*, *Marston v. Lewis*, 410 U.S. 679, 681, 93 S. Ct.

1211, 1212–13, 35 L. Ed. 2d 627, 629–30 (1973); *Burns v. Fortson*, 410 U.S. 686, 686–87, 93 S.

Ct. 1209, 1210, 35 L. Ed. 2d 633, 634–35 (1973), this two-part clause has been construed as

establishing and guaranteeing a right—that of a citizen to vote in "federal elections"—and a

power—that of Congress to legislate (relatively) untrammeled in this area, *United States v.*

*Classic*, 313 U.S. 299, 314–15, 61 S. Ct. 1031, 1037, 85 L. Ed. 1368, 1377 (1941); *accord Cook*

*v. Gralike*, 531 U.S. 510, 523–24, 121 S. Ct. 1029, 1038, 149 L. Ed. 2d 44, 56–57 (2001)

(quoting *Smiley v. Holm*, 285 U.S. 355, 366, 52 S. Ct. 397, 76 L. Ed. 795, 800 (1932)); *Oregon v.*

*Mitchell*, 400 U.S. 112, 124–31, 91 S. Ct. 260, 264–68, 27 L. Ed. 2d 272, 281–85 (1970); *see*

*also, e.g.*, *United States v. Bowman*, 636 F.2d 1003, 1009–10 (5th Cir. 1981) (describing the

Elections Clause as "the basis of Congressional authority to provide a complete code for

congressional elections" (quoting *Smiley*, 285 U.S. at 366)); *Tex. Democratic Party v. Benkiser*,

No. A-06-CA-459-SS, 2006 U.S. Dist. LEXIS 47115, at *25, 2006 WL 1851295, at *8 (W.D.

Tex. July 6, 2006) (quoting *Cook*, 531 U.S. at 523–24), *aff'd*, 459 F.3d 582 (5th Cir. 2006); *cf.*

*Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 1071, 30 L. Ed. 220, 226 (1886) ("Though

not regarded strictly as a natural right, but as a privilege merely conceded by society according to

---

[17] Though its holding is clear, the ultimate import of *Arizona State Legislature v. Arizona Independent Redistricting Commission* is subject to varying interpretations. *Compare* Samuel Issacharoff, *Beyond the Discrimination Model on Voting*, 127 HARV. L. REV. 95, 112-13 (2013) (arguing that "there is untested room for expansion of congressional intervention under the Elections Clause"), *with* Joshua A. Douglas, *(Mis)Trusting States to Run Elections*, 92 WASH. U. L. REV. 553, 569 n.96 (2015) ("The ultimate significance of the decision therefore may be opposite from what the actual holding reflects, as states will be able to use the reasoning in the majority's opinion to defend their election regulations, at least regarding voter qualification requirements."). One fact, however is certain: it does not explicitly touch upon Section 7(a)(6).

its will, under certain conditions, nevertheless . . . ['the political franchise of voting'] is regarded as a fundamental political right, because preservative of all rights.").

With the Elections Clause so construed, the Necessary and Proper Clause[18] has been read to authorize legislation deemed essential to the realization of principal aims animating the Elections Clause. S. REP. No. 103-6, at 3–4 (1993). Consequently, in ratifying the Constitution or joining the Union, every then existent state and every subsequent one not only gave "Congress plenary authority over federal elections but also explicitly ensured that all conflicts with similar state laws would be resolved wholly in favor of the national government" in accordance with the Supremacy Clause.[19] *Harkless v. Brunner*, 545 F.3d 445, 454–55 (6th Cir. 2008); *see also* Jocelyn Friedrichs Benson, *Democracy and the Secretary: The Crucial Role of State Election Administrators in Promoting Democracy and Access to Democracy*, 27 ST. LOUIS U. PUB. L. REV. 343, 347 (2008).

Passed pursuant to these two constitutional provisions,[20] *Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 793–94 (7th Cir. 1995), the NVRA became binding and supreme

---

[18] "The Congress shall have Power . . . To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." U.S. CONST. art. I, § 8, cl. 18; *McCulloch v. Md.*, 17 U.S. (4 Wheat.) 316 (1819).

[19] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing [sic] in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

[20] Nuance can complicate things, for in spite of this understanding, "the Constitution . . . does not confer the right of suffrage upon any one." *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 178 (1875); *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9, 102 S. Ct. 2194, 2199, 72 L. Ed. 2d 628, 635 (1982) (citing *Minor*, 88 U.S. at 178). Accordingly, "although the Constitution was promulgated in the name of 'We, the people of the United States,' the individual states retain[] the power to define just who 'the people' are." ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 24

federal statutory law on January 1, 1995,[21] Pub. Law No. 103-31, § 13, 107 Stat. 77 (1993); *Young v. Fordice*, 520 U.S. 273, 277, 117 S. Ct. 1228, 1231, 137 L. Ed. 2d 448, 453 (1997); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 399 (5th Cir. 2013). The NVRA's constitutionality provoked a debate eventually resolved in its favor, and its preemptive effect was soon widely recognized.[22] *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 (10th Cir. 2014) ("[W]hen Congress acts pursuant to the Elections Clause, courts should not assume reluctance to preempt state law." (internal quotation marks omitted)); *cf.* Franita Tolson, *Protecting Political Participation Through the Voter Qualifications Clause of Article I*, 56 B.C. L. REV. 159, 210–11 (2015). That fact may explain why the NVRA's substantive provisions were seldom litigated as this statute entered its twenties, *see True the Vote*, 43 F. Supp. 3d at 699–700, though several states continued to resist compliance and the Act's impact was judged to be "positive," WALDMAN, *supra*, at 170; *see also, e.g.*, Bruce Ransom, *The National Voter Registration Act and National-State Conflict: The Case of South Carolina*, 7 PUBLIC BUDGETING & FIN. MGMT. 440, 452–60 (1995)

---

(2000). The NVRA only effects *how* the "people," having been so defined by each state, are to be registered.

[21] States that did not require registration to vote or allow election-day registration at polling places were exempt from the NVRA. 52 U.S.C. § 20503(b). These states were Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin, and Wyoming. *See* 75 FED. REG. 47,729-01, 47,730 (Aug. 9, 2010).

[22] A different standard applies when Congress passes legislation pursuant to Section 5 of the Fourteenth Amendment or even the Commerce Clause. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991); *Bondholder Comm. v. Williamson Cnty. (In re Brentwood Outpatient)*, 43 F.3d 256, 264–65 (6th Cir. 1994).

2.      **Statutory Purposes**

The NVRA's obvious and well-known purposes appear in its bare text. *See Miller v. Amusement Enters., Inc.*, 394 F.2d 342, 350 (5th Cir. 1968), *cited in, e.g.*, *United States v. DuBose*, 598 F.3d 726, 731 (11th Cir. 2010). To justify its requirements, Congress made three findings: "(1) "the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(1)–(3); *see also, e.g.*, *Vladez v. Herrera*, No. 09-668 JCH/DJS, 2010 U.S. Dist. LEXIS 142209, at \*22–23 (D.N.M. Dec. 21, 2010) ("In enacting the NVRA, Congress found that federal, state, and local governments have a duty to promote the exercise of the right to vote and it sought to mitigate discriminatory and unfair registration laws and procedures[.]" (internal quotation marks omitted)); President's Remarks on Signing the National Voter Registration Act of 1993, 29 WEEKLY COMP. PRES. DOC. 914, 915 (May 20, 1993) ("[T]he failure to register is the primary reason given by eligible citizens for their not voting. The principle behind this legislation is clear: Voting should be about discerning the will of the majority, not about testing the administrative capacity of a citizen."); *cf.* Justin Weinstein-Tull, *Election Law Federalism*, 114 MICH. L. REV. 747, 755–56 (2016) (summarizing NVRA's provisions).

So convinced, Congress passed the NVRA so as "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office," and "to

protect the integrity of the electoral process"; and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1)–(4); *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1346 (11th Cir. 2014); *see also* Robert A. Kengle, *To Accept or To Reject:* Arizona v. Intertribal Council of Arizona*, the Elections Clause, and the National Voter Registration Act of 1993*, 57 How. L.J. 759, 769 (2014).

 As adopted and construed, the NVRA hence seeks to accomplish two general goals. In certain respects, the NVRA strives to "protect the integrity of the electoral process." *Nearman v. Rosenblum*, 358 Or. 818, 823 (Or. 2016); *accord Gonzalez v. Ariz.*, 677 F.3d 383, 403 (9th Cir. 2012). Yet, its "primary emphasis" has always been to simplify the methods for registering to vote in federal elections and maximize such opportunities for a state's every citizen. *Colón-Marrero v. Vélez*, 813 F.3d 1, 9 n.13 (1st Cir. 2016) (relying on *Young*, 520 U.S. at 275); *accord Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 209–10 (3d Cir. 2012); *cf. Nat'l Coalition for Students with Disabilities Educ. & Legal Defense Fund v. Scales*, 150 F. Supp. 2d 845, 854 (D. Md. 2001) ("A main thrust of the legislation was for states to play a more active role in promoting the enfranchisement of eligible voter."). To Congress, a plethora of byzantine and ambiguous state registration procedures too often denied voters the chance to register with ease and convenience. S. REP. No. 103-6, at 2–3; *see also Ortiz v. City of Philadelphia Office of City Comm'rs Voter Reg. Div.*, 28 F.3d 306, 339–40 (3d Cir. 1994) (combing the NVRA's legislative history); *cf.* Peyer Dreier, *America's Urban Crisis: Symptoms, Causes, Solutions*, 71 N.C. L. REV. 1351, 1400 (1993) ("A major reason for the low rate of urban voting is the nation's complex, crazy-quilt voter registration laws."). If only by a fraction, the NVRA was intended to ameliorate this "unfortunate" fact. *Ortiz*, 28 F.3d at 339.

3.      **General Structure**

The NVRA "prescribes three methods for registering voters for federal elections," subject to two inapposite exceptions. 52 U.S.C. § 20503; *Gonzalez*, 677 F.3d at 394; *Broyles v. Texas*, 618 F. Supp. 2d 661, 690 (S.D. Tex. 2009). First, pursuant to Section 5, "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application."[23] 52 U.S.C. § 20504(a)(1); *Keathley v. Holder*, 696 F.3d 644, 646–47 (7th Cir. 2012). Second, per Section 6, "[e]ach State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to . . . § 20508(a)(2) for the registration of voters in elections for Federal office," though a state "may develop and use a mail voter registration form that meets all of the criteria stated in . . . § 20508(b)." 52 U.S.C. § 20505(a)(1)–(2); *Voting for Am., Inc.*, 732 F.3d at 400; *Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1365–66 (N.D. Ga. 2004). Lastly, in accordance with Section 7, "[e]ach State shall designate agencies for the registration of voters in elections for Federal office." 52 U.S.C. § 20506(a)(1); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1035 (9th Cir. 2015). As this section's second subparagraph adds, a state "shall designate" as VRAs "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with

---

[23] This provision was so emphasized and deemed so significant that the NVRA has been colloquially known as the "Motor Voter Law." *See, e.g.*, *Gonzalez*, 677 F.3d at 394 n.10; *United States v. Lara*, 181 F.3d 183, 191 (1st Cir. 1999); *Condon v. Reno*, 155 F.3d 453, 463 n.6 (4th Cir. 1998). Indeed, Section 5 has been called the Act's "centerpiece." *Nat'l Coalition for Students with Disabilities Educ. & Legal Defense Fund v. Gilmore*, 152 F.3d 283, 292 (4th Cir. 1998).

disabilities." 52 U.S.C. § 20506(a)(2)(A)–(B); *Krieger v. Loudon Cnty.*, No. 5:13cv073, 2014 U.S. Dist. LEXIS 138293, at \*15, 2014 WL 4923904, at \*6 (W.D. Va. Sept. 30, 2014); *see also* H.R. REP. No. 103-66, at 19 (1993) (explaining that Section 7 is intended to increase registration of "the poor and persons with disabilities who do not have driver's licenses and will not come into contact with the other princip[al] place to register under this Act").

As a statutory matter, the two categories listed in § 20506(a)(2) are neither exclusive nor exhaustive, for each state must still "designate other" unspecified "offices within the State as voter registration agencies." 52 U.S.C. § 20506(a)(3)(A); *cf. N.C. State Conf. of NAACP v. McCrory*, Nos. 1:13CV658, 1:13CV660, 1:13CV861, 2016 U.S. Dist. LEXIS 55712, at \*220, 2016 WL 1650774, at \*61 (M.D.N.C. Apr. 25, 2016). These additional offices "may include [s]tate or local government offices such as public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, and unemployment compensation offices, and offices not described in . . . [§ 20506(a)(2)(B)] that provide services to persons with disabilities" and "[f]ederal and nongovernmental offices, with the agreement of such office." 52 U.S.C. § 20506(a)(3)(B)(i)–(ii); *Nat'l Coalition for Students with Disabilities Educ. & Legal Defense Fund*, 152 F.3d at 291. Notably, this section refers to other entities, requiring "[a]ll departments, agencies, and other entit[i]es of the executive branch of the Federal Government" to cooperate, "encourag[ing]" nongovernmental entities to do so, and setting unique procedures as to armed forces' recruitment offices. 52 U.S.C. § 20506(b)–(c).

In accordance with the NVRA, each VRA must distribute voter registration application forms for voting in federal elections, assist applicants in completing these forms, and accept

completed applications for transmittal to the appropriate state official.[24] *Id.* § 20506(a)(4)(A); *Valdez v. Squier*, 676 F.3d 935, 944–45 (10th Cir. 2012). The foregoing duties appear in paragraph (a)(4) of Section 7, whose prefatory phrase reads—"At each voter registration agency . . . . ."—and appears nowhere else in this particular section. 52 U.S.C. § 20506(a)(4)(A).

Section 7, meanwhile, does contain other paragraphs. Thus, in addition to the duties specified in paragraph (a)(4), each VRA must both "distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance-. . . the mail voter registration application form described in" § 20508(a)(2) "unless the applicant, in writing, declines to register to vote" and provide a form with specified content.[25] 52 U.S.C. § 20506(a)(6)(A)–(B). The NVRA further forbids any partisan involvement or discouragement and the use of any "information relating to a declination to register to vote in connection with an application" at a VRA for "any purpose other than voter registration." *Id.* § 20506(a)(5), (7). "Nothing" in the NVRA "authorizes or requires conduct that is prohibited by the Voting Rights Act of 1965." *Id.* § 20510(d)(2).

4.    **Enforcement and Responsibility**

Like many statutes, *cf.* 31 U.S.C. § 3730(a)–(b); *Carter ex rel. United States v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 230–31 (S.D. Cal. 2015), the NVRA affords two coequal enforcement methods, 52 U.S.C. § 20510; *see also* 138 Cong. Rec. 10,736 (1992) (statement of Sen. Wendell Ford) (explaining that the language providing for a private cause of

---

[24] Section 20506(d) specifies the relevant transmittal deadlines. 52 U.S.C. § 20506(d).

[25] Of some significance, "[i]f a voter registration agency designated under paragraph (2)(B) provides services to a person with a disability at the person's home, the agency shall provide the services described in subparagraph (A) at the person's home." 52 U.S.C. § 20506(a)(4)(B).

action substituted "person" for "individual" to "permit organizations as well as individuals, and the Attorney General to bring actions under the [A]ct"). A private person "aggrieved by a violation" may sue for declaratory or injunctive relief once "written notice of th[is] violation" has been provided "to the chief election official of the State involved" and a certain number of days have passed. 52 U.S.C. § 20510(b)(1)–(3); *Nat'l Council of La Raza*, 800 F.3d at 1035; *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 912 F. Supp. 976, 981 (W.D. Mich. 1995). A prevailing private party may be allowed "reasonable attorney fees, including litigation expenses, and costs." 52 U.S.C. § 20510(c); *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999).

Independently, on behalf of the United States, "[t]he Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out" the NVRA. 52 U.S.C. § 20510(a); *Harkless*, 545 F.3d at 450. The NVRA thereby "provides broad authority to the United States in ensuring compliance with the provisions of the statute." *United States v. New York*, 700 F. Supp. 2d 186, 197 (N.D.N.Y. 2010); *see also United States v. New York*, 255 F. Supp. 2d 73, 78 (E.D.N.Y. 2003). According to one appellate court, "[t]he statute envisions the federal government predominantly will enforce the NVRA." *United States v. Missouri*, 535 F.3d 844, 851 (8th Cir. 2008). These remedies "are in addition to all other rights and remedies provided by law." 52 U.S.C. § 20510(d)(1); *Miller*, 912 F. Supp. at 981.

Throughout its sections, the NVRA opts for a particular introductory formulation: "Each *State* shall . . . ." 52 U.S.C. §§ 20503(a), 20506(a) (emphasis added).[26] Among the many duties enumerated in the NVRA is one of delegation, as "[e]ach *State*" must "designate a State officer or employee as the chief State election official to be *responsible* for *coordination* of *State*

---

[26] In the one exception it carves out to the duties it imposes, it refers to "a State." 52 U.S.C. § 20503(b)(1)–(2); *see also supra* note 21.

responsibilities under this . . . [Act]." 52 U.S.C. § 20509 (emphasis added); *United States v. Louisiana*, No. 11-470-JWD-RLB, 2015 U.S. Dist. LEXIS 24701, at *3–4, 2015 WL 893034, at *1 (M.D. La. Mar. 2, 2015). Within this circuit, this designated official's power to coordinate encompasses "enforcement power." *Scott*, 771 F.3d at 838; *accord Harkless*, 545 F.3d at 453–54; *cf. Miller*, 129 F.3d at 838 (holding "that Congress structured the notice requirement [in § 20510(b)(1)–(2)] in such a way that notice would provide states in violation of the Act an opportunity to attempt compliance before facing litigation," so that the official required to receive notice under state law must also have the concomitant power to cure a violation).

Overall, then, Congress' chosen terms lead to an inescapable textual conclusion. While some NVRA provisions "envision delegation, and do not require the states to do more than delegate," "[u]nder the plain language of the statute, *states* must take specific actions" and thus bear ultimate liability and final responsibility for any contrary nonaction. *Missouri*, 535 F.3d at 849 (emphasis added). In Louisiana, by virtue of the statute from which he derives his authority, the SOS has been classified as the official responsible for the NVRA's coordination and enforcement. *See* LA. R.S. §§ 18:18A(6). As surely as this state's governor, the SOS has always been an "instrumentalit[y] of the state" who has no greater power than that afforded by Louisiana's constitution and laws. LA. CONST. art. IV, §§ 1(A), 7.

## C.        FACTUAL AND PROCEDURAL BACKGROUND

### 1.        *Scott* Matter

#### a.        *Findings of Fact and Conclusions of Law in* Scott *Matter*

"Intermittently homeless," Scott received benefits pursuant to the Supplemental Nutrition Assistance Program ("SNAP"), a hybrid federal-state program providing nutrition assistance to

millions of eligible, low-income individuals and families managed by DCFS. (Doc. 436 at 5, No. 2:11-cv-00926-JTM-JCW; *see also* Doc. 1 ¶¶ 102–06 at 27–28, No. 2:11-cv-00926-JTM-JCW.) Scott applied for SNAP in September 2009 and December 2009 and renewed his application on November 2010 at a local DCFS office." (Doc. 436 at 5–6, No. 2:11-cv-00926-JTM-JCW; *see also* Doc. 1 ¶¶ 102–06 at 27–28, No. 2:11-cv-00926-JTM-JCW.)[27]

The initial application forms submitted by Scott in 2009 did contain a section entitled "Voter Registration," which contained "the proper language under" and was generally "in compliance with" the NVRA. (Doc. 436 at 6–9, No. 2:11-cv-00926-JTM-JCW.) At least once he discussed voter registration with a DCFS-managed office. (*Id.*) However, the document that he submitted in November 2010 did "not contain the voter registration language as required under the NVRA," and voter registration was discussed with Scott only on his first recorded visit. (*Id.* at 9, No. 2:11-cv-00926-JTM-JCW; *see also* Doc. 1 ¶ 106 at 28.) More problematically, Scott "did not receive a voter registration form[s] [with] . . . [his] benefits form[s]" (Doc. 436 at 8–9, No. 2:11-cv-00926-JTM-JCW; *see also* Doc. 1 ¶¶ 102–06 at 27–28, No. 2:11-cv-00926-JTM-JCW.)

On the bases of these factual findings, "Scott suffered an actionable injury during . . . [these] transactions with DCFS when . . . [its employees] failed to meet their obligation to Scott" under the NVRA. (Doc. 436 at 10, No. 2:11-cv-00926-JTM-JCW; *see also* Doc. 1 ¶ 106 at 28.) In sum, Scott had "been in person to . . . [a] DCFS office several times and did not receive the information required under the NVRA." (Doc. 436 at 11, No. 2:11-cv-00926-JTM-JCW *see also* Doc. 1 ¶ 106 at 28, No. 2:11-cv-00926-JTM-JCW.) Adducing extensive evidentiary support for

---

[27] On this score, a factual inconsistency appears in the Parties' papers: Paragraph 104 of Document 1 says Scott first applied for SNAP in January 2010.

its factual findings, (Doc. 436 at 26–27, No. 2:11-cv-00926-JTM-JCW), the *Scott* Court found

DCFS equally guilty of sundry violations:

> (1) DCFS did not provide voter registration services with every remote transaction; (2) DCFS did not provide voter registration services with every renewal of benefits prior to October 31, 2010; (3) DCFS did not require its staff to distribute a voter preference form at every change of address transaction; (4) DCFS policy did not require that voter registration services be provided during any remote change of address transaction; (5) DCFS change of address forms, such as the CCAP 10 and the OFS 4SR, did not contain voter registration questions; (6) DCFS policy did not expressly require that voter registration be provided with the CCAP, KCSP, and DSNAP programs; (7) DCFS policy gave employees discretion to give voter registration forms to clients, or to advise the client about the SOS's website; [and] (8) DCFS did not require staff to distribute voter registration forms unless the client checked "yes."

(*Id.* at 25–26, No. 2:11-cv-00926-JTM-JCW; *see also* Doc. 1 ¶¶ 57–81 at 16–24, No. 2:11-cv-

00926-JTM-JCW.)

The *Scott* Court went further. Having never interacted with Scott, DHH had nonetheless

"engaged in numerous NVRA violations" prior to August 11, 2011. (Doc. 436 at 5, 20, 25, No.

2:11-cv-00926-JTM-JCW; *see also* Doc. 1 ¶ 56 at 16, ¶¶ 61–77 at 17–22, No. 2:11-cv-00926-

JTM-JCW.) Documenting each violation, (Doc. 436 at 21–25, No. 2:11-cv-00926-JTM-JCW),

the *Scott* Court proceeded to identify at least seven separate violations by DHH:

> (1) DHH did not provide voter registration services with any remote transactions prior to July 2011; (2) DHH did not provide voter registration services with address changes; (3) DHH did not require staff to distribute voter registration forms unless the client checked the "yes" box; (4) DHH Medicaid application and renewal forms did not include a voter registration question; (5) DHH's "Motor Voter Form" lacked a disclaimer that registering to vote will not affect the "amount" of assistance received; (6) DHH's [Woman, Infants, and Children Program ("WIC")] . . . did not advise clients of the disclaimers required by the statute; and (7) while DHH checked benefits application forms and followed up for missing information, it did not do so with voter registration forms.

(*Id.* at 20; *see also* Doc. 1 ¶¶ 61–77 at 17–22, 84–97 at 24–26, No. 2:11-cv-00926-JTM-JCW.)

SOS was adjudged next. As the *Scott* Court concluded, SOS had provided NVRA training and materials, but had not "engage[d] in any other measures to ensure that individual public assistance offices are complying with their responsibilities under the NVRA." (Doc. 436 at 28, No. 2:11-cv-00926-JTM-JCW.) The SOS' training was found to be "inconsistent and inaccurate." (*Id.*) For support for this conclusion, the *Scott* Court emphasized three facts: (1) SOS had provided no NVRA training for DCFS employees from 2008 to the spring of 2011; (2) it had falsely informed DHH personnel "that DHH clients were only afforded an opportunity to register to vote only if . . . [they] appeared in person at a DHH officer"; and (3) it did not "Advise DCFS or DHH with regard to distributing voter registration application forms to clients who did not respond to the voter declaration question." (*Id.*)

For all these reasons, the *Scott* Court entered the First Injunction. (Doc. 437, No. 2:11-cv-00926-JTM-JCW.)

### b.    *Fifth Circuit's* Scott *Decisions*

In considering the SOS' appeal of the First Injunction, the Fifth Circuit left it mostly undisturbed. The panel did "dismiss Scott's claims on standing and notice grounds," and it did "vacate in part the relief that the district court granted to the Louisiana NAACP." *Scott*, 771 F.3d at 833. Thus, "[b]ecause it found that the plaintiffs before it lacked standing to raise the issue, the Fifth Circuit did not address the question whether Section 7 requires voter registration agencies to offer voter registration services and assistance to persons who engage in *remote transactions*." (Doc. 174 at 2 (emphasis added) (internal quotation marks omitted).) Accordingly, with neither DCFS nor DHH having appealed, the court also resolved "the only question" before it: as to "the validity of the injunction against the Secretary of State," it held "that the Act gives the Secretary

of State enforcement authority, and that consequently he has an obligation to require the two state agencies to comply with the other miscellaneous portions of the Act." *Scott*, 771 F.3d at 833. After the Amended Injunction was appealed, the Fifth Circuit vacated and remanded due to this latest order's lack of specificity. *Scott v. Schedler*, No. 15-30652, 2016 U.S. App. LEXIS 10919, at *2, 2016 WL 3345277, at *1 (5th Cir. June 15, 2016).

## 2.     Alleged "Facts": Pre-*Scott* and Post-*Scott*

### a.     US' Version

Before and after the *Scott* Matter's adjudication, other facts relating to several statutory violations have been unearthed. Three alleged violations involve paragraph (a)(4)(A) of Section 7, which begins: "*At* each voter registration agency, the following services shall be made available . . . ." 52 U.S.C. § 20506(a)(4)(A (emphasis added); *Ass'n of Cmty. Orgs. for Reform Now v. Ridge*, Civ. Nos. 95-7671, 95-382, 1995 U.S. Dist. LEXIS 3933, at *5–6, 1995 WL 136913, at *2 (E.D. Pa. Mar. 30, 1995). Thereupon § 20506(a)(4)(A)(i) requires each VRA to "distribut[e] . . . mail voter registration application forms" that satisfy the minimal content requirements set in § 20506(a)(6). 52 U.S.C. § 20506(a)(4)(A)(i); *Krieger*, 2014 U.S. Dist. LEXIS 138293, at *15, 2014 WL 4923904, at *6. Section 20506(a)(4)(A)(ii) requires that "assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance," be provided. 52 U.S.C. § 20506(a)(4)(A)(ii); *Scales*, 150 F. Supp. 2d at 854. Paragraph (a)(4)(A)'s final subparagraph then compels each VRA to transmit each "completed voter registration application forms" to "the appropriate State election official." 52 U.S.C. § 20506(a)(4)(A)(iii); *Valdez*, 676 F.3d at 944.

Paragraph (a)(6) is the focus of a separate series of purported violations. As this paragraph commands, each VRA must "distribute" a certain approved type of mail voter registration application, a form including a series of questions, and finally "provide each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the [voter] registration application form as is provided by th[at VRA] office with regard to the completion of its own forms, unless the applicant refuses such assistance." 52 U.S.C. § 20506(a)(6)(A)–(C). Unlike paragraph (a)(4)(A), this paragraph does not contain an "at" or any similar preposition. Instead, it begins: "A voter registration agency that is an office that provides service or assistance in addition to conducting voter registration shall . . . ." *Id.* § 20506(a)(6); *see also Cegavske*, 800 F.3d at 1035 ("Voter registration agencies are required to 'distribute' voter registration application forms with *each application for assistance*." (emphasis added)).

According to the US, multiple entities operating under the umbrella of DCFS and DHH have run afoul of these subsections. First and foremost, DCFS itself does not distribute voter registration applications via its Common Access Front End system ("CAFÉ"), this agency's online portal, thereby violating this NVRA provision in two ways. First, it does "not include an integrated option for users to download and print a voter registration application"; second, it does not "allow users to request that DCFS mail a voter registration system." (Doc. 360-1 at 17; *see also* Doc. 1 ¶ 23 at 7–8.).) Instead, "CAFÉ routes users to a website maintained by the SOS where an individual can either register to vote through that website or print out a hardcopy voter registration application."[28] (Doc. 360-1 at 17; *see also* Doc. 1 ¶ 23 at 7–8.).) DCFS, moreover,

---

[28] Notably, a determination of the defects, if any, in CAFÉ's compliance with the NVRA lay beyond the *Scott* Court's scope. (Doc. 436 at 26, No. 2:11-cv-00926-JRM-JCW.)

continues not to "distribute voter registration applications every time a client changes their address with the agency," whether or not CAFÉ is used, and "does not include more than one copy of a declaration form and voter registration form with each benefits application," though more than one eligible voters can apply for services using a single application. (Doc. 360-1 at 18; *see also* Doc. 1 ¶ 23 at 7–8.)

The US contends that the Medicaid program managed by DCFS is also rife with compliance issues. "Prior to the initiation of this . . . and the *Scott* litigation, Medicaid applications and renewal forms did not contain the required voter registration forms, and Medicaid offered no voter registration services or assistance to clients and applicants who did not appear in person at a parish office or [Medicaid Application Centers." (Doc. 3601-1 at 18; *see also, e.g.*, Doc. 360-2 ¶ 12 at 4, ¶ 27 at 7.) Up to August 2015, "Medicaid was still failing to offer voter registration forms and declaration forms to all adult citizens who applied for Medicaid using the standard application form," opting to provide such forms "only to the first-named applicant." (Doc. 360-1 at 18; *see also, e.g.*, Doc. 360-2 ¶ 29 at 8.)

Meanwhile, prior to April 11, 2013, the Office for Citizens with Development Disabilities ("OCDD"), classified as a VRA under § 20506(a)(2)(B) and a component of DHH,[29] "failed to provide voter declaration forms, voter registration application forms, and related assistance with easy initial application for the State-funded development disabilities services offered through its Early Steps program." (Doc. 360-1 at 19; *see also* Doc. 360-2 ¶ 59 at 15.) The same inaction typified OCDD's regional offices prior to February 2011. (Doc. 360-1 at 19; *see*

---

[29] "As of July 2013, and with some exceptions, OCDD no longer directly provides state-funded disabilities services to the public. DHH has outsourced the delivery and day-to-day administration of OCDD's core client services to ten human services districts/authorities, also known as Local Governing Entities." (individually, "LGE" and collectively, "LGEs"). (Doc. 360-2 ¶ 55 at 14.)

*also* Doc. 360-2 ¶ 60 at 15.) DHH's Office of Behavioral Health ("OBH") has similarly failed. (Doc. 360-1 at 19–20; *see also* Doc. 360-2 ¶¶ 66–67 at 17.) The Louisiana Commission for the Deaf ("LCD"), prior to February 2011, and the Office of Aging and Adult Services ("OAAS"), prior to May 15, 2013, have also not provided "voter registration application, voter declaration forms, [and/]or related assistance with each initial, renewal, recertification application, or change-of-address transaction." (Doc. 360-1 at 20; *see also* Doc. 360-2 ¶ 45 at 12, ¶ 50 at 13.) An LGE, Jefferson Parish Human Services Authority ("JPHSA"), is currently failing to "offer voter declaration forms, voter registration application forms, and related assistance to the parents or guardians of minor children or other incapacitated wards who apply, recertify, or renew for, or change their addresses." (Doc. 360-1 at 20; *see also* Doc. 360-2 ¶ 94 at 25.)

The US argues that the many colleges and universities within the University of Louisiana System ("ULS"), the Southern University System ("SUS"), and the Louisiana State University System ("LSU") are not "routinely providing" these forms. (Doc. 360-1 at 21–23; *see also* Doc. 360-2 ¶ 149 at 40–41.) Lastly, OAAS and two more LGEs—the Metropolitan Human Services District ("MHSD") and Capital Area Human Services District ("CAHSD")—fail to offer "the same degree of assistance" in completing voter registration forms mandated by § 20506(a)(6). (Doc. 360-1 at 23–24; *see also* Doc. 360-2 ¶ 46 at 12, ¶¶ 91–92 at 24.)

Moving on to § 20506(a)(4)(A)(iii) and (d), the US documents these same and other entities' purported failure to comply with the NVRA's transmittal obligations. By virtue of its reliance on CAFÉ, DCFS "ignores its acceptance and transmittal duties almost entirely by solely providing a link to the SOS's online voter registration portal, which is a different mode of voter registration altogether." (Doc. 360-1 at 25; *see also* Doc. 360-2 ¶ 118 at 32, ¶ 125 at 33–34, ¶ 131 at 35.) Moreover, throughout 2013, 2014, and 2015, photocopied registration applications

were being sent by DCFS document processing centers, though such photocopied materials cannot "result in valid voter registration" under Louisiana law. (Doc. 3601- at 25; *see also* Doc. 360-2 ¶ 131 at 35.) In addition, "DCFS also continues to hold voter registration applications it receives longer than the 10 [and/]or five day deadlines mandated by the NVRA." (Doc. 360-1 at 25 (referring to § 20506(d)(1)); *see also* Doc. 360-2 ¶ 132 at 35–36.) In fulfilling its duty, the US maintains that DCFS has arguably stumbled in one more particular. Specifically, it "still fails to ensure that all completed voter registration applications transmitted to registrars of voters are properly marked as originating from a public assistance agency." (Doc. 360-1 at 25; *see also* Doc. 360-2 ¶ 132 at 35–36.)

Like DCFS, DHH has also failed to transmit voter registration with the rigor expected by § 20506(a)(4) and (d). (Doc. 360-1 at 25–26; *see also* Doc. 360-2 ¶¶ 67–67A at 17–18.) Relatedly, since DHH's contracts with each LGE provide that it "shall monitor this Contract and conduct compliance monitoring consistent with the provisions of the AIP, and all applicable statutes, rules, and regulations, assuring corrective action through coordination with the LGE," (Doc. 360-2 ¶ 77 at 20), these LGEs' many documented failings to comply with the NVRA must be attributed to DHH. (Doc. 360-1 at 26–28.)

Noting that the SOS' coordination power includes "enforcement power" pursuant to *Scott*, 771 F.3d at 838–39, the US turns to those facts bearing on SOS' defiance of the NVRA.[30] Broadly, the SOS has "failed to identify and designate" as VRAs "all offices of the State that provide public assistance," as required by § 20506(a)(2)(A).[31] (Doc. 360-1 at 29 (internal

---

[30] The US argues that the SOS "continues to disavow his authority and responsibility to ensure statewide compliance with the NVRA." (Doc. 360-1 at 29; *cf.* Doc. 342.)

[31] As only one example, the US points to the Commodity Supplemental Food Program. As noted before, *see supra* note 11, the US has now dropped that claim.

citations omitted); *see also* Doc. 360-2 ¶ 163 at 45.) Moreover, having promulgated administrative rules regarding NVRA compliance in March 2013 after a two-year delay, (Doc. 360-2 ¶ 169 at 47; *cf.* Doc. 360-1 at 30), the SOS has defied his own regulations. Thus, the SOS "requires that mandatory voter registration agencies appoint NVRA department and site coordinators to be responsible for ensuring that the offices under their supervision comply with the NVRA," but "none of Louisiana's four public college and university systems has appointed an NVRA department coordinator." (Doc. 360-2 ¶ 172 at 48; *see also* Doc. 360-1 at 30–31.) Indeed, the SOS has not ensured that coordinators are appointed at each of more than 600 DHH-certified MACs or at each of more than 200 DCFS-certified community partners. (Doc. 360-1 at 31; *see also* Doc. 360-2 ¶ 173 at 48.) No regular annual trainings regarding NVRA compliance have been given, and the SOS' list of physical VRAs "remains incomplete and infrequently updated." (Doc. 360-1 at 31–32; *see also* Doc. 360-2 ¶¶ 176–81 at 49–50.)

More violations are alleged by the US: the SOS does not include instructions on voter registration declaration and application forms outlining the duties of applicants and agencies and uses a model form that does not include information required by Louisiana's own Election Code. (Doc. 360-2 ¶¶ 186–87 at 52.) The SOS has even given voter registration agencies advice or instructions that "directly . . . conflict" with the NVRA. (Doc. 360-1 at 32; *see also* Doc. 360-2 ¶ 182 at 51–52.) Even his classification system for voter forms runs afoul of federal law's clear requirements, with many applications not being coded as having been received or generated through a public assistance agency. (Doc. 360-2 ¶¶ 193–96 at 54–55; *cf.* Doc. 1 ¶ 23 at 7–8.) One more example suffices: though SOS has required DCFS to submit quarterly activity reports as of January 2014, "DCFS did not submit any of the required quarterly reporting information until January 2015." (Doc. 360-2 ¶ 104 at 28.)

### b.      Defendants' Version

As to the foregoing failings predating the *Scott* Matter, DHH and DCFS have acknowledged their noncompliance "with the NVRA in every respect." (Doc. 398 at 1; Doc. 399 at 1; Doc. 402 at 2.) More importantly, while they challenge the propriety of the present suit, DHH and DCFS aver no more than their "substantial compliance" with the NVRA and characterize any "current . . . violation" as "minimal, at best." (Doc. 398 at 2; Doc. 399 at 2; Doc. 402 at 2.) Hence, DCFS and DHH do not truly deny every "fact," characterized as such by the US. (Doc. 398 at 2; Doc. 399 at 2; Doc. 402 at 2; Doc. 399-1; Doc. 402-1.) Instead, these allied defendants repeatedly insist "substantial compliance with the NVRA" has occurred since the First Injunction was entered, (Doc. 398 at 9–38; Doc. 399 at 9–38), though SOS attempted to do so with a belated motion, (Doc. 448).

### c.      Summary: Selected Comparison

In its Findings of Fact and Conclusions of Law, the *Scott* Court stated its conclusions plainly and unmistakably: "[p]rior to August 15, 2011," DHH, DCFS, and SOS had not not "in full compliance with the [NVRA's] mandates." (Doc. 436 at 3, 25, 27, 29, No. 2:11-cv-00926-JTM-JCW.) This court did award a broad remedy, requiring the SOS "to implement such policies, procedures, and directives as to each [qualifying'] program," (Doc. 437, No. 2:11-cv-00926-JTM-JCW), and was eventually reversed for this seeming "vagueness" pursuant to Rule 65(d), *Scott*, 2016 U.S. App. LEXIS 10919, at *12–13, 2016 WL 3345277, at *4. However, as its actual opinion reveals, the *Scott* Court adjudicated NVRA compliance by SOS, DHH, and DCFS

as to only three specific state programs: Medicaid, WIC,[32] and the Louisiana Children's Health Insurance Program ("LaCHIP"). (Doc. 436 at 3, 25, 27, 29, No. 2:11-cv-00926-JTM-JCW.)

Examples gleaned from Defendants' own filings and the US' MSJ disclose as much. Thus, DCFS and DHH have already conceded that certain "disability services programs," including the regional service centers of several LCDs, OBH, and OAAS, were "not raised or litigated in *Scott*." (Doc. 398 at 9; Doc. 399 at 9.) Yet, according to these Defendants, these VRAs "were not consistently providing voter registration with each application" as required by the NVRA. (Doc. 398 at 10–13; Doc. 399 at 10–13.) Similarly, DCFS has acknowledged that the *Scott* Court never discussed or determined CAFÉ's compliance with the NVRA. (Doc. 402 at 7.) Indeed, in DHH's First Opposition to US' MSJ, DHH identifies only two programs as having been litigated to a final judgment in *Scott*: WIC and Medicaid. (Doc. 398 at 9.) No mention of any deficiencies in the services provided by Louisiana's higher education system or several LGEs, moreover, can be found in *Scott*. (Compare Doc. 346-1, *with* Doc. 436, No. 2:11-cv-00926-JTM-JCW.) Despite their multiple motions, DCFS and DHH admit that "instances of program-specific NVRA violations" still regularly occur. (Doc. 398 at 2.)

### D.    PROCEDURAL HISTORY

Eighty-four (84) days after the *Scott* Matter had begun, Plaintiff filed the relevant complaint on July 12, 2011, charging Defendants with violating Section 7 of the NVRA. (Doc. 1; *see also* Doc. 1, No. 2:11-cv-00926-JTM-JCW.) Dated January 25, 2016, Schedler's MSJ prompted the filing of the US' Opposition to Schedler's MSJ on February 24, 2016, (Doc. 382),

---

[32] As SNAP is part of WIC, (*See* Doc. 398 at 8), any violations attributable to SNAP fall within the broader program.

which was followed by Schedler's MSJ Reply on March 15, 2016, (Doc. 395), the US' Surreply to Schedler's Reply on March 23, 2016, (Doc. 420), and Schedler's Surreply on March 28, 2016, (Doc. 423). DCFS' MTD, filed on January 29, 2016, (Doc. 340), led to the tendering of the US' Opposition to DCFS' MTD on February 29, 2016, (Doc. 385), and the DCFS' Reply on March 21, 2016, (Doc. 407). Stamped January 29, 2016, (Doc. 341), LA's First MTD prompted the US' Opposition to LA's First MTD on February 29, 2016, (Doc. 384), and LA's First Reply on March 21, 2016, (Doc. 409). Schedler's MTD, filed on January 31, 2016, (Doc. 342), was followed by the US' Opposition to Schedler's MTD on March 1, 2016, (Doc. 388), DCFS' Joinder Response on March 1, 2016, (Doc. 389), and Schedler's MTD Reply on March 23, 2016, (Doc. 415). LA's Second MTD was filed on February 1, 2016, (Doc. 345), the US' Opposition to LA's Second MTD on March 2, 2016, (Doc. 394), and Schedler's MTD Reply on March 23, 2016, (Doc. 414). The US' MSJ, an incorrect version filed on February 1, 2016, (Doc. 346), and a corrected one on February 2, 2016, (Doc. 360), was trailed by DHH's First Opposition to US' MSJ, (Docs. 398–99), LA's Opposition to US' MSJ, (Doc. 400), and DCFS' Opposition to US' MSJ on March 18, 2016, (Doc. 402). The US' MSJ Reply came on April 18, 2016. (Doc. 444.) Twenty days earlier, on March 29, 2016, in response to the Parties' Joint Motion to Set Dispositive Motions for Oral Argument, (Doc. 421), the Court scheduled oral argument on these motions for May 17, 2016. (Doc. 426.) On May 17, 2016, this Court heard the Parties' arguments ("Motions Hearing") and took the matter under advisement.[33] (Doc. 452.)

On January 23, 2013, the *Scott* Court issued the First Injunction. (Doc. 437, No. 2:11-cv-00926-JTM-JCW.) The Fifth Circuit affirmed and vacated in part on November 5, 2014. *Scott*,

---

[33] The hearing transcript appears in Document Number 455. In this Ruling, it will be cited by page and line, i.e. Hr'g Tr. 8:2–4, in accordance with standard practice.

771 F.3d at 831, 841–42. In response, the *Scott* Court issued the Amended Injunction on July 10,

2015. (Doc. 538, No. 2:11-cv-00926-JTM-JCW.) Neither DCFS nor DHH appealed the *Scott*

Court, as both the Amended Injunction, (*Id.* at 1 n.1.), and the Fifth Circuit emphasize, *Scott*, 771

F.3d at 835. (*See also* Doc. 174 at 3.) The Amended Injunction was reversed and remanded on

June 15, 2016. *Scott*, 2016 U.S. App. LEXIS 10919, 2016 WL 3345277.


**III.    SUMMARY OF PARTIES' ARGUMENTS**[34]

**A.    LA'S ARGUMENTS FOR DISMISSAL: NVRA'S APPLICABILITY TO STATE**

In its first dispositive motion, (Docs. 341), and its supporting reply, (Doc. 409), LA

invokes Rules 12(b)(1), contesting this Court's jurisdiction for three reasons.[35]

First, LA argues that this court has always lacked subject-matter jurisdiction over the

Parties' dispute based on the Constitution's Eleventh Amendment. (Doc. 341 at 2; Doc. 341-1 at

2–4; *see also* Doc. 414 at 6–8.) This amendment "bars a state's citizens from filing suit against . .

. [a s]tate in federal court unless it has waived its immunity." (Doc. 341 at 2–3, 3 n.3.) LA has

not done so, as both case law and state law reveal, and Plaintiff's suit must therefore be

dismissed. (*Id.* (referring to LA. R.S. § 13:5106(A); *Patterson v. Stalder*, Civ. No. 06-752-P,

2007 U.S. Dist. LEXIS 65198, 2007 WL 2479830 (W.D. La. Aug. 27, 2007); and *Kiper v. La.*

*State Bd. of Elementary & Secondary Educ.*, 592 F. Supp. 1343 (M.D. La. 1984)); *see also, e.g.*,

Doc. 341-1 at 4–6; Doc. 409 at 7–8.)

---

[34] The Parties' arguments will be dissected in finer detail in the relevant sections of this Ruling. *See infra* Part V. This part offers up no more than a general preview.

[35] Indeed, LA had previously conceded to the existence of this Court's jurisdiction. (Doc. 38 at 2.)

Second, LA asserts that only one "very narrow" and inapplicable exception—the so-called "*Ex Parte Young* exception"—exists. (Doc. 341 at 2.) In general, this exception allows "[a] state official in his or her official capacity . . . [to] be sued for prospective injunctive relief [so as] to prevent or cure an ongoing violation of the Constitution or federal law." (Doc. 341-1 at 6.) Here, however, "the Plaintiff [has] fail[ed] to show that the State of Louisiana has the requisite connection with the enforcement of the act challenged necessary to establish the *Ex Parte Young* Exception." (Doc. 341 at 2; *see also, e.g.*, Doc. 341-1 at 6–7; Doc. 409 at 8–9.) *Young* does not apply, and *Young* alone could justify the US' present suit.

Third, "other officers and agencies," not LA, "are actually responsible for specific enforcement of the provisions of the National Voter Registration Act challenged." (Doc. 341 at 2.) LA "cannot singularly enforce the policies of the NVRA," and since "[t]his court" has already held the SOS "responsible for NVRA compliance," it was and is "not necessary or proper for 'the State' to be a named Defendant in connection with this case." (Doc. 341 at 3; *see also* Doc. 409 at 2–6.) For support for this contention, LA directs this Court to an order regarding the Plaintiff's motion to compel, (Doc. 315), issued by the Honorable Richard L. Bourgeois and identifying the SOS as "the entity responsible for NVRA compliance" ("Order on Motion to Compel"), (Doc. 327 at 5). (Doc. 341-1 at 7–8; *see also* Doc. 409 at 6; *cf.* Doc. 414 at 8.) In LA's First Reply, this point is emphasized: as LA has designated the SOS as its chief election officer, it "has completed its duty" under the NVRA and "is no longer directly responsible or liable for enforcement of the NVRA." (Doc. 409 at 3.)

To LA's First MTD, the US makes three responses. First, the Eleventh Amendment does forbid suits by a state's citizens against a state, but it does not proscribe a suit against a state by the United States. (Doc. 384 at 3–4; *see also* Doc. 444 at 14.) While there are limited exceptions,

none apply here, and the present action is thus unimpeded by the Constitution. (Doc. 384 at 4–5; *see also* Doc. 444 at 14.) Second (and relatedly), LA is "mistaken" when it insists the *Ex Parte Young* Exception could alone justify this suit, as "*Ex Parte Young* does not apply to the United States' suing the State." (Doc. 384 at 6–7; *see also* Doc. 444 at 14.) Third, "[q]uestions about whether the United States has sufficiently alleged acts and omissions on the part of the State that violate the NVRA, or about whether the State has the ability to enforce the NVRA" go to the merits, more properly advanced in a motion to dismiss predicated on Rule 12(b)(6) or (c). (Doc. 384. at 7; *see also* Doc. 444 at 14.) The US even advises LA that Rule 12(c)[36] is "the proper vehicle for resolving such issues." (Doc. 384 at 7; *see also* Doc. 444 at 14.)

Within days of its first motion, (Doc. 341; Doc. 384 at 7), LA submitted its second dismissal motion, (Doc. 345). In essence, this motion argues that "no statutory authority is given [by the US] to support a suit against the State of Louisiana under the NVRA," (Doc. 345 at 2; *see also* Doc. 414 at 9), as "none of the[] provisions [cited by the US] give the . . . [US] the authority to actually bring suit against the state," (Doc. 345-1 at 2). LA goes further, contending that the Complaint contains "no allegations against the State of Louisiana or that the State of Louisiana caused the deprivation of a clearly established constitutional right of the Plaintiff."[37] (Doc. 345 at 2.) Once more, LA maintains that "the State of Louisiana, as a whole, is not responsible for enforcement of the NVRA" and attacks the US for not having alleged "any action by the State of Louisiana that was unreasonable or unconstitutional" and "not specifically identify[ing] what laws they [sic] want changed." (*Id.*; *see also* Doc. 345-1 at 2–6.) According to LA's

---

[36] The distinction is partly academic, though still mandatory, as Rule 12(b)(6) and Rule 12(c) have been construed identically. *See infra* Part IV.B.

[37] This language echoes the state's frequent responses to actions by private parties suing under Section 1983 of the U.S. Code's forty-second title.

understanding of *Scott*, "other state agencies and officers . . . have been held by the Fifth Circuit to be the proper parties to enforce the NVRA." (Doc. 345 at 2; *see also* Doc. 345-1 at 5–6; Doc. 414 at 4–5, 10.) Therefore, "for this reason alone, a claim against the State of Louisiana, as a separate defendant, is improper." (Doc. 345-1 at 2; *see also* Doc. 414 at 2, 8–10.) Again citing to the Order on Motion to Compel, (Doc. 327), LA insists that "[t]his court has found that another defendant state official is responsible for NVRA compliance." (Doc. 345 at 3; *see also* Doc. 414 at 8.) In sum, then, LA's Second MTD repeats the third reason for dismissal advocated in LA's First MTD, (*Compare* Doc. 341-1 at 8, *with* Doc. 345 at 2), entire paragraphs being indistinguishable replicas, (*Compare* Doc. 345-1 at 3–4, *with* Doc. 409 at 4–5).

The US responds to LA's Second MTD with statutory citations and jurisprudential distinctions. By its reckoning, "as a 'State of the United States,' Louisiana is subject to the requirements of the NVRA." (Doc. 394 at 3 (citing to 52 U.S.C. §§ 20502(4), 20503); *see also* Doc. 444 at 14.) Section 20509, in turn, "speaks generally about '*State* responsibilities under this chapter.'" (Doc. 394 at 3 (emphasis in original); *see also* Doc. 444 at 14.) In addition, pursuant to § 20510(a), the United States may "bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out th[is Act]." (Doc. 394 at 2 (citing § 20510(a)); *see also* Doc. 444 at 14.) As such, LA is "mistaken" to contend that no provision of the NVRA gives the United States "the authority to actually bring suit against the state." (Doc. 394 at 2, 4 (quoting Doc. 345-1 at 2); *see also* Doc. 444 at 14.) Instead, "the United States routinely, and often without dispute, sues states to enforce the NVRA and other statutes it enforces." (Doc. 394 at 3–4; *see also* Doc. 444 at 14.) Moreover, no case cited by LA actually supports its contention that a state agent's responsibility for NVRA compliance absolves the state of liability for NVRA violations. (Doc. 394 at 4–5, 6–8; *see also* Doc. 444 at 14.)

The US then points to a telling piece of evidence: on July 8, 2015, the former Governor of Louisiana issued an executive order directing the other defendants here to comply with the SOS' efforts to enforce the NVRA, a "recent and noteworthy example of the State's exercise of its direct authority under the NVRA." (Doc. 394 at 5; *see also* Doc. 444 at 14.) Characterizing LA's reliance on Rule 12(c) as "misguided," the US concludes with a reaffirmation of this case's factual and legal underpinnings, as it perceives them: LA "is responsible for its consistent and repeated failure to meet its obligations under the NVRA," and the "behavior of . . . [its] officials – actions and omissions which have resulted in consistent and widespread NVRA noncompliance throughout Louisiana – make the State an appropriate Defendant in this case." (Doc. 394 at 8–9.) Naturally read, the NVRA pegs LA as the entity responsible for its overall enforcement and compliance, assigning it ultimate liability even as it requires that one official be selected as the state's administrator, as the Governor's statement underscores.

## B.    DCFS' AND DHH'S ARGUMENTS FOR DISMISSAL: PRECLUSION AND MOOTNESS

Predicated on *res judicata* and mootness, DHH and DCFS advance four specific grounds for this matter's dismissal in DCFS' MTD.

First, invoking the doctrine of *res judicata*, which "incorporates claim preclusion and issue preclusion," DCFS and DHH contend that the *Scott* judgement should bind this Court and lead to this action's dismissal. Defendants argue that, in the two actions, "defendants (DHH and DCFS) are the same," "the sole issue" is "the same," and "the remedy requested . . . is the same." (Doc. 340-1 at 3, 6–7.) Further, DHH and DCFS "continue to operate their voter registration programs under compulsion of the Eastern District's <u>permanent</u> injunction." (*Id.* (emphasis in

original); *see also* Doc. 407 at 3–7, 9–12.) The *Scott* Court rejected the need for "monitoring and further reporting," the remedy that the US now seeks, and the present suit thus amounts to an "unsupportable" attempt at the "dissection and partial enforcement of the *Scott* court's final judgment." (Doc. 340-1 at 2–3 (internal quotation marks omitted); *see also* Doc. 407 at 3–4, 9.) In other words, the *remedy* chosen by the *Scott* Court must bind this Court, regardless of any caveats and conditions appended, *see supra* Part II.1.

Second, DCFS and DHH deem the US to have been in "aligned interest with the *Scott* Plaintiffs." (Doc. 340-1 at 3; *see also* Doc. 185 at 9.) Though a non-party to the *Scott* suit, the US was "adequately represented" as Scott and the NAACP were "so closely aligned to . . . [its] interests as to be . . . [its] (virtual) representative." (Doc. 340-1 at 3; *see also* Doc. 185 at 9.) This alignment is "extensively illustrated through court filings and on/off-the-record appearances." (Doc. 340-1 at 3.)

This "ample" evidence consists of the Statement of Interest the US filed in the *Scott* Matter, taken "under consideration" by the *Scott* Court, its filing of an amicus brief in the Fifth Circuit, and its five-minutes' worth of oral argument there. (Doc. 185 at 9–10; *see also* Doc. 340-1 at 4.) In addition, "USA's counsel" allegedly "observed the *Scott* trial and often conferred with counsel for the *Scott* Plaintiffs throughout trial." (Doc. 185 at 10 n.37; *see also* Doc. 340-1 at 4.) With the US having been virtually represented in the *Scott* matter, *res judicata* applies, and the US should not be allowed "to take a second shot at . . . [its] previously-rejected request for continued monitoring and reporting." (Doc. 340-1 at 5.) In making this argument, Defendants emphasize *res judicata*'s underlying purposes: the avoidance of duplicative and wasteful litigation. (*See, e.g.*, Doc. 38 at 6–7; Doc. 340-1 at 5–7; Doc. 398 at 42–44, 47–48; Doc. 407 at 7, 12.)

Third, "because the issues raised in this case were mooted through resolution of those same issues in *Scott*, there is no case or controversy for this Court to resolve."[38] (Doc. 340-1 at 4; *see also* Doc. 185 at 13–15; Doc. 407 at 14–15.) More precisely, "because no additional remedy beyond the injunction already rendered . . . is appropriate in this case, the US[] cannot establish that any case or controversy exists." (Doc. 407 at 14.) When viewed from these Defendants' perspective, this case, then, is moot as a matter of law, for "those same issues" have already been "resol[ved]" by the *Scott* Court. (Doc. 340-1 at 4.)

Lastly, these Defendants question the propriety of the kind of constant monitoring that the US has now demanded, as the latter has yet to show Defendants' unwillingness to comply with the NVRA. (Doc. 340-1 at 5–6; *see also* Doc. 191 at 9–10; Doc. 407 at 14–15.) Absent such defiance, monitoring has been rejected as a remedy, as it was by the *Scott* Court. (Doc. 340-1 at 6; *see also* Doc. 191 at 9–10.) Federalism itself compels that this Court stay its hand. (*See, e.g.*, Doc. 340-1 at 5, 7.)

Beyond these rationales for dismissal, DHH and DCFS repeatedly concede that "isolated instances of non-compliance" or "minor issues" have occurred since *Scott*'s injunction was entered, but deny the emergence of "a supportable persistent practice of current noncompliance." (Doc. 407 at 7–8, 16–17.)[39] As DCFS and DHH are in "substantial compliance" with the NVRA and as the *Scott* Plaintiffs served as the US' "virtual representatives," dismissal should follow on the basis of "res judicata, collateral estoppel, or mootness." Doc. 185 at 2–4, 12; Doc. 191 at 2–3; Doc. 407 at 9; *cf.* Doc. 340 at 1, 3.) According to DCFS and DHH, "the principles of equity and judicial economy" girding these distinct doctrines leave this Court with no other option,

---

[38] This argument mirrors the one made in Schedler's MTD. (Doc. 342.)

[39] Even SOS acknowledges that such "post-*Scott* grievances" exist. (Doc. 415 at 1.)

(Doc. 407 at 12–14), the US "privy of the *Scott* Plaintiffs and holder of the identical interests successfully vindicated by the *Scott* Plaintiffs," (Doc. 191 at 10).

The US responds with five distinct points. First, it has independent authority and interest in the NVRA's enforcement; thus, it cannot be barred by preclusion principles from litigating the present matter as a result of private parties' separate litigation. (*See, e.g.*, Doc. 189 at 8, 13–14; Doc. 385 at 3; Doc. 444 at 9.) Second, regardless of how Defendants portray its prior actions, the US was neither a party nor in privity with the *Scott* Plaintiffs, and its interests were not so aligned as to render the latter virtual representatives of this nation's federal sovereign. (*See, e.g.*, Doc. 189 at 8, 14–17; Doc. 385 at 3, 5–14; Doc. 444 at 9.) Third, the claim here cannot be moot, as the US is seeking relief for two types of violations: (1) those not before the *Scott* court and (2) those that transpired or continued after the First Injunction was issued. (*See, e.g.*, Doc. 189 at 17–18; Doc. 385 at 14; Doc. 444 at 9.) As to the former, the US highlights certain areas allegedly left uncovered by *Scott*, which focused purely on "Louisiana's public assistance programs" and did not deal with "facts related to NVRA compliance or non-compliance in Louisiana's disability services program" or find that Defendants were in "full compliance with the requirements of the NVRA." (Doc. 189 at 17; *see also, e.g.*, Doc. 385 at 14–15.) As to the latter, as a matter of logic, it did not resolve the problems raised by Defendants' continued noncompliance in *Scott*'s aftermath. (Doc. 385 at 4, 15–16; *see also* Doc. 189 at 17–18.)[40] Fourth, whatever the suitability of the remedial monitoring that it now seeks, arguments about proposed remedies "cannot properly support dismissal on *res judicata* grounds." (Doc. 385 at 15–17; *see also* Doc. 189 at 17–19.) Rather, whether monitoring should be "part of an appropriate remedy, and to what

---

[40] In one pertinent filing, the US has summarized other purportedly unresolved issues. (Doc. 189 at 19–20; *see also* Doc. 444 at 9.)

extent," should await this Court's determination of DCFS and DHH's liability. (Doc. 385 at 17.) Naturally, the US emphasizes that "[c]ourts have ordered monitoring as part of the remedy in cases involving . . . violations of the NVRA and other federal voting rights statutes." (*Id.* at 16–17.) Finally, even though the US is not affected by these sundry preclusion precepts, DCFS and DHH are, indeed, fully and completely bound. (*See, e.g.*, Doc. 444 at 9–13; Doc. 189 at 9–13; Doc. 385 at 3–4.)

## C.   SCHEDLER'S ARGUMENT FOR DISMISSAL: MOOTNESS

On January 31, 2016, Schedler filed his own MSJ. As Schedler argues, "[c]ompelled" by the *Scott* court's injunction, (Doc. 437, No. 2:11-cv-00926-JTM-JCW), "defendants adopted a regime of NVRA rules, practices, procedures and forms that changed their previous practices and procedures relating to voter registration." (Doc. 342 at 2; *see also* Doc. 342-15 at 1.) Logically, therefore, "[t]he declaratory and injunctive relief sought by the United States has been rendered moot because the United States can no longer challenge registration practices and procedures that no longer exist in order to obtain prospective relief." (Doc. 342 at 2; *see also* Doc. 342-15 at 10.) In other words, "[u]nless the United States can assert colorable claims that have not been subsumed by *Scott* and the State's response to *Scott*, the issues in this case, again with the exception of the in-person remote issue, are moot." (Doc. 415 at 3; *see also* Doc. 342-15 at 1, 3–4.) SOS has "made more than a reasonable effort to coordinate the State's NVRA responsibilities post-*Scott*," as shown by the declaration of Ms. Lani Durio, SOS' own NVRA coordinator, (Doc. 342-15 at 14). (Doc. 415 at 19.) Accordingly, "[t]here really is no case left." (*Id.*; *see also* Doc. 342-15 at 14–15.) With only one exception—"to the extent" the US seeks "to expand the

provisions of Section 7 beyond 'in person' applications"—no case and controversy, as required by the Constitution's third article, remains.[41] (Doc. 342 at 2; *see also* Doc. 342-15 at 1.)

Though he has disparaged the Amended Injunction's vagueness before the Fifth Circuit, *see Scott*, 2016 U.S. App. LEXIS 10919, at *9–10, 2016 WL 3345277, at *1, Schedler here maintains that the relief sought by the US has now "been obviated by the changes in rules, policies, practices, forms, training, oversight and procedures" effectuated by SOS, (Doc. 342-15 at 16–17), as SOS has taken "the reasonable efforts to ensure state compliance required" by case law and statute, (Doc. 415 at 1). This case must therefore be deemed moot. (*See, e.g.*, Doc. 342 at 2; Doc. 342-15 at 17; Doc. 415 at 5.)

Incorporating the arguments already raised in response to DCFS' MTD, (Doc. 385), and the US' MSJ, (Docs. 346, 360), the US contests Schedler's construction of the mootness doctrine. Under well-settled law, "[a] case should not be declared moot as long as the parties maintain a concrete interest in the outcome and effective relief is available to remedy the effect of the violation." (Doc. 388 at 4 (quoting *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008)). Here, because it has presented evidence demonstrating SOS' continued violation of the NVRA and ineffective implementation of his own promulgated regulations, this case has not been mooted by *Scott*'s still indeterminate[42] resolution. (*Id.* at 5–9; *see also* Doc. 444 at 13.) Moreover, since the US has also presented much proof of

---

[41] In Schedler's MTD Reply, the SOS expands his argument. There, he "absolutely and without hesitation disavows an[y] obligation 'to ensure statewide compliance'." (Doc. 415 at 8.)

[42] Indeed, SOS appealed the Amended Injunction. (Doc. 415 at 17.) On June 15, 2016, the injunction was vacated because it was "insufficiently specific." *Scott*, 2016 U.S. App. LEXIS 10919, at *2, 2016 WL 3345277, at *1. As before, this second Fifth Circuit ruling did not delve into the merits. However, the reversal's basis—the vagueness of the Amended Injunction—raises questions about how compliant SOS could have been with a directive that it derided as far too ambiguous.

noncompliance either not adjudicated in *Scott* or postdating the First Injunction, the "partial relief" ordered there cannot "moot an action seeking additional relief." (Doc. 388 at 9–10 (quoting 13A CHARLES A. WRIGHT ET AL., FED. PRAC. & PROC. § 3533.2 (2d ed. 1995)); *see also* Doc. 444 at 13.) Such relief is precisely what it now hopes to win here. (Doc. 1 at 8–9.)

## D.   SCHEDLER'S MSJ: NVRA'S COVERAGE AS TO REMOTE TRANSACTIONS

In his own MSJ, Schedler advances one argument: per its text, the NVRA does not apply to certain types of actions undertaken by Louisiana's various VRAs. (Doc. 336 at 1; *see also* Doc. 395 at 1, 11–12.) Defined more precisely, the NVRA, he contends, does not require that the voter registration efforts it mandates in Section 7 occur when a VRA engages in a remote transactions. (Doc. 336 at 1; *see also* Doc. 395 at 1.) Instead, it "applies only to in person transactions at agency offices." (Doc. 336-5 at 4; *see also* Doc. 395 at 1–2.) In his view, any other construction of the NVRA expands its coverage and scope in a manner contrary to the Constitution and the laws of the United States. (Doc. 336 at 2; *see also* Doc. 336-5 at 7; Doc. 395 at 6–9.)

In support, SOS offers up the following "evidence." First, he cites to one of Section 4's paragraphs. (Doc. 336-5 at 7.) In relevant part, this subsection states that "each State shall establish procedures to register to vote in elections for Federal office . . . by application in person . . . at a Federal, State, or nongovernmental office designated under section 7." 52 U.S.C. § 20503(a)(3). This subsection, in turn, cabins the scope of Section 7 to only "in person" transactions; thus, as "the NVRA speaks in clear, unambiguous terms with respect to in person applications at public assistance and disability services offices," this Court obligated to adhere to "[such] particular, concrete terms." (Doc. 336-5 at 8–9; *see also* Doc. 395 at 12–13.) In such

instances, any construction of Section 7 that ignores the limitation in Section 4 disregards the NVRA "architecture" and thus runs afoul of two cardinal rules of statutory interpretation by both producing an absurd result and disregarding statutory structure. (Doc. 336-5 at 11–13; *see also* Doc. 395 at 12–14.) To him, the US' proposed construction is inherently "anomalous," an impermissible attempt to employ Section 7 as "an exegetical fulcrum to construe the Act as a whole." (Doc. 336-5 at 12; *see also* Doc. 395 at 12–14.)

Second, Schedler places much weight on the NVRA's legislative history. Most particularly, he stresses the "in person" phrase encoded in Section 20503(a)(3) and the Act's apparent silence as to the issue of remote transactions. (Doc. 336-6 at 9–10; *see also* Doc. 395 at 14–16.) No reference to telephonic or online applications appears in that thirteen page act, and the "in person" restriction that adorns other sections must be read into Section 7(a)(6). "Statutes do not change their terms," he states. (Doc. 395 at 18.) "Congress" alone "must amend them." (*Id.*)

Third, he contends that if one looks at how the VRAs "work in practice," it is clear "that the procedures contemplate an in person, face to face transaction." (Doc. 336-5 at 13–17.) To ignore the weight of this evidence is to rewrite the statute, a congressional function beyond the province of any court. (*See, e.g.*, *Id.* at 17–18; Doc. 395 at 18–19.) Although they both failed to appeal the *Scott* Court's decision finding the NVRA to extend to remote transactions, DCFS and DHH now endorse this position. (*See, e.g.*, Doc. 38 at 6, 8.)

The US counters with two points. First, it disputes the extent to which a live and ripe controversy as to the NVRA's coverage over remote transactions actually exists for one reason. As Schedler has himself admitted, (Doc. 382-1 at 2), the actual policies already governing the VRAs require that these entities provide "voter registration services in connection with

qualifying transactions that occur remotely." (Doc. 382 at 3; *see also* Doc. 444 at 14.) In fact, despite the SOS' insistence to the contrary, DHH and DCFS have adopted the same such regulations, and this general approach is embodied in SOS' NVRA compliance manual. (Doc. 382 at 3–4; *see also, e.g.*, Doc. 420 at 1; Doc. 444 at 14.) The US emphasizes the latter, this "long understood" construction of the NVRA wholly consistent with the SOS' own online manual, regardless of its present head's litigation posture. (Doc. 382 at 4–5; *see also* Doc. 444 at 14.) In other words, Schedler, not the US, is contravening history by adopting a personalized statutory "reading," one previously rejected by the agency he administers, as his "current litigation position."[43] (Doc. 382-1 at 2, 4; *see also* Doc. 382 at 5.) In short, the VRAs must provide voter registration services as a matter of Louisiana law, so that no "live controversy" truly exists. (Doc. 382 at 5–6; *see also* Doc. 444 at 14.)

Second, the US strives to show that Section 7 does apply to remote transactions, attacking Schedler's reading for being "inconsistent with the NVRA's plain text and contrary to Congress'[] intent." (Doc. 382 at 6; *see also* Doc. 444 at 14.) Textually, the NVRA "establishes a framework through which all voter registration agencies must offer registration opportunities both (1) upon request by individuals appearing in person," in accordance with § 20506(a)(4), and "(2) with 'each' qualifying transaction," in accordance with § 20506(a)(6). (Doc. 382 at 6; *see also* Doc. 444 at 14.) The latter requirement is qualified by the former, as two different courts have ruled: *Scott*, (Doc. 436, No. 2:11-cv-00926-JTM-JCW), and *Georgia State Conference of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1329 (N.D. Ga. 2012). (Doc. 382 at 6–7; *see also* Doc.

---

[43] In support of this argument, the US relies on the deposition of Ms. Catherine C. McRitchie ("McRitchie") ("McRitchie Deposition"). (Doc. 382; Doc. 420 at 1–2.) Schedler's Surreply attempts to supplement and correct this official's deposition pursuant to Rule 30(e). (Doc. 423.) The issue raised by this attempt are explored in the later portions of this ruling. *See infra* Part V.D.

444 at 14.) In the course of this analysis, the US insists that Section 4 "does no more than identify a State's *general* obligation" while Sections 5, 6, and 7 set forth more detailed requirements regarding motor-voter, mail-in, and agency-based voter registration. (Doc. 382 at 8–9.) Properly understood, pursuant to the general/specific canon, Section 7 should be read as imposing additional and more particularized obligations on a certain subject of designated VRAs; it expressly requires voter registration be attempted with "each application" for service. (Doc. 382 at 11–15; *see also* Doc. 444 at 14.) Quite simply, nothing within Section 7's language "limits . . . [its] application to in-person transactions only." (Doc. 382 at 10–11.) As the US repeats, the SOS's "narrow interpretation" of Section 4 should not be read to undercut Section 7's broadly inclusive language. (*Id.* at 12–15.)

Such an interpretation, according to the US, has additional benefits. Most obviously, it does not render two other statutory phrases—Section 4's reference to "in person" transactions and Section 7's use of "in addition"— superfluous, as one more canon forbids, *see infra* Parts IV.D, V.B. (*Id.* at 15–16.) Furthermore, it aligns with the NVRA's preeminent purpose—"to increase voter registration and expand registration opportunities"—and avoids an "odd, "obviously unintentional," and "absurd" result—the NVRA would not reach those citizens "not likely to benefit from the State motor-vehicle registration application provisions." (*Id.* at 17–18.) The Act was expansively written, and remote transactions rather neatly fit within Section 7(a)(6).

E.     US' MSJ: DEFENDANTS' PAST AND CONTINUING VIOLATIONS OF THE
       NVRA

In moving for summary judgment, the US relies on the "facts" summarized above, *see supra* Part II.C.2, that it has collected during this case's discovery to support a specific

conclusion: as a matter of undisputed fact and clear law, Defendants have failed to achieve "full compliance with Section 7" and "to remedy its earlier pre-*Scott* "non-compliance," their failings varied and documented. (Doc. 346 at 1–2; *see also* Doc. 444 at 19–56.) Briefly summarized, the US contends there is no genuine dispute as to four issues.

First, despite § 20506(a)(6)(A)–(B), DCFS, DHH , OCDD, OBH, LCD, OAAS, LGEs, disability offices at various colleges and universities have not and continue not to distribute voter registration applications, voter declaration forms, and related assistance with each initial application for their NVRA-covered services. (Doc. 360-1 at 18–23; *accord* Doc. 346-1 at 17–23; *see also* Doc. 444 at 19–29, 40–51.)

Second, although § 20506(a)(6)(C) requires each VRA to "provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance," two of these same entities—OAAS and LGEs—have not done so. (Doc. 360-1 at 23–24; *accord* Doc. 346-1 at 23–24; *see also, e.g.*, Doc. 444 at 2, 17–19, 37–40, 51–52.)

Third, even as § 20506(a)(4)(A)(iii) mandates that "at each" VRA that entity "accept[] . . . completed voter registration application forms for transmittal to the appropriate State election official" § 20506(d) sets precise deadlines, a VRA "may not simply direct an applicant to another state agency that accepts completed voter registration application forms," thereby "shed[ding] one of its core NVRA responsibilities." (Doc. 360-1 at 24–25; *accord* Doc. 346-1 at 24–25.) The US attributes this failure to three separate agencies: DCFS, DHH, and several LGEs supervised by DHH and its own constituent departments. (Doc. 360-1 at 25–28; *accord* Doc. 346 at 25–28; *see also* Doc. 444 at 29–37.) Notably, while the first and second failings argued by the

US apply as to both in-person and remote transactions, the third refers to failings occurring when an applicant appears in-person. (Doc. 360-1 at 17, 25–26.)

Fourth, in defiance of the NVRA's tenth section and the Fifth Circuit in *Scott*, the SOS "continues to disavow his authority and responsibility to ensure statewide compliance with the NVRA," (Doc. 360-1 at 29; *accord* Doc. 346-1 at 29; *see also* Doc. 444 at 54–56), as suggested by the "facts" uncovered so far, *see supra* Part Part II.C.2.a. For example, SOS "willingly allowed DCFS and DHH to flout" his own NVRA rules "for more than two years because those agencies repeatedly questioned the SOS's authority to issue the rules." (Doc. 360-1 at 29–32; *accord* Doc. 346-1 at 29–32.[44]) To recap, based on the facts so far collected, the US points to multiple incontestable violations of the NVRA by Defendants before and after the *Scott* Court's Amended Injunction.

The US makes two more legal points. First, it insists that preclusion does apply to the *Scott* Court's findings as to Defendants, but that preclusion does not bar it from introducing evidence of pre-*Scott* noncompliance or this Court from considering additional relief appropriate to address the Defendants' past and present noncompliance, regardless of the Amended Injunction. (Doc. 360-1 at 33–37; *accord* Doc. 346-1 at 32–37; *see also* Doc. 444 at 51–54.) Second, the US emphasizes that the very fact that Defendants have continued to defy the NVRA supports its present suit's unique remedial request. As it explains, "[t]he United States is seeking different and more tailored declaratory and injunctive relief than what the *Scott* court granted to the private plaintiffs in that case—precisely because, as the uncontroverted evidence in this case shows, the *Scott* court's remedial order was not sufficient to prevent Louisiana's continued

---

[44] Whether these regulations are fully compliant with the NVRA is disputed. (Doc. 360-1 at 29 n.;9; Doc. 346-1 at 29 n.9.)

noncompliance with the NVRA or to remove the lingering impact of Louisiana's longtime noncompliance with the NVRA." (Doc. 360-1 at 37–38; *accord* Doc. 346-1 at 37–38; *see also* Doc. 444 at 6.) Three years after the *Scott* Matter began, the evidence establishes that "simply requiring Defendants to certify generic compliance with the NVRA, without imposing any mechanism for monitoring how such compliance is achieved and without specifying the particular actions that Defendants must take to remedy th[ose] violations, is insufficient." (Doc. 360-1 at 38; *accord* Doc. 346-1 at 38; *see also* Doc. 444 at 6.) With Defendants' recent history having underscored the ineffectiveness of the *Scott* Court's chosen remedy, a new one is now appropriate. (Doc. 360-1 at 38; *accord* Doc. 346-1 at 38; *see also* Doc. 444 at 6.)

In general, even while repeatedly insisting on the strict application of preclusion law to bar this suit by the US, (Doc. 398 at 1–2, 38–42; Doc. 399 at 1–2, 38–42; Doc. 400 at 10–11; Doc. 402 at 17), and emphasizing the unfairness and wastefulness effectuated if this Court was not to do so, (Doc. 398 at 42–48; Doc. 399 at 42–48; Doc. 400 at 11, 17), DCFS and DHH advance five other[45] arguments against the US' MSJ. First, emphasizing their "substantial compliance" with the NVRA, Defendants contend that the NVRA requires merely a "'reasonable effort' standard," as "actually contemplated by Congress." (Doc. 398 at 2–3; Doc. 399 at 2–3; Doc. 402 at 5, 18.) For support, as they have done before, Defendants both direct this Court's attention to the NVRA's legislative history and, without citing to a specific section, claim that this touchstone is "the only standard set forth on the face of the statute." (Doc. 398 at 7; Doc. 399 at 7; Doc. 402 at 2–3, 5–6, 18.[46]) Full compliance, DCFS adds, is "simply not practical." (Doc.

---

[45] For example, in its reply, LA echoes its first and second dispositive motion, casting itself as an unnecessary and hence improper party. (Doc. 400 at 4–10.) The arguments summarized in this and next paragraphs do not appear elsewhere in the Parties' papers.

[46] DCFS' Opposition to US' MSJ contains substantial sections identical to those included in DHH's First Opposition to US' MSJ. (*Compare* Doc. 398 at 2–4, *with* Doc. 402 at 2–4.)

402 at 6.) In fact, "[t]he [G]overnment alleges NVRA violations even though some of the allegedly defective practices are not even required by the Act." (Doc. 398 at 3; Doc. 399 at 3.)

Second, Defendants contest every "fact" collected by and relied upon by the Plaintiff in the US' MSJ. (Doc. 398 at 4; Doc. 399 at 4.) By Defendants' reckoning, their current efforts "far exceed the 'reasonable effort' standard imposed" by the NVRA; only "discrete and isolated events" in contravention of the NVRA can be supported. (Doc. 402 at 5–6, 12; Doc. 398 at 7; Doc. 399 at 7.) Third, Defendants maintain that their every past effort has already been "litigated to final judgment in *Scott*," (Doc. 398 at 9; Doc. 399 at 9), a position that they promptly undermine, (Doc. 398 at 10–12; Doc. 399 at 10–12).[47] Still, "all such programs achieved certified substantial compliance with the NVRA in 2013." (Doc. 398 at 9; Doc. 399 at 9; *see also* Doc. 400 at 10–11; Doc. 402 at 11.)

Throughout their papers, Defendants rest on their asserted achievement of "substantial compliance" by those VRAs involved—and those not involved—in *Scott*. (Doc. 398 at 10–21, 26–29; Doc. 399 at 10–21, 26–29; Doc. 400 at 10–11; Doc. 402 at 5–6, 10–12.) In this vien, the absence of any formal complaint by an applicant is repeatedly stressed. (Doc. 398 at 26; Doc. 399 at 26; Doc. 402 at 15.) Any more burdensome duties mined from the NVRA by the US, in turn, are simply unsupported by the Act's plain text. (Doc. 398 at 18–25; Doc. 399 at 18–25; Doc. 402 at 6–15.)

Fourth, DHH first denies its responsibility for the LGEs' alleged violations of the NVRA and then labels the US' allegations as to these creations be wholly "unsubstantiated." (Doc. 398 at 29–38; Doc. 399 at 29–38.) Finally, returning to their preclusion arguments, Defendants contend that the "law dictates denial of the [G]overnment's proposition that this Honorable Court

---

[47] *See supra* Part II.C.

revisit the Defendants' past violations in order to fashion a remedy in this case." (Doc. 398 at 49–53; Doc. 399 at 49–53; Doc. 400 at 9–11.) Too little evidence of unwillingness to comply, in their view, exists to justify the kind of extensive monitoring that the US now demands. (Doc. 398 at 49–53; Doc. 399 at 49–53; Doc. 400 at 11.) With their final motion in opposition, Defendants reiterate these points, concluding: "There is no occasion in this case for the requested intrusion into the [state] government's sovereignty." (Doc. 402 at 18.)


## IV.    APPLICABLE STANDARDS

### A.    RULE 12(b)

Rule 12(b)(1) requires a federal court to dismiss an action over which it "lack[s] subject matter jurisdiction." FED. R. CIV. P. 12(b)(1). The lack of such constitutionally required jurisdiction may be found in any one of "three separate bases": (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus a court's resolution of disputed facts. *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996) (quoting *Voluntary Purchasing Grps., Inc. v. Reilly*, 889 F.2d 1380, 1384 (5th Cir. 1989)); *accord, e.g.*, *Jasper v. FEMA*, 414 F. App'x 649, 651 (5th Cir. 2011). Nonetheless, a court may consider "outside matter" attached to a motion to dismiss "if the material is pertinent to the question of the [d]istrict [c]ourt's jurisdiction since it is always the obligation of a federal court to determine if it has jurisdiction." *Alabama ex rel. Baxley v. Woody*, 473 F.2d 10, 12 (5th Cir. 1973). As such, "[u]nlike a 12(b)(6) motion, the district court is empowered to consider matters outside the Complaint and matters of fact that may be in dispute," *Higgins v. Tex. Dep't of Health Servs.*, 801 F. Supp. 2d 541, 547 (W.D. Tex. 2011), and a "trial court is free to weigh the evidence and satisfy itself as to the

existence of its power to hear the case," *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992) (internal citations omitted); *see also Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *accord Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S. Ct. 673, 675, 86 L. Ed. 951, 955 (1942); *cf. Padilla-Mangual v. Pavia Hosp.,* 516 F.3d 29, 34 (1st Cir. 2008). Yet, district courts are expected to treat Rule 12(b)(1) motions to dismiss where jurisdiction is intertwined with the merits as challenges to the latter. *Williamson*, 645 F.2d at 415; *accord, e.g., Stem v. Gomez*, 813 F.3d 205, 210 (5th Cir. 2016); *Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990).

Rule 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The analysis mandated by Rule 12(b)(6) analysis incorporates the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*: "To pass muster under Rule 12(b)(6), [a] complaint must have contained enough facts to state a claim to relief that is plausible on its face." *Reece v. U.S. Bank Nat'l Ass'n*, 762 F.3d 422, 424 (5th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007)). In the course of this determination, a court "must" still "consider the [factual] allegations in the plaintiff's complaint as true." *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *accord, e.g.*, *S.R.P. v. United States*, 676 F.3d 329, 344 (3d Cir. 2012). A claim possesses the requisite facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868, 884 (2009).

In the Fifth Circuit, "[g]enerally a *res judicata* contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 n. 2 (5th Cir. 2005); *see also Norris v. Hearst Trust*, 500 F.3d 454, 461 n. 9 (5th Cir. 2007). The Fifth Circuit has further noted that "[r]es judicata is an affirmative defense that should not be raised as part of a 12(b)(6) motion, but should instead be addressed at summary judgment or at trial." *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 664 n.1 (5th Cir. 2004) (citing *Moch v. E. Baton Rouge Parish Sch. Bd.*, 548 F.2d 594, 596 n. 3 (5th Cir. 1977) ("Generally, a party cannot base a 12(b)(6) motion on res judicata."). Nevertheless, "[d]ismissal under Rule 12(b)(6) on *res judicata* grounds is appropriate when the elements of *res judicata* are apparent on the face of the pleadings." *Murry v. Gen. Servs. Admin.*, 553 F. App'x 362, 364 (5th Cir. 2014) (citing *Kan. Reinsurance Co. v. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994)).

## B.   RULE 12(c)

Pursuant to Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c); *Lillian B. v. Gwinnett Cnty. Sch. Dist.*, 631 F. App'x 851, 852 (11th Cir. 2015). As required for purposes of Rule 12(b)(6), a court may not consider any evidence outside the pleadings in weighing the merits of a Rule 12(c) motion. *Hiller v. HSBC Fin. Corp.*, 589 F. App'x 320, 322 (6th Cir. 2015). In addition, it must "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Hoven v. Walgreen Co.*, 751 F.3d 778, 783 (6th Cir. 2014) (citing *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d

509, 512 (6th Cir. 2001)); *see also Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) ("The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."). Rule 12(c) provides "a means of disposing of cases when . . . a judgment on the merits can be achieved by focusing on the content of the competing pleadings." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1336 (11th Cir. 2014) (emphasis omitted).

## C.    RULE 56

Per Rule 56(a), summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014). A court construes all facts and evidence in the light most favorable to the nonmovant. *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013). In response to another's motion, the nonmovant cannot rely on "[c]onclusional allegation and details, speculation, . . . unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002).

Still, "[w]hen both parties have submitted evidence of contradictory facts," *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005), a court is bound to "draw all reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson Plumping Prods.*,

530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105, 122 (2000); *see also Anderson*, 477

U.S. at 248 (emphasizing the irrelevance of "[a]ny proof or evidentiary requirements imposed by

the substantive law," materiality "not a criterion for evaluating the evidentiary underpinnings of

[factual disputes]"). It thus cannot "make credibility determinations or weigh the evidence."

*Reeves*, 530 U.S. at 150. This command—that a district court "eschew making credibility

determination or weighing the evidence," *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir.

2011) (citing *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)); *accord, e.g.*, *Flythe v.

Dist. of Columbia*, 791 F.3d 13, 22 (D.C. Cir. 2015)—applies so long as the record retains

patches of reasonable ambiguity that have not been artificially manufactured. *See, e.g.*, *Tolan v.

Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (per curiam) ("[C]ourts may not resolve

genuine disputes of fact in favor of the party seeking summary judgment.").

     So constrained, by Rule 56, this Court must "give credence to the evidence favoring the

nonmovant as well as that evidence supporting the moving party that is uncontradicted and

unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 9A

WRIGHT, *supra*, § 2529. To wit, although this Court "should review the record as a whole, it

must disregard all evidence favorable to the moving party that the jury is not required to

believe." *Reeves*, 530 U.S. at 151, *cited in Havera*, 723 F.3d at 591. Within the narrow domain

of Rule 56, summary judgment is hence inappropriate (1) if there are legitimate, not superficial

or frivolous, factual disputes that may affect the outcome of the case under the applicable

substantive law, *see Anderson*, 477 U.S. at 248, and (2) so long as the nonmovant does not

exclusively rely on "some metaphysical doubt as to the material facts," "conclusory allegations,"

"unsubstantiated assertions," or "a scintilla of evidence," *Little v. Liquid Air Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994) (quoting *Matsushita*, 475 U.S. at 586; *Lujan*, 497 U.S. at 871–73, and

*Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994)). Questions of statutory construction is particularly well-suited for resolution by summary judgment. *See, e.g.*, *Asher v. Am. Home Mortg. Servicing, Inc. (In re Asher)*, 488 B.R. 58, 64 (Bankr. E.D.N.Y. 2013); *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing *Oklahoma ex rel. Dep't of Human Servs. v. Weinberger*, 741 F.2d 290, 291 (10th Cir. 1983*)); Stissi v. Interstate & Ocean Transport Co.*, 765 F.2d 370, 374 (2d Cir. 1985); WILLIAM W. SCHWARTZER ET AL., FEDERAL JUDICIAL CENTER, THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS 15 (1991).

## D.   OVERVIEW: PERTINENT PRINCIPLES OF STATUTORY INTERPRETATION

Statutory interpretation begins with the enacted text, and a court's review must terminate if that language is both plain and unambiguous. *E.g.*, *Roberts v. Sea-Land Servs.*, 132 S. Ct. 1350, 1356, 182 L. Ed. 2d 341, 354 (2012) (quoting *Robinson v. Shell Oil Co.*, 519 U. S. 337, 340, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808, 813 (1997)); *Tyler v. Douglas*, 280 F.3d 116, 122 (2d Cir. 2001) (quoting *Sullivan v. Cnty. of Suffolk*, 174 F.3d 282, 285 (2d Cir. 1999)), *cert. denied*, 536 U.S. 906, 122 S. Ct. 2361, 153 L. Ed. 2d 182 (2002). Indeed, though the result may be harsh or impractical, the written text must be applied. *See, e.g.*, *Lamie v. U.S. Tr.*, 540 U.S. 526, 538, 124 S. Ct. 1023, 1032, 157 L. Ed. 2d 1024, 1036 (2004) ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding."); *Cent. Trust Co. v. Official Creditors' Comm. of Geiger Enters., Inc.*, 454 U.S. 354, 360, 102 S. Ct. 695, 698, 70 L. Ed. 2d 542, 548 (1982) (per curiam) ("While the Court of Appeals may have reached a practical result, it was a result inconsistent with the unambiguous language used by Congress."); *Edwards v. Valero Refining-Meraux, LLC*, No. 3:14-00772-JWD-EWD, 2016 U.S. Dist. LEXIS 9898, at *15 n.9, 2016 WL 355080, at *5 n.9 (M.D. La. Jan. 28,

2016) ("Indeed, laws can often have hard consequences, . . . but the words must control absent certain . . . exceptions.").

In ascertaining a statute's degree of ambiguity or plainness, an interpreter must attend to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341; *accord FCC v. AT&T, Inc.*, 562 U.S. 397, 407, 131 S. Ct. 1177, 1184, 179 L. Ed. 2d 132, 141 (2011). In the most mundane instances of statutory construction, it is context that often proves critical. *Cf. Towne v. Eisner*, 245 U.S. 418, 425, 38 S. Ct. 158, 159, 62 L. Ed. 372, 375 (1918) (Holmes, J.) ("A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."). The reason has oft been noted. As language is "inherently contextual," *Moskal v. United States*, 498 U.S. 103, 108, 111 S. Ct. 461,465, 112 L. Ed. 2d 449, 458 (1990), the ambiguity generated by a term's multiple ordinary connotations can oftentimes be dissipated—and a statute found to be both plain *and* unambiguous—if it can be determined that "only one of the[se] permissible meanings produces a substantive effect that is compatible with the rest of the law," *Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S. Ct. 626, 630, 98 L. Ed. 2d 740, 748 (1988), *quoted in AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 354, 131 S. Ct. 1740, 1754, 179 L. Ed. 2d 742, 760 (2011); *accord FCC*, 562 U.S. at 407; *Nken v. Holder*, 556 U.S. 418, 426, 129 S. Ct. 1749, 1756, 173 L. Ed. 2d 550, 561 (2009). For this reason, "[i]n expounding a statute, . . . [courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its policy." *Colortex v. Richardson*, 19 F.3d 1371, 1375 (11th Cir. 1994) (quoting *Offshore Logistics v. Tallentire*, 477 U.S. 207, 222, 106 S. Ct. 2485, 2494, 91 L. Ed. 2d 174, 189 (1986)); *accord Hickman v. Texas (In re Hickman)*, 260 F.3d 400, 403

(5th Cir. 2001) (quoting *Kelly v. Robinson*, 479 U.S. 36, 43, 107 S. Ct. 353, 357–58, 93 L. Ed. 2d 216, 225 (1986)).

For decades, numerous linguistic, semantic, and syntactic canons have been utilized in this exercise. *See generally* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012). Even if a statute has been found both plain and unambiguous by means of such analysis, courts may reject that meaning's application if: (1) an absurdity would result; (2) clear and incontrovertible evidence of contrary legislative intent exists; (3) an "obvious clerical or typographical error[]" is to blame; or (4) a constitutional conflict would arise. *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 381–82, 125 S. Ct. 716, 724–25, 160 L. Ed. 2d 734, 747 (2005); *U.S. Nat'l Bank v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 462, 113 S. Ct. 2173, 2186, 124 L. Ed. 2d 402, 422 (1993); *Russello v. United States*, 464 U.S. 16, 20, 104 S. Ct. 296, 299, 78 L. Ed. 2d 17, 22 (1983); *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.*, 448 F.3d 1092, 1097 (9th Cir. 2006) (Bybee, J., dissenting); *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). In this jurisprudence, absurdity is narrowly understood, and "odd" things, the byproducts of stray omissions or careless additions, are not necessarily "absurd." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 565, 125 S. Ct. 2611, 2624, 162 L. Ed. 2d 502, 525 (2005); *see also Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) (holding canon applicable only in "rare situations where the plain language of a statute, at least where read in isolation, yields a result that is both absurd and completely at odds with the entire statutory context in which the language is found"). "The oddity or anomaly of certain consequences" may thus militate against a certain construction, "but it is no basis for disregarding or changing the text," SCALIA & GARNER, *supra*, at 237, especially in light of the courts' "unwillingness to soften the import of Congress' chosen words even if we

believe the words lead to a harsh outcome," *Lamie*, 540 U.S. at 538; *cf. Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc., Woodbridge Logistics LLC*, 5 F. Supp. 3d 707, 720 (D.N.J. 2014) ("Just because the application of . . . bright line rules sometimes leads to harsh outcomes does not mean that courts may deviate from them whenever doing so seems fair."). In all other cases, if the foregoing textual and contextual analysis discloses one certain meaning and the statutory scheme is neither incoherent nor inconsistent, the statute's import is plain and unambiguous and hence dispositive and conclusive, the court's sole function "to enforce it according to its terms." *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 641 (M.D. La. 2015).

## V.    DISCUSSION

### A.    THRESHOLD QUESTIONS: *RES JUDICATA*, IMMUNITY, AND MOOTNESS

Before considering the motions for summary judgment filed by Schedler and the US, this Court must determine whether three separate doctrines—the principles of preclusion and of mootness and the extent, if any, of LA's constitutional immunity—compel the Complaint's dismissal. In this analysis, Rule 12 governs. (*See, e.g.*, Doc 340–42, 345.) Accordingly, this Court must grant a presumption of truth to every factual allegation made by the US, the nonmovant, and must confine itself to the pleadings or any documents incorporated by reference. *See supra* Part IV.A–B; *see also, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Relying on no other evidence, this Court does not choose to convert the relevant Dispositive Motions into motions for summary judgment, even though some of the same essential points reappear in Defendants' miscellaneous filings.

Defendants' position is straightforward. In their view, their "substantial compliance" with the NVRA in *Scott*'s aftermath moots the US' current suit, as it is partly predicated on their pre-*Scott* misdeeds. (*See, e.g.*, Doc. 340-1 at 1–4; Doc. 407 at 1.) Similarly, as the *Scott* Matter involved the same issues and was litigated by plaintiffs aligned with the US, claim and issue preclusion foreclose the continuance of this litigation. (*See, e.g.*, (Doc. 340-1 at 4; *see also* Doc. 185 at 13–15; Doc. 407 at 14–15.) LA alone, in turn, insists on its immunity from suit under the NVRA, pointing to both the Eleventh Amendment and the alleged absence of explicit statutory authority for such suit. (*See* Doc. 341.) If preclusion does indeed apply, dismissal of some discrete issues should likely follow, and if LA's position is not legally mistaken, its dismissal as a party would be mandatory. However, as shown below, preclusion cannot foreclose this action in its entirety, and neither the Eleventh Amendment nor the NVRA absolve LA of liability for this law's violation.

1.      **Preclusion as to the US**[48]

a.      *Introduction: Control and Virtual Representation*

As used by the Parties here, (Doc. 340-1 at 3), and as widely accepted, *res judicata* can

refer to two separate preclusion doctrines: claim and issue preclusion.[49] *See, e.g.*, *Test Masters*

*Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005); *Kelly-Hansen v. Kelly-Hansen*,

941 P.2d 1108, 1111–12 (Wash. Ct. App. 1997). According to binding federal common law, *see*

*Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 507, 121 S. Ct. 1021, 1027, 149 L. Ed.

2d 32, 42 (2001), claim preclusion serves to preclude litigation of a later claim if four elements

---

[48] The preclusive effect of the *Scott* Court's findings as to all the Defendants is not open to reasonable question. Though DHH now avers otherwise, (Doc. 399 at 44–46), its earlier motions pled the elements for preclusion and insisted they applied to the Defendants and the US, (*See, e.g.*, Doc. 185 at 7). Moreover, unlike the US, the Defendants, with the one exception of LA, were parties to the prior action. As such, the doctrine of "non-mutual offensive collateral estoppel" of issues of law and questions of fact, defined as "when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party," does apply on its own terms. But, while no private person may employ this form of estoppel against the United States, *see United States v. Mendoza*, 464 U.S. 159 n.4, 162, 104 S. Ct. 568, 573 n.4, 78 L. Ed. 2d 379, 386 n.4 (1984); *see also, e.g.*, *Sun Towers, Inc. v. Heckler*, 725 F.2d 315, 323 n.8 (5th Cir. 1984); *Kanter v. Comm'r*, 590 F.3d 410, 420 (7th Cir. 2009); *United States v. Maybusher*, 735 F.2d 366, 370 (9th Cir. 1984); *U.S. Dep't of Justice v. Hudson*, No. 1:06-CV-763 (FJS), 2009 U.S. Dist. LEXIS 130261, at *11, 2009 WL 7172812, at *4 (N.D.N.Y. July 8, 2009); *Baptist Mem. Hosp. Sys. v. Shalala*, No. H-97-1764, 1998 U.S. Dist. LEXIS 23530, at *31–32 (S.D. Tex. May 28, 1998), a few courts have granted state governmental entities the benefit of this prohibition*, see, e.g.*, *Benjamin v. Coughlin*, 708 F. Supp. 570, 573 (S.D.N.Y. 1989); *Hercules Carriers, Inc. v. Claimant State of Florida, Dep't of Transp.*, 768 F.2d 1558, 1580 (11th Cir. 1985). Still, no binding precedent compels such a result, and *Mendoza* and its progeny overwhelmingly focus upon the federal government. Perhaps more significantly, DHH and DCFS have repeatedly conceded their failure to comply with the NVRA prior to the initiation of the *Scott* litigation, as outlined in the First and Amended Injunctions. As such, the defendants in *Scott* are now estopped from denying the truth of these admissions. Regardless, as former parties to the *Scott* Matter who chose not to appeal, this doctrine offers no succor to either DCFS or DHH. As for LA and SOS, for the reasons stated in this Part and in this footnote, preclusion must apply against them.

[49] Rather frequently, courts use the phrase "*res judicata*" to refer solely to claim preclusion, and "collateral estoppel" to refer to issue preclusion. *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 892 n.5, 128 S. Ct. 2161, 2170 n.5, 171 L. Ed. 2d 155, 167 n.5 (2008); *Berríos v. Gonzalez-Rosario*, 630 F.3d 7, 11 n.5 (1st Cir. 2010).

are met: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both action," *Comer v. Murphy Oil USA*. 718 F.3d 460, 467 (5th Cir. 2013); *accord Stevens v. Bank of Am., N.A.*, 587 F. App'x 130, 132–33 (5th Cir. 2014). More simply, this "relevant aspect of res judicata . . . prohibits successive litigation of the very same claim by the same parties." *Whole Woman's Health v. Hellerstedt*, No. 15-274, 2016 U.S. LEXIS 4063, at *24–25, 2016 WL 3461560, at *11 (June 27, 2016) (internal quotation marks omitted) (citing *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S. Ct. 1808, 1814, 149 L. Ed. 2d 968, 976–77 (2001)).[50] Issue preclusion applies when the following three elements are met: "(1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a part of the judgment in that earlier action." *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 932 (5th Cir. 1999).

Regardless of the form of preclusion applicable, an effective congruence of interest between a former litigant and the present party is required. *See, e.g.*, *Taylor*, 553 U.S. at 893–96; *Stephens v. Jessup*, 793 F.3d 941, 944–45 (8th Cir. 2015); *Virnich v. Vorwald*, 664 F.3d 206, 216 (7th Cir. 2011). The reason for this requirement is clear, as "a person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." *Taylor*, 553 U.S. at 892–93 (internal quotation marks omitted). In *Taylor v. Sturgell*, at

---

[50] "The doctrine of res judicata has never been as pithily or colorfully expressed as it was during the Civil War by a highly unlikely source. General Nathan Bedford Forrest, the semi-literate cavalry genius of the Confederacy, after twice refusing a soldier's request for a furlough, scribbled on the back of the form, 'I told you twicest Godamnit know.'" *Gregory v. Chehi*, 843 F.2d 111, 112 (3d Cir. 1988). Needless to say, historical confirmation for this legend is lacking.

least six relationships were recognized as creating the requisite link by the Supreme Court. *Id.* at 893–96. Here, Defendants rely on only two, insisting the US either controlled the *Scott* Plaintiffs or was "adequately represented" by these private parties.[51]

For two reasons, this Court cannot preclude the US from re-litigating those factual and legal allegations not definitively adjudicated by the *Scott* court and Defendants' allegedly ongoing noncompliance with the NVRA.

### b.   *Insufficient Evidence of Control*

First and foremost, despite the US' obvious interest in the *Scott* litigation, its involvement was simply too minimal for this Court to conclude that it "assume[d] control over [that] litigation." *Montana v. United States*, 440 U.S. 147, 154, 99 S. Ct. 970, 974, 59 L. Ed. 2d 210, 218 (1979); *accord, e.g.*, *Donley v. Hudson's Salvage, LLC*, No. 10-3223, 2011 U.S. Dist. LEXIS 136908, at *38–39, 2011 WL 5930473, at *14 (E.D. La. Nov. 29, 2011). "To have control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action . . . [and] must also have control over the opportunity to obtain review." *Freeman v. Lester Coggins Trucking Inc.*, 771 F.2d 860, 864 n.3 (5th Cir. 1985). A "typical example[]" occurs when the nonparty is but the party's alter ego. *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974), *cited in Freeman*, 771 F.2d at 864; *see also Robin Singh Educ. Servs. Inc. v. Excel Test Prep Inc.*, 274 F. App'x 399, 400 n.1 (5th Cir. 2008).

---

[51] These theories are not necessarily distinct. *Meza v. General Battery Corp.*, 908 F.2d 1262, 1267 (5th Cir. 1990) ("Courts have tended to treat authorized representation, class representation, associational representation, and virtual representation as synonymous with adequate representation for res judicata purposes."). As this section shows, in fact, they often intermingle in application.

Beyond this oft-cited example, due to this high standard, only a handful of other examples can be found in the case law. In one famed case—*Montana v. United* States—the requisite control by the government was indeed found. *Montana*, 440 U.S. at 155. That finding, however, came only after the United States stipulated that it (1) had required the first lawsuit to be filed, (2) reviewed and approved the complaint, (3) paid the plaintiff's attorneys' fees and costs, (4) directed the appeal from the state district court to the Montana Supreme Court, (5) appeared and submitted a brief as amicus in the Montana Supreme Court, (6) directed the filing of a notice of appeal to the Supreme Court, and (7) effectuated Kiewit's abandonment of that appeal on advice of the Solicitor General. *Id.* As these and other examples show, decisive evidence of domination over a party's strategy, presentation, and procedural maneuvers must be provided by the party demanding preclusion's application. *See, e.g.*, *Donley*, 2011 U.S. Dist. LEXIS 136908, at *26, 2011 WL 5930473, at *9; *cf. United States v. Bhatia*, 545 F.3d 757, 759–60 (9th Cir. 2008) ("[A] court must evaluate whether the relationship between the nonparty and a party was such that the nonparty had the *same* practical opportunity to control the course of the proceedings." (emphasis added) (internal quotation marks omitted)).

Here, no such overwhelming evidence of the domination required by *Montana* and its progeny appears in either case's docket. That the US filed a single statement of interest and a single amicus brief and presented a five-minute argument before the Fifth Circuit does not show that it so tightly managed and supervised the *Scott* Plaintiffs' litigation. Yet, no more than these few facts have been shown. (Doc. 185 at 9–10; *see also* Doc. 340-1 at 4.) Nor does the unproven allegation that a US attorney observed the *Scott* proceedings and conferred with counsel for the *Scott* Plaintiffs throughout trial, (Doc. 185 at 10 n.37; *see also* Doc. 340-1 at 4), demonstrate that the US dictated these private persons' every move or framed their every argument. *See, e.g.*,

*United States v. Davis*, 906 F.2d 829, 833 (2d Cir. 1990). Unlike in *Montana*, the US did not

"require" that the first lawsuit be filed; it did not "review and approve" the complaint; it did not

pay attorneys' costs and fees; it did not "direct" the *Scott* Plaintiffs' appeal to the Fifth Circuit or

"direct" the filing of a notice of appeal to the Supreme Court; and it did not "effectuate [the]

abandonment" of any such appeal. *Montana*, 440 U.S. at 155. In *Montana*, the US stipulated to

these pivotal facts; neither here nor before the *Scott* Court, has it done so.

True, the US' actions do indicate its interest in the *Scott* Matter and even its hopes for the

success of these private actors. However, this fails to prove that the US possessed "effective

choice as to the legal theories and proofs to be advanced in behalf of the party to the action."

*Freeman*, 771 F.2d at 864 n.3; *see also Algie v. RCA Global Commc'n*, 891 F. Supp. 839, 852

(S.D.N.Y. 1994) ("[A] purported controlling non-party must, at least, be able to decide what

legal theories and evidence should be advanced in the first action and whether an appeal should

be taken from an adverse decision."). Rather, these facts are cumulatively too minor to support

preclusion's application, as numerous authorities have recognized. *See, e.g.*, *Nat'l Fuel Gas*

*Distrib. Corp. v. TGX Corp.*, 950 F.2d 829, 839 (2d Cir. 1991) (participation as amicus

insufficient to demonstrate control under New York law); *Va. Hosp. Ass'n v. Baliles*, 830 F.2d

1308, 1313 (4th Cir. 1987) (observing that a nonparty's "substantial interest in establishing

favorable precedent under the doctrine of stare decisis cannot preclude the nonparty from later

relitigating issues determined in the prior suit" and adding that "a nonparty is not deemed to have

control over litigation simply because he procures witnesses or evidence for a party to the suit"

(internal quotation marks omitted); RESTATEMENT (SECOND) OF JUDGMENTS § 39 cmt. c (1983)

("It is not sufficient . . . [to prove control] that the person merely contributed funds or advice in

support of the party, supplied counsel to the party, or appeared as amicus curia.").

In fact, in the decades since *Montana*, the Fifth Circuit has not bucked this pattern nor

strayed from such a narrow construction. Thus, after enumerating three examples of "necessary"

control—"the president and sole shareholder," "parent corporation" which controls its

"subsidiary," and "an indemnitor defend[ing] an action against an indemnitee"—the Fifth Circuit

once warned: "[L]esser measures of participation without control do not suffice." *Benson &*

*Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir. 1987). It then proceeded to

add the following as insufficient:

> Thus it is not enough [that] the nonparty supplied an attorney or is represented by
> the same law firm; helped to finance the litigation; appeared as an amicus curiae;
> testified as a witness; participated in consolidated pretrial proceedings; undertook
> some limited presentations to the court; or otherwise participated in a limited way.

*Id.*; *accord, e.g.*, *Hinsley v. Boudloche (In re Hinsley)*, No. 97-20967, 1998 U.S. App. LEXIS

39954, at *26, 1998 WL 414302, at *9 (5th Cir. July 15, 1998).

Viewed in toto, the facts indicate nothing more than the US' bare interest, the evidence of

supposed control presented by Defendants discounted by the Fifth Circuit in its distinct

precedents, including *Benson & Ford, Inc. v. Wanda Petroleum* Company. 833 F.2d at 1174; *see*

*also, e.g.*, *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 960 F.2d 1286, 1297 (5th Cir. 1992)

(requiring "an express or implied legal relationship between the party and the nonparty "in which

[the] party to the first suit [is] accountable to [the] non-party who files a subsequent suit raising

identical issues" (alteration in original) (internal quotation marks omitted)). With Defendants

having failed to satisfy their heavy burden of demonstrating clear domination as long defined by

multiple courts, *see, e.g.*, *Terrell v. De Conna*, 877 F.2d 1267, 1271 (5th Cir. 1989); *Jon Jon's*

*Inc. v. City of Warren*, 534 F. App'x 541, 543 (6th Cir. 2013); *Buck v. Thomas M. Cooley Law*

*Sch.*, 597 F.3d 812, 816 (6th Cir. 2010), this Court finds the conduct by the US in the *Scott*

litigation to be insufficient to trigger preclusion on this basis, *cf. Hastings v. Judicial Conf. of*

*U.S.*, 829 F.2d 91, 101 (D.C. Cir. 1987). At best, no more than "participation" has been confirmed, and the requisite "actual control" not shown. *See Benson & Ford, Inc.*, 833 F.2d at 1174; *Fitzgibbon v. Martin Cnty. Coal Corp.*, Civ. No. 05-36, 2007 U.S. Dist. LEXIS 30388, at *23–24, 2007 WL 1231509, at *8–9 (E.D. Ky. Apr. 25, 2007).


c.      *Insufficient Indicia of Virtual Representation*

Similarly, this Court cannot regard the *Scott* Plaintiffs as having been the US' "virtual representatives," as Defendants have also repeatedly maintained. As the Supreme Court and Fifth Circuit have stressed, this concept contemplates only a limited set of relationships: estate beneficiaries bound by administrators, presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a trust beneficiary by the trustee. *Taylor*, 553 U.S at 895; *Kinnison v. Humana Health Plan of Tex., Inc.*, Civ. A. No. C-07-381, 2008 U.S. Dist. LEXIS 47289, at *33, 2008 WL 2446051, at *10 (S.D. Tex. June 17, 2008) (summarizing Fifth Circuit jurisprudence). For its part, the Fifth Circuit has stressed that "virtual" or "adequate" representation "demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to nonparties who file a subsequent suit raising identical issues." *Freeman*, 771 F.2d at 864; *see also, e.g.*, *Taylor*, 553 U.S. at 904; *Pollard v. Cockrell*, 578 F.2d 1002, 1008 (5th Cir. 1978); *Reneker v. Offill*, No. 3:08-CV-1394-D, 2012 U.S. Dist. LEXIS 83017, at *53 n.17, 2012 WL 2158733, at *16 n.17 (N.D. Tex. June 14, 2012); *Limon v. Berryco Barge Lines, L.L.C.*, 779 F. Supp. 2d 577, 583 (S.D. Tex. 2011). Such representation, it clarified, "requires more than a showing of parallel interests — it is not enough that the non-party may be interested in the same questions or proving the same facts." *Eubanks v. Fed. Deposit Ins. Co.*, 977 F.2d 166, 170 (5th Cir. 1992). Just as the Supreme Court specifically

rejected "an expansive doctrine of virtual representation," *Taylor*, 553 U.S at 896, so has the

Fifth Circuit, *see, e.g.*, *In re Hinsley*, 1998 U.S. App. LEXIS 39954, at *27–28, 1998 WL

414302, at *9; *Gulf Island-IV, Inc. v. Blue Streak-Gulf Island Operations*, 24 F.3d 743, 747 (5th

Cir. 1994) (quoting *Eubanks*, 977 F.2d at 170); *White v. Fox*, 576 F. App'x 327, 331 (5th Cir.

2014) (same); *cf. Cadle Co. v. Reed*, 392 B.R. 675, 682 (N.D. Tex. 2008).

     Even when the broadest definition of "virtual representation" is utilized, the US does not

fall within it. Obviously, the US was not the *Scott* Plaintiffs' estate or trust beneficiary or alter

ego, and Defendants have yet to allege the existence of such a legal relationship. Furthermore,

despite its interest "in the same questions or [in] proving the same facts," *Eubanks*, 977 F.2d at

170, not a scintilla of evidence suggests that the *Scott* Plaintiffs were "accountable to" the US for

their every move and overall strategy, *Freeman*, 771 F.2d at 864. Presented with a less than clear

doctrine whose capacious construction has been specifically rejected by this nation's highest

tribunal, this Court opts to honor preclusion law's underlying principle: "[I]t is a violation of due

process for a judgment [in a prior suit] to be binding on a litigant who was not a party or a privy

and therefore has never had an opportunity to be heard." *Parklane Hosiery Co.*, 439 U.S. at 327

n.7. Thus, as Defendants have failed to prove a sufficiently definite and comprehensive link

between the US and the *Scott* Plaintiffs, the US cannot be precluded from suing Defendants for

their noncompliance with the NVRA.

### d.    *Other Relevant Considerations*

     Two more principles favor non-preclusion in this case, further buttressing this Court's

preceding analysis. First, as the Supreme Court has recently noted, "[the] development of new

material facts can mean that a new case and an otherwise similar previous case do not present the

same claim." *Whole Woman's Health*, 2016 U.S. LEXIS 4063, at *25, 2016 WL 3461560, at *11

(citing to THE RESTATEMENT (SECOND) OF JUDGMENTS § 24 cmt. f). As such, "res judicata does

not bar claims that are predicated on events that postdate the filing of the initial complaint" in the

predecessor case. *Morgan v. Covington*, 648 F.3d 172, 178 (3d Cir. 2011). As Defendants

themselves have admitted, a number of alleged infractions post-date *Scott*; though derided as

"minor" and "isolated," they are still very real. New facts, ones which bear on the resolution of

this case's key issues, have emerged in *Scott*'s aftermath, and their very existence militates

against preclusion's application. *See, e.g.*, *Abie State Bank v. Bryan*, 282 U.S. 765, 772, 51 S. Ct.

252, 257, 75 L. Ed. 690, 703 (1931); *cf. Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328,

75 S. Ct. 865, 868, 99 L. Ed. 1122, 1127 (1955). Considering the fact that "[c]hanged

circumstances showing that a challenged law has an . . . [illegal] effect" defeat preclusion, *Whole

Woman's Health*, 2016 U.S. LEXIS 4063, at *27, 2016 WL 3461560, at *12, this Court has this

additional reason for denying Defendants' request.

Second, "even when the traditional prerequisites for collateral estoppel are satisfied," a

court retains "broad discretion" to decide whether it may be applied. *Collins v. D.R. Horton, Inc.*,

505 F.3d 874, 882 (9th Cir. 2007); *see also Liberty Life Ins. Co. v. W. R. Grace & Co.*, No. C/A

No. 87-3147-17, 1990 U.S. Dist. LEXIS 20203, at *5–6 (D.S.C. Jan. 16, 1990). In exercising this

discretion, a court should permit a party "to relitigate an issue if it is one of law and treating it as

conclusively determined would inappropriately foreclose opportunity for obtaining

reconsideration of the legal rule upon which it was based." *State v. United Cook Inlet Drift

Ass'n*, 895 P.2d 947 (Alaska 1995) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 29(7)

(internal quotation marks omitted))). In fact, "where important human values are at stake, even a

slight change of circumstances may afford a sufficient basis for concluding that a second action

may be brought." *Whole Woman's Health*, 2016 U.S. LEXIS 4063, at *26, 2016 WL 3461560, at

*11 (citing to THE RESTATEMENT (SECOND) OF JUDGMENTS § 24 cmt. f). The right to vote is

precisely such a value. In this proceeding, when all the known facts are weighed, especially in

light of the US' minimally attested involvement in the *Scott* Matter and the pivotal importance of

the right to vote, it would be improper to foreclose consideration of Defendants' alleged ongoing

noncompliance and the apparent reach of the NVRA to various state agencies and over remote

transactions. These issues remain, even after *Scott*, undetermined and undecided.


e.      *Conclusion*

Based on the foregoing, this Court declines to permit Defendants to make use of the *Scott*

court's findings against the US. *See, e.g.*, *Donovan v. Cunningham*, 716 F.2d 1455, 1462-63 (5th

Cir. 1983) (holding that Secretary of Labor is not bound under doctrine of *res judicata* by the

results of private ERISA litigation because of the Secretary's overriding public interest that is

separate and distinct from a private litigant's interests); *Herman v. S.C. Nat'l Bank*, 140 F.3d

1413, 1424 (11th Cir. 1998) (same); *Sec. of Labor v. Fitzsimmons*, 805 F.2d 682, 687-91 (7th

Cir. 1986) (*en banc*) (same).


2.      **LA's Immunity**

Invoking the NVRA and the Constitution, LA denies its liability for any statutory

infraction. Yet, neither argument can withstand close scrutiny for three reasons.[52]

---

[52] Some of the same reasons and a number of equally relevant cases appear later in this Ruling. *See infra* Part V.C.2.

First, LA misconstrues the NVRA's constitutional basis. As its history attests and as courts have recognized, the NVRA was deliberately and expressly anchored in the Elections Clause. S. REP. No. 103-6 at 2–3; *Ass'n of Cmty. Orgs. for Reform Now*, 56 F.3d at 793–94; *see also supra* Part II.B. Its "substantive scope . . . broad," its language "embrace[s] authority to provide a complete code for congressional elections . . . ." *Arizona*, 133 S. Ct. at 2253 (citing *Smiley*, 285 U.S. at 366); *see also Foster v. Love*, 522 U. S. 67, 69, 118 S. Ct. 464, 466,139 L. Ed. 2d 369, 373 (1997) ("[I]t is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33, 115 S. Ct. 1842, 1869, 131 L. Ed. 2d 881, 918 (1995))).

This constitutionally bestowed power "is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Ex parte Siebold*, 100 U.S. 371, 392, 25 L. Ed. 717 (1880). Per the Supremacy Clause, "[a]s long as it is acting within the powers granted it under the Constitution," as it did with the NVRA, "Congress may impose its will on the States." *Wyeth v. Levine*, 555 U.S. 555, 584, 129 S. Ct. 1187, 1205, 173 L. Ed. 2d 51, 72 (2009). Thus, once Congress enacted the NVRA pursuant to its authority under the Elections Clause, the Eleventh Amendment could no longer immunize a state from any liability. *See, e.g.*, *Arizona*, 133 S. Ct. at 2253; *Kobach*, 772 F.3d at 1195; *Ass'n of Cmty. Orgs. for Reform Now*, 56 F.3d at 796; *Veasey v. Perry*, 29 F. Supp. 3d 896, 912 –13 (S.D. Tex. 2014). Consequently, as the Fifth Circuit itself announced, the Eleventh Amendment has "no relevance to . . . claims seeking to vindicate federal rights and thereby the supremacy of federal law" pursuant to the NVRA. *Young v. Hosemann*, 598 F.3d 184, 189 (5th Cir. 2010); *see also, e.g.*,

*Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000). The US is seeking no more and no less in this action.[53] *See, e.g.*, *True the Vote*, 29 F. Supp. 3d at 872 n.1; *Harkless*, 545 F.3d at 454; *Voting Rights Coalition v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995).

Second, the Eleventh Amendment does not apply to this particular suit on its own explicit terms. Per this oft-cited provision, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. As written and construed, it does not bar suits brought by the United States itself. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 756, 119 S. Ct. 2240, 2267, 144 L. Ed. 2d 636. 679 (1999); *Arkansas v. Farm Credit Servs.*, 520 U.S. 821, 826–27, 117 S. Ct. 1776, 1780, 138 L. Ed. 2d 34, 40–41 (1997); *Arizona v. California*, 460 U.S. 605, 614, 103 S. Ct. 1382, 1388, 75 L. Ed. 2d 318, 330 (1983). Here, unlike in *Scott*, the US stands forth as the sole and only plaintiff. (*See, e.g.*, Doc. 1; Doc. 444.) Authorized to vindicate a "fundamental right," 52 U.S.C. § 20501, pursuant to § 20510(a), the US, as a litigant, could never be constricted by the Eleventh Amendment. *Cf. Broyles*, 618 F. Supp. 2d at 699–700.

Of course, had the NVRA been silent as to a state's responsibilities or liability, LA may have been immune from its reach. Having earlier defined "State" as "a State of the United States and the District of Columbia,"[54] however, the NVRA's seventh section makes clear who

---

[53] Because of this indisputable constitutional basis, Defendants' repeated invocation of "federalism" is inapposite to the case at hand, obfuscating the requisite analysis. True, the states retain innumerable rights in this nation's constitutional order, and they hold a most sacred and inviolate role as separate sovereigns. However, where the Constitution permits Congress to abrogate that immunity, Congress may do so, and the states must give way to a law so tethered. The NVRA is precisely such a statute. *See supra* Part II.B.

[54] Several states were exempted. 52 U.S.C. § 20503(b). LA was and is not one of them. *See* note 21.

Congress has chosen to hold accountable for compliance with its substantive provisions: "Each *State* shall . . . ." 52 U.S.C. §§ 20502(4), 20506(a) (emphasis added); *see also Colón-Marrero v. Conty-Pérez*, 703 F.3d 134, 137 (1st Cir. 2012). As its plain terms reveal, "[t]he Act adopts procedures designed to make it easier to register to vote, and it requires the *states* to put these procedures into place." *Nat'l Coalition for Students with Disabilities Educ. & Legal Defense Fund*, 152 F.3d at 285 (emphasis added). True, it requires states to appoint a single agent to coordinate and enforce its provision. 52 U.S.C. § 20509. Nevertheless, the NVRA does not simultaneously absolve "each State" of liability for this agent's failures to fulfill that state's statutory obligations.[55]

Instead, its language is clear, and a state may not effectively rewrite supreme federal law simply by delegating both its enforcement function and its ultimate liability to other departments or actors. *See, e.g.*, *Harkless*, 545 F.3d at 457; *New York*, 255 F. Supp. 2d at 79; *see also, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 286 (2d Cir. 2003) (holding that New York could not avoid its obligations under the Rehabilitation Act by delegating authority to localities to deliver federally funded services). In the interest of efficiency and speed, a state may prefer to entrust the actual implementation of the NVRA and supervision of its compliance to subordinate actors. But, in so doing, it cannot devolve its ultimate responsibility for compliance and liability for defiance, as explicitly embodied in the NVRA's sundry sections, unto these other entities. *E.g.*, *Harkless*, 545 F.3d at 457; *Missouri*, 535 F.3d at 850; *see also, e.g.*, *Reynolds v. Giuliani*, 118 F.

---

[55] Another point ignored by Defendants is apposite. As one court observed, the appointment of an official is seemingly intended to ensure the existence of some state actor who can wield the power to rectify any violation alleged and noticed by private parties pursuant to § 20510(b)(1)–(2). *Miller*, 129 F.3d at 838. In other words, the requirement is intended to ensure a state can correct its alleged errors prior to a private suit's commencement, not to free the state from any and all liability for the NVRA's contravention. For more on the NVRA's structure, see *supra* Part II.B.

Supp. 2d 352, 386 (S.D.N.Y. 2000) ("[I]mplicit in the State's obligations to administer the Food

Stamp Act, Medicaid Act, and cash assistance programs is a duty to oversee the City defendants'

administration of the programs to ensure compliance with federal law."); *Woods v. United States*,

724 F.2d 1444, 1447 (9th Cir. 1984) ("The Food Stamp Act places responsibility for the

administration of the food stamp program on the state."). Only Congress, as Schedler himself

concedes, may so rewrite the NVRA, not only authorizing delegation but also exempting a state

from responsibility. *See New York*, 255 F. Supp. 2d at 79 ("It would be plainly unreasonable to

permit a mandatorily designated State agency to shed its NVRA responsibilities because it has

chosen to delegate the rendering of its services to local municipal agencies."); *accord, e.g.*,

*Harkless*, 545 F.3d at 453; *cf. Woods*, 724 F.2d at 1447 ("While the state may choose to delegate

some administrative responsibilities, the ultimate responsibility for operation of the [food stamp

program] remain[s] with the state.").

     In the context of the NVRA, only one case, promptly reversed, has held differently.

*Missouri*, 535 F.3d at 852 (reversing *United States v. Missouri*, No. 05-4391-CV-C-NKL, 2006

U.S. Dist. LEXIS 32499, 2006 WL 1446356 (W.D. Mo. May 23, 2006)). Bound by the NVRA's

unadorned terms,[56] this Court refuses to discharge LA from this law's plainly imposed and stated

duties. *See, e.g.*, *Robertson v. Jackson*, 972 F.2d 529, 534 (4th Cir. 1992); *Moore v. Perales*, 692

F. Supp. 137, 139 (E.D.N.Y. 1988); *California v. Block*, 663 F.2d 855, 858 (9th Cir. 1981); c*f.*

*Delgado v. Galvin*, No. 12-cv-10872, 2014 U.S. Dist. LEXIS 33476, at *19–21, 2014 WL

1004108, at *7 (D. Mass. Mar. 14, 2014) (observing that the notice provided to Massachusetts'

Secretary of this Commonwealth in accordance with § 20510(b)(1) was sufficient though it

---

[56] The State itself admitted that it does not think the SOS' special role "absolve[s]" it from
liability. (Hr'g Tr. 8:19–20.)

referred only to "local offices" and the state's general "compliance with public assistance

provisions of the NVRA"); *Ass'n of Cmty. Orgs. for Reform v. Scott*, No. 08-CV-4084-NKL,

2008 U.S. Dist. LEXIS 101778, 2008 WL 5272059, at *2 (W.D. Mo. Dec. 17, 2008) (holding

that the relevant state official was not a necessary party but identifying other defendants as

eligible and covered persons). Explicitly named in the statute, forty-four states were charged

with duties by the NVRA, and LA is and has always been one such sovereign actor. *See*

*Cegavske*, 800 F.3d at 1041 (finding "no difficulty [in] concluding that Plaintiffs have

adequately alleged that the injury they suffer is attributable to the State" in another NVRA case);

*Scales*, 150 F. Supp. 2d at 850 (holding that "the allegations that the [state defendant]'s

noncompliance frustrates these goals and requires the organization to expend resources in

facilitating the registration of disabled persons that they otherwise would spend in other ways is

sufficient to show an actual or threatened injury in fact that is fairly traceable to the alleged

illegal action and is likely to be redressed by a favorable court decision ordering injunctive

relief").

     Although the NVRA's text demands this result as a matter of supreme federal law, this

Court also finds support in Louisiana's "fundamental law," *Graham v. Jones*, 3 So. 2d 761, 795

(La. 1941). As a constitutional matter, the SOS is independent of other executive figures, but he

(or she) remains an instrumentality of the state itself, LA. CONST. art. IV, §§ 1(A), 7, a not

unusual feature of the various state's constitutional systems, *see, e.g.*, *Ysursa v. Pocatello Educ.*

*Ass'n*, 555 U.S. 353, 362, 129 S. Ct. 1093, 1100, 172 L. Ed. 2d 770, 779–80 (2009) ("Political

subdivisions of States--counties, cities, or whatever--never were and never have been considered

as sovereign entities. . . . They are instead "subordinate governmental instrumentalities created

by the State to assist in the carrying out of state governmental functions." (internal quotation

marks omitted). Regardless of Schedler's independence from other officers, he is a creature of the state itself. *Cf. Trenton v. New Jersey*, 262 U.S. 182, 187, 43 S. Ct. 534, 537, 67 L. Ed. 937, 941 (1923) ("State political subdivisions are merely . . . department[s] of the State, and the State may withhold, grant or withdraw powers and privileges as it sees fit."). The NVRA does indeed contain a "centralized requirement under the NVRA that one person respond and be responsible," (Hr'g Tr. 8:19 –23), but under Louisiana law, the State is the ultimate sovereign here—and thus a proper defendant under the NVRA. Like so many other officials and agents, the SOS is but a "creature of the State exercising and holding powers and privileges subject to the sovereign will." *Trenton*, 262 U.S. at 187.

### 3.      Mootness

#### a.      *General Doctrine's Application*

Pursuant to Article III of the Constitution, a federal court's jurisdiction is limited to live cases or controversies. U.S. CONST. art. III, § 2; *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 413 n.16 (5th Cir. 1999) (quoting *North Carolina v. Rice*, 404 U.S. 244, 245–46, 92 S. Ct. 402, 404, 30 L. Ed. 2d 413, 415 (1971)). A "live" (or "justiciable")[57] case is "must be definite and concrete, touching the legal relations of parties having adverse legal interests" and is "thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 –41, 57 S. Ct. 461, 464,

---

[57] Courts often treat standing and mootness, two justiciability doctrines, as a subset of subject-matter jurisdiction. *See, e.g.*, *Genesis HealthCare Corp. v. Symczyk*, 133 S. Ct. 1523, 1532, 185 L. Ed. 2d 636, 647 (2013). "Nevertheless, the concepts derive from different textual sources in the Constitution and are conceptually distinguishable." *Target Training Int'l, Ltd. v. Extended Disc N. Am.*, Nos. 2015-1873, 2015-1908, 2016 U.S. App. LEXIS 7292, at *8 n.1, 2016 WL 1612780, at *3 n.1 (Fed. Cir. Apr. 22, 2016).

81 L. Ed. 617, 621 (1937); *see also, e.g.*, *Val-Com Acquisitions Trust v. Chase Home Fin., L.L.C.*, 434 F. App'x 395, 395–96, 396 n.2 (5th Cir. 2011) ("An actual controversy is a dispute that is 'definite and concrete, touching the legal relations of parties having adverse legal interests.'" (citing *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000))); *Talbott Big Foot, Inc. v. Boudreaux (In re Talbott Big Foot, Inc.)*, 924 F.2d 85, 86–87 (5th Cir. 1991). If a case is moot, it must be dismissed. *See, e.g.*, *Abraham v. Del. Dep't of Corr.*, 331 F. App'x 929, 931 (3d Cir. 2009) (per curiam).

Since correction of a prior and illegal practice may dissolve a parties' conflict, such cessation may occasionally moot an otherwise active case. Despite this principle, however, "[w]hen defendants are shown to have settled into a continuing practice . . . courts will not assume that it has been abandoned without clear proof," for "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform." *United States v. Or. State Med. Soc'y.*, 343 U.S. 326, 333, 72 S. Ct. 690, 96 L. Ed. 978 (1952); *see also City News & Novelty v. City of Waukesha*, 531 U.S. 278, 284 n.1, 121 S. Ct. 743, 747 n.1, 148 L. Ed. 2d 757, 763 n.1 (2001) ("[A] party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."). This reluctance must be most marked, the Supreme Court has warned, "when abandonment seems timed to anticipate suit, and there is probability of resumption." *Or. State Med. Soc'y.*, 343 U.S. at 333; *see aslo Hernandez v. Cremer*, 913 F.2d 230, 235 (5th Cir. 1990) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." (internal quotation marks omitted)).

Guided by the "general rule that voluntary cessation of a challenged practice rarely moots a federal case," *City News & Novelty*, 531 U.S. at 284 n.1, mootness bars nothing here. Even if

this Court was to adopt Defendants' broad reading of *Scott*, the evidence adduced by the US and conceded by Defendants leaves no question about the continued existence of "definite and concrete" disputes. In the Complaint, the US has alleged a series of actions by Defendants that either post-date the First Injunction or were not litigated before the *Scott* Court. (*See, e.g.*, Doc. 1; *see also, e.g.*, Doc. 346.) True, Defendants may be unpersuaded at this evidence; true, a future factfinder may agree; but both the allegations as well as the evidence proffered in support of the MSJ affirm the reality of a dispute neither academic nor hypothetical.

In this regard, the US does not stand alone, as Defendants themselves have made two important concessions. First, they have repeatedly admitted that "isolated" and "discrete" acts of noncompliance continue to occur in spite of the First and Amended Injunctions. (*See, e.g.*, Doc. 398 at 7; Doc. 399 at 7; Doc. 402 at 6, 12; Doc. 407 at 7–8, 16–17.) To DCFS and DHH, these events appear insignificant. (*See, e.g.*, Doc. 398 at 7; Doc. 399 at 7; Doc. 402 at 6, 12; Doc. 407 at 7–8, 16–17.) Still, even minor violations of the NVRA remain statutory infractions sufficient to trigger a live dispute over their significance, regardless of whether a "reasonable" or "full" compliance standard is utilized, *see infra* Part V.C. Second, as DHH and DCFS have again admitted, at least four VRAs were "not consistently providing voter registration with each application" as required by the NVRA and were not at issue in *Scott*. (Doc. 398 at 9–12; Doc. 399 at 9–12.) That the *Scott* Court required that DCFS and DHH certify their every program's compliance with the NVRA does not change this admitted fact's patent import: the US is now suing Defendants for existing and arguably ongoing violations that, by Defendants' own admission, were never resolved in the *Scott* Matter. Accordingly, because this suit involves at least some NVRA violations never previously addressed, this case cannot be regarded as moot.

In point of fact, the Fifth Circuit's reversal and remand of the Amended Injunction only supports this inference, as its binding edict has determined that the phrase "policies, procedures, and directives," (Doc. 437, No. 2:11-cv-00926-JTM-JCW), upon which Defendants so heavily rely as encompassing any and all possible programs, (*See, e.g.*, Doc. 398), is not specific enough to reasonably measure at least one defendant's adherence to the NVRA. *Scott*, 2016 U.S. App. LEXIS 10919, at *14–15, 2016 WL 3345277, at *4.[58] Stated differently, this Court will not find mootness when the scope of the most recent injunctive decree is, as of June 6, 2016, uncertainly demarcated.

### b.     *Exception for Repeatable Acts*

Further strengthening this conclusion, a particular exception to the mootness doctrine bears special relevance to this proceeding. Generally, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660, 1665, 75 L. Ed. 2d 675, 684 (1983) (internal quotation marks omitted) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S. Ct. 669, 676, 38 L. Ed. 2d 674, 683 (1974)), *cited in Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411, 2435, 156 L. Ed. 2d 257, 290 (2003). However, an exception has long been recognized if a dispute is capable of repetition or "any continuing, present adverse effects" can be pinpointed. *See, e.g.*, *Renne v. Geary*, 501 U.S. 312, 320–21, 111 S. Ct. 2331, 2338, 115 L. Ed. 2d 288, 301 (1991). In such cases, past

---

[58] At the very least undermining Defendants' present posture, the Fifth Circuit summarized Schedler's argument thusly: "Schedler argues that the Amended Permanent Injunction is too vague to be understood because he 'is not aware of any policies, procedures or directives maintained by the office of the Secretary of State, particularly any 'as revised' that the court might refer to in its order.'" *Id.* If he was so confused then, this Court remains skeptical that he— or any of the Defendants—can be said to have so fully complied with the NVRA's every requirement as to moot every possible issue raised by the US in its pleadings.

wrongs can be reconsidered as evidence bearing on "whether there is a real and immediate threat of repeated injury." *L.A.*, 461 U.S. at 102 (citing *O'Shea*, 414 U.S. at 496); *see also Blinder, Robinson & Co. v. SEC*, 692 F.2d 102, 106-07 (10th Cir. 1982) (holding that a defendant contending that a plaintiff has no cause of action because of the defendant's new behavior "must meet a heavy burden of demonstrating that there is no reasonable expectation that the alleged wrongs will be repeated"(quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S. Ct. 894, 897, 97 L. Ed. 1303, 1309 (1953))).

Consequently, assuming its predicates are met, no case involving a dispute "capable of repetition" will be deemed moot. *See, e.g.*, *Arcia*, 772 F.3d at 1343 (internal quotation marks omitted) (relying on *Davis v. FEC*, 554 U.S. 724, 735, 128 S. Ct. 2759, 2769–70, 171 L. Ed. 2d 737, 749 (2008)); *see also, e.g.*, *Vieux Carre Prop. Owners v. Brown*, 948 F.2d 1436, 1447 (5th Cir. 1991) (holding that, under this exception, "[a]lthough a case may be technically moot, a federal court may nevertheless retain jurisdiction if a continuing controversy exists or if the challenged problem is likely to recur or is otherwise capable of repetition."). "Election cases also frequently present issues that will persist in future elections," one court has explained, and such cases often require this exception's invocation so as to secure "the fundamental right," 52 U.S.C. § 20501(a)(1), protected by the NVRA. *Arcia*, 772 F.3d at 1343.

As alleged and as acknowledged, this case's facts almost surely compel application of this exception. Here, the actions of which the US has accused Defendants can yet be repeated, their pernicious effects played out, before effective and full review can ever be completed. *See News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1507 (11th Cir. 1991). Meanwhile, the acknowledged noncompliance with the NVRA of various state agencies before and after *Scott*— and the SOS' appeal of the Amended Injunction—leaves this Court certain that the infractions so

diligently documented by the US are capable of reoccurring, as not even the Amended Injunction seemingly stymied their recurrence. Revealingly, as the Supreme Court itself advised in an early elections case, no case is moot when "the issues properly presented . . . will persist as the . . . statutes are applied in future elections." *Storer v. Brown*, 415 U.S. 724, 737 n.8, 94 S. Ct. 1274, 1282–83 n.8, 39 L. Ed. 2d 714, 727 n.8 (1974); *accord, e.g.*, *Teper v. Miller*, 82 F.3d 989, 992 n.1 (11th Cir. 1996). In such cases, "the controversy is capable of repetition, yet evading review." *Storer*, 415 U.S. at 737 n.8 (internal quotation marks omitted); *see also Norman v. Reed*, 502 U.S. 279, 288, 112 S. Ct. 698, 705, 116 L. Ed. 2d 711, 722 (1992) (applying the exception, though an election had ended, as "[t]here would be every reason to expect the same parties to generate a similar, future controversy subject to identical time constraints if we should fail to resolve the constitutional issues that arose" beforehand).

Naturally, when parties actively dispute a certain law's reach, repetition is more likely. Just as logically, "where the challenged conduct is a failure to act, it is difficult to determine with precision whether future conflicts will run their courses before being fully litigated, because the duration of the controversy is solely within the control of the defendant." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174 (9th Cir. 2002). In such cases, the second prong to this exception—"evading review"—is satisfied. *Id.*

In short, due to the repeatability of the purportedly illegal conduct alleged by the US, the importance accorded to the right at issue, and Defendants' admissions of ongoing, if arguably minor, noncompliance despite the entering of two separate injunctions by another district court, the law's longstanding exception for activities capable of repetition governs. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 190, 120 S. Ct. 693, 709, 145 L. Ed. 2d 610, 633 (2000) (elaborating the following example: "When . . . a mentally disabled patient files a lawsuit

challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action"); *ProtectMarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) ("[W]here a purportedly invalid law inhibits a political candidate or party's ability to win an election, we can only remedy that impediment before the election occurs.").

### c.    Sossamon*'s Inapplicability*

To the SOS, one case—*Sossamon v. Lone Star State of Tex.*, 560 F.3d 316 (5th Cir. 2009)–negates this exception's application. According to their presentation, *Sossamon*, which "dealt with a change of behavior on the part of a public agency," "created an exception to the *Friend of the Earth* [or *Laidlaw*] Rule about voluntary cessation of conduct when the case involves a public entity." (Hr'g Tr. 27:21–28:6.) True, as Defendants note, per *Sossamon*, "courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity." *Sossamon*, 560 F.3d at 325. Standing alone, its context and nuances ignored, *Sossamon* could be made to support Defendant's position.

Schedler, however, has overstated this case's rather narrow holding. First, while the Fifth Circuit encouraged the display of "some solicitude" and recognized this rule's validity, this "presumption of good faith" is applicable only "[w]ithout evidence to the contrary." *Sossamon*, 560 F.3d at 325; *see also Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988) ("[S]uch self-correction [by a government defendant] provides a secure foundation for a dismissal based on mootness so long as it appears *genuine*." (emphasis added)). By any measure, "some solicitude" is not the same as absolute deference to a state and an ironclad exemption based on a profession of good faith, and far more than a modicum of "evidence to the contrary" populates

this matter's docket, *see supra* Part II.C. Indeed, even *Sossamon*'s lighter burden requires the public entity "to make 'absolutely clear' that the . . . [illegal] condition cannot 'reasonably be expected to recur'." *Id.*; *see also, e.g.*, *Hornbeck Offshore Servs. L.L.C. v. Salazar*, Civ. No. 10-1663 Section "F", 2010 U.S. Dist. LEXIS 98309, at *18, 2010 WL 3523040, at *5 (E.D. La. Sept. 1, 2010) (Under *Sossamon*, "where the defendant's voluntary conduct is at issue, a case can only be found moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (internal quotation marks omitted)).

In this case, though derided as isolated and minor, familiar NVRA violations have reoccurred, and discrete and new legal harms have been exacted by Defendants' own admissions. *See supra* Part II.C.a. In addition, no such "voluntary cessation" occurred here, as every Defendant's compliance post-dates the inauguration of the *Scott* Matter. In this regard, Schedler's recent position before the Fifth Circuit cannot be ignored, for his own apparent inability to identify every "policy" and "procedure" encompassed by the Amended Injunction leaves this Court unable to assume that the kind of genuine and concrete change required by the NVRA could have taken place.[59] In sum, because Defendants cannot satisfy the predicates set out in *Sossamon*, the *Scott* decision does not render this case moot.[60]

---

[59] As the Fifth Circuit has also observed, the "capable of repetition, yet evading review" exception differs from "the voluntary-cessation exception to mootness," with only the latter at issue in *Sossamon*. *Id.* at 325 n.14. Here, SOS relies on the voluntary cessation exception, though this Court finds that no such cessation has transpired and invokes the former exception as an additional support for a conclusion already compelled by the mootness doctrine's existing framework.

[60] A less significant distinction is statutory: *Sossamon* addressed official capacity claims under Section 3 of the Religious Land Use and Institutionalized Persons Act.

**B.      STATUTORY CONSTRUCTION: NVRA AND REMOTE TRANSACTIONS**

**1.      Introduction**

In his MSJ, Schedler urges this Court to read § 20503(a) as constricting the scope of § 20506.[61] (*See, e.g.*, Doc. 336 at 2; Doc. 336-5 at 7–8.) "In general," the former obliges "each State" to "establish procedures to register to vote in elections for Federal office" by "application made simultaneously with an application for a motor vehicle driver's license," "mail application," and "by application in person." 52 U.S.C. § 20503(a)(1)–(3); *Nearman*, 358 Or. at 823–24. As § 20506, the section under which the US now sues, (Doc. 1), does no more than specify the precise nature of the duties of a VRA as to the three types of applications enumerated in § 20506(a)(3), *see* 52 U.S.C. § 20506, the designation and distribution requirements set forth in the former need only be provided  in the course of in-person transactions. Branding the US' construction as "absurd," Schedler contends the NVRA's plain text and obvious structure exempt remote transactions from its coverage, with only Congress, not the Department of Justice, empowered to expand its reach. (*See, e.g.*, Doc. 336 at 2; Doc. 336-5 at 8–13, 17–18.)

In point of fact, however, Section 7's unambiguous import can be discerned by use of ordinary tools of interpretation. *See, e.g.*, *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1329; *cf. Moskal*, 498 U.S. at 108 (emphasizing language's "inherently contextual" character). Obligated to apply the plain and unambiguous meaning of Section 7 that best comports with the NVRA's overall statutory design, this Court favors "[a] straightforward interpretation of the provision [that] makes sense of the language," *United States v. Schurtz*, 510 F.3d 1242, 1244 (10th Cir. 2007). Accordingly, it rejects Schedler's attempted revision.

---

[61] While the *Scott* Court rejected this position, that part of the opinion was reversed on unrelated jurisdictional grounds.

In this analysis, this Court adheres to four interpretive principles. First, it "must read the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006). Second, "identical words used in different parts of the same act" are deemed to possess "the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S. Ct. 2499, 2504, 110 L. Ed. 2d 438, 446 (1990). Conversely, "[c]ourts often say that the choice of different words reflects an intent to say something different." *United States v. Poff*, 926 F.2d 588, 591 (7th Cir. 1991); *see also, e.g.*, *Energy Research Found. v. Def. Nuclear Facilities Safety Bd.*,917 F.2d 581, 583 (D.C. Cir. 1990) ("[W]hen Congress employs the same word, it normally means the same thing, when it employs different words, it usually means different things." (quoting Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, *in* BENCHMARKS 224 (1967))); *cf. Samantar v. Yousuf*, 560 U.S. 305, 317, 130 S. Ct. 2278, 2288, 176 L. Ed. 2d 1047, 1062 (2010) ("Drawing meaning from silence is particularly inappropriate . . . [when] Congress has shown that it knows how to [address an issue] in express terms." (alteration in original) (quoting *Kimbrough v. United States*, 552 U.S. 85, 103, 128 S. Ct. 558, 571, 169 L. Ed. 2d 481, 485 (2007))). Third, a proviso can "only operate within the reach of the principal provision it modifies," and "a modifier at the beginning or end of a series of terms" does normally modify all terms. *Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 262, 112 S. Ct. 683, 690, 116 L. Ed. 2d 687 (1992); *United States v. Laraneta*, 700 F.3d 983, 989 (7th Cir. 2012). Fourth, (and relatedly), "the scope of a subpart" is "[o]rdinarily . . . limited to that subpart," as "it is a commonplace of statutory construction that the specific governs the general." *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1105–06 (11th Cir. 2015); *see also, e.g.*, *RadLAX Gateway Hotel LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071, 182 L. Ed. 2d 967 (2012) (so

stating and underlining that this obligation is particularly strong whenever "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions" (internal quotation marks omitted)); *cf. Fitzgerald v. Barnstable Sch. Comm.*, 55 U.S. 246, 254–55, 129 S. Ct. 788, 795, 172 L. Ed. 2d 582, 592 (2009) (displaying a marked reluctance to construe a statute in a way that appeared "inconsistent with Congress' carefully tailored scheme").

## 2.      Application: NVRA's Text and Context

Once these tools are applied, the text and structure of the NVRA compel a specific understanding of Section 7(a)(6), the one advanced by the US. Undeniably, Section 4 sets forth the states' "general" responsibilities and, in relevant part, only requires a state to establish "procedures to register to vote . . . by application *in person*" at the VRAs. 52 U.S.C. § 20503(a) (emphasis added). Just as surely, Section 7(a)(4) lists three services that must be available "[*a*]t each" VRA. *Id.* § 20506(a)(4) (emphasis added). The word "at," one court has observed, is "used as a function word to indicate presence or occurrence in, on, or near," so that Section 7(a)(4) may rightly be read as "indicat[ing] that Congress intended for the[] three services [specified therein] to be made available at the physical location of the voter registration agency." *Ferrand*, 2012 U.S. Dist. LEXIS 61862, at *23. Read in conjunction, Sections 4(a)(3) and 7(a)(4) quite plainly contain only two requirements. First, as indicated by a single explicit phrase—"in person"—each VRA must have procedures for in-person application in accordance with Section 4(a)(3); second, as implicit in its prefatory phrase—"At each . . ."—each VRA office must make available the three services enumerated in Section 7(a)(4). 52 U.S.C. §§ 20503(a)(3), 20506(a)(4)(A). In short, the "at" in Sections 4(a)(4)(A) and 7(a)(4) expresses "the simple relation of a thing to a point of

space which it touches" or, in other words, "the place where it is," while "in person" bears a

similar connotation: "with or by one's own . . . physical presence, personally." *At, In Person*,

OXFORD ENGLISH DICTIONARY ONLINE (May 2016); *accord* OXFORD ENGLISH DICTIONARY 738–

39 (2d ed. 1989); *Simien v. I.R.S*, No. 05 CV 1458, 2007 U.S. Dist. LEXIS 7043, at *11, 2007

WL 324605, at *4 (W.D. La. Jan. 31, 2007) (noting that the phrase "in person" is susceptible of

several meanings and "synonymous with 'personally'"); *Calafati v. Comm'r*, 127 T.C. 219, 226

(T.C. 2006) (noting that the term "in-person" is generally defined as "in one's bodily presence"

by various dictionaries).

Necessarily, therefore, this choice of prepositions and prepositional phrases is decisive

and restrictive, and these paragraphs' unvarnished text thus establishes physical presence as

these provisions' critical requirement. *See, e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338–39,

99 S. Ct. 2326, 2331, 60 L. Ed. 2d 931, 937 (1979) (refusing to adopt a "strained" construction

that would "rob" two terms of their "independent and ordinary significance"); *United States v.

Nader*, 542 F.3d 713, 718 (9th Cir. 2008) ("A prepositional phrase with an adverbial or

adjectival function should be as close as possible to the word it modifies to avoid awkwardness,

ambiguity, or unintended meanings." (quoting THE CHICAGO MANUAL OF STYLE ¶ 5.167 (15th

ed. 2003))); *Rosenruist-Gestao E Servicos LDA v. Virgin Enters.*, 511 F.3d 437, 452 (4th Cir.

2007) (Wilkinson, J., dissenting) ("[C]ourts cannot interpret one word in a prepositional phrase

and ignore another."); *cf., e.g.*, *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519, 43 S.

Ct. 428, 430, 67 L. Ed. 778, 782 (1923) ("That a word may be known by the company it keeps is,

however, not an invariable rule, for the word may have a character of its own not to be

submerged by its association."); *United States v. Cunningham*, 630 F. App'x 873, 878 n.6 (10th

Cir. 2015) (according controlling weight to the Colorado legislature's choice of a particular prepositional phrase).

Textually, Section 7(a)(6), the one provision at issue in the Parties' dispute over the NVRA's coverage of remote transactions, differs from Sections 4(a)(3) and 7(a)(4). As already discussed, each of the latter sections contains the phrase "in person" or "at each . . .," and no reasonable linguistic debate beclouds these phrases' ordinary meanings. *Cf., e.g.*, *Muscarello v. United States*, 524 U.S. 125, 127–132, 118 S. Ct. 1911, 1914–17, 141 L. Ed. 2d 111, 115–18 (1998) (considering the "ordinary English meaning" of a particular phrase), *superseded by statute*, Pub. L. No. 105-316, 112 Stat. 3469 (1998), *as recognized in Sylvester v. United States*, Nos. 08 Civ. 3222 (LMM), 05 Cr. 849 (LMM), 2008 U.S. Dist. LEXIS 96990, at *7 n.4, 2008 WL 4962984, at *3 n.4 (S.D.N.Y. Nov. 17, 2008); *Nw. Forest Research Council v. Glickman*, 82 F.3d 825, 833 (9th Cir. 1996) ("Where a statutory term is not defined in the statute, it is appropriate to accord the term its ordinary meaning." (internal quotation marks omitted)). Physical presence is their shared requirement, as their plain language naturally connotes.

In contrast, unlike Section 4(a)(3) and Section 7(a)(4), Section 7(a)(6) contains neither the phrase "in person" nor the preposition "at." 52 U.S.C. § 20506(a)(6); *see also Ferrand*, 2012 U.S. Dist. LEXIS 61862, at *23–24. Instead of conditioning the provision of voter registration aid on an applicant's presence "at" a certain location, as the other provisions had expressly done, it assigns each VRA the responsibility of distributing a voter registration form with "*each application* for . . . service or assistance." 52 U.S.C. 20506(a)(6). In other words, though it did so in the NVRA's other parts, "Congress did not impose express locational or in-person limitations on the mandates of Section 7 paragraph (a)(6)." *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1331. Prepositions, i.e. "at," and phrases requiring a physical presence, i.e. "in person," had been

used in the NVRA's other sections, but not one such identical or similar expression appears in the whole of Section 7(a)(6). Having inserted language necessarily indicative of a personal and physical prerequisite not only in a separate section (§ 4(a)) but also in another subsection (§ 7(a)(4)), Congress' knowing capacity to do the same in the latter section's sixth paragraph cannot be reasonably questioned. *Cf. Delgado*, 2014 U.S. Dist. LEXIS 33476, at *35, 2014 WL 1004108, at *11 ("The parties do not dispute that the NVRA has a completely distinct set of requirements for the RMV, which do not reflect on the requirements for public assistance agencies.").

Due to this patent fact—that at least two other sections of the same statute included language establishing locational limitations on a particular duty by certain VRAs—this Court is "bound to respect these different treatments," "limiting the applicability of" Section 4(a)(3) and 7(a)(4) and "declining to infer a limit where Congress chose not to include one" in Section 7(a)(6). *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1331; *see also, e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 222, 112 S. Ct. 570, 575, 116 L. Ed. 2d 578, 587–88 (1991); *Zabielski v. Montgomery Ward & Co.*, 919 F.2d 1276, 1279 (7th Cir. 1990). Significantly, this result aligns with the logic adopted by the Fifth Circuit in its *Schedler* opinion: by declining to construe an explicitly inputted phrase—"at each voter registration agency"—as irrelevant where it appears, it avoids introducing an inconsistency into the Act. *See Scott*, 771 F.3d at 840–41.

Three other textual characteristics of Section 7(a)(6) specifically and the NVRA as a whole support this interpretation. First, Section 4(a)(3) requires each VRA to develop procedures for in-person registration, and Section 7(a)(4) describes what specific types of voter registration services must be offered at each VRA. 52 U.S.C. §§ 20503(a)(3), 20506(a)(4)(A). Neither, however, say anything regarding "the manner in which voter registration forms or voter

preference forms must be distributed or provided," the sole subject of Section 7(a)(6). *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1330. Had Section 7(a)(6) been a subpart of Section 7(a)(4) or Section 4(a)(3), this subject-matter distinction may not have mattered.

However, as a structural matter, Section 7(a)(6) is neither a subsection nor a subpart of either provision. Therefore, it should not and cannot be subsumed into visibly distinguishable parts of the NVRA. *See, e.g.*, *Pirani v. Baharia (In re Pirani)*, No. 15-40538, 2016 U.S. App. LEXIS 9730, at *19–20, 2016 WL 3063261, at *6 (5th Cir. May 27, 2016); *Scherer v. Volusia Cnty. Dep't of Corr.*, 171 So. 3d 135, 138 (Fla. Ct. App. 2015); *Lary*, 780 F.3d at 1105–06; SCALIA & GARNER, *supra*, at 156. This is especially true when the NVRA's complexity and comprehensiveness indicates Congress' vigilant and meticulous drafting. *Cf., e.g.*, *RadLAX Gateway Hotel LLC*, 132 S. Ct. at 2071 (emphasizing that the Bankruptcy Code, "standardizes an expansive (and sometimes) unruly area of law" and thus underscoring the judiciary's "obligation to interpret the Code clearly and predictably using well established principles of statutory construction"); *United States v. Ron Pair Enters.*, 489 U.S. 235, 240–41, 109 S. Ct. 1026, 1030–31, 103 L. Ed. 2d 290, 298–99 (1989) (emphasizing similar concerns and deriving a similar obligation); *McMillan v. Maestri (In re McMillan)*, 543 B.R. 808, 815 (Bankr. N.D. Tex. 2016) (refusing to import language from one subsection into another of 11 U.S.C. § 303, effectively rewriting the statute, as it would tinker with a "comprehensive remedial scheme"). Bound by such "well-established principles of interpretation," *Stafford v. Scottsdale Ins. Co.*, 416 F. App'x 191, 194 (3d Cir. 2010), this Court will not reorder Congress' selected priority scheme by subsuming an independent subsection into a coequal provision, i.e. Section 7(a)(4)(A), or into a wholly distinct part, i.e. Section 4(a)(3). *Cf., e.g.*, *Vanderbrook v. Unitrin Preferred Ins. Co. (In re Katrina Canal Breaches Litig.)*, 495 F.3d 191, 219 (5th Cir. 2007).

Second, Section 7(a)(6) characterizes its obligations as "in addition" to any others imposed by the NVRA and specifies a series of duties that arise from "each application" and thus every transaction. 52 U.S.C. § 20506(a)(6). In other words, no physicality limitation, such as "each application . . . submitted in person or at the voter registration agency," appears in this section. *Id.* The inclusion of this phrase and this subsection's reference to "each application" evidences a sure intent: "[W]hile all voter registration agencies are required under Section 7(a)(4) to make basic voter registration services available" at their physical location, "Section 7(a)(6) articulates an additional set of obligations that mandatory public assistance offices owe to their clients during every transaction." *Ferrand*, 2012 U.S. Dist. LEXIS 61862, at *26. Once more, the language requires as much, since "in addition" specifically means "as an extra or additional thing []*to* something else[]." *In addition*, OXFORD ENGLISH DICTIONARY ONLINE (emphasis added).

If this Court decided differently, as Defendants now urge, it would once more effectively amalgamate separate sections and thereby "rob" varied words and phrases of their distinct import, *Reiter*, 442 U.S. at 338–39. This Court did not so treat "in person" or "at each." For the same reason, it will not nullify "in addition" and "each application" of their quiddity. *See, e.g.*, *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S. Ct. 513, 520, 99 L. Ed. 615, 624 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute, . . . rather than to emasculate an entire section[.]" (internal citations omitted) (internal quotation marks omitted))); *see also supra* Part V.B.1.

Finally, as its first two words announce, Section 4(a) sets forth the states' "general" obligations. 52 U.S.C. § 20503(a). Subsequent sections, such as Sections 5 and 6, provide a far more specific set of obligations. In such cases, especially considering the other textual

differences already noted, jurisprudence compels this Court to honor Section 7's specific language and hold the NVRA to cover what its text also commands: remote transactions. *See, e.g.*, *RadLAX Gateway Hotel LLC*, 132 S. Ct. at 2071 (concluding that "nothing in . . . [a] generalized statutory purpose . . . can overcome the specific manner of that protection which the [relevant] text . . . contains"). To conclude otherwise would require this Court to override the enacted text's explicit terms and express structure, a task beyond its powers. *See, e.g.*, *Ron Pair Enters.*, 489 U.S. at 240–41 (refusing to consider purpose or history when the language "express[ed] Congress' intent" with "sufficient precision" and was supported by the statute's "grammatical structure").

### 3.      Application: NVRA's Purposes

Under modern jurisprudence, if a statute's text is plain and unambiguous,[62] apparent purpose need not be considered. *See supra* Parts IV.D, V.B.1; *see also, e.g.*, *Singh v. Ashcroft*, 383 F.3d 144, 150 (3d Cir. 2004). In spite of this axiom, statutes should still normally "be interpreted in harmony with their dominant purpose." *Dupuy v. Dupuy*, 511 F.2d 641, 643 (5th Cir. 1975) (citing *Kokoszka v. Belford*, 417 U.S. 642, 650–51, 94 S. Ct. 2431, 2436, 41 L. Ed. 2d 374, 382 (1974)); *see also, e.g.*, *Miller*, 394 F.2d at 350 (observing that "Supreme Court decisions clearly show that . . . [a certain canon] does not prevail when the result of its use would be contrary to the obvious purpose of the statute in question"); *cf., e.g.*, 21 U.S.C. § 854(d) ("The provisions of this section shall be liberally construed to effectuate its remedial purposes.").

---

[62] In contrast, as summarized above, *see supra* Part V.B.1, when multiple plain meanings can be conjectured, ambiguity is said to exist, and a statute's purpose, if well-known and obvious, may allow a court to select the apposite meaning from a multitude of possibilities. *United Sav. Ass'n of Tex.*, 484 U.S. at 371; *see also, e.g.*, *Roberts*, 132 S. Ct. at 1357; *Robinson*, 519 U.S. at 341.

While this Court finds no structural or linguistic ambiguity in Section 7(a)(6), *see supra* Part V.B.2, the construction urged by the Government has one more benefit worth stressing in light of these precedents: it, rather than Defendants' version, aligns with the NVRA's known purposes. *Cf., e.g.*, *Ltd., Inc. v. Comm'r*, 286 F.3d 324, 334 (6th Cir. 2002) (contrasting "a plain language interpretation" with a disfavored "hypertechnical analysis"); *In re Friesenhahn*, 169 B.R. 615, 637 38 (Bankr. W.D. Tex. 1994) ("Courts are not to forge ahead under the plain meaning dogma, in blind nullification of Congressional intent." (internal quotation marks omitted)); *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 396, 18 L. Ed. 830 (1867) ("The proper course in all cases is to adopt that sense of the words which best harmonizes with the context, and promotes in the fullest manner the policy and objects of the legislature. . . . [T]he words should be taken in such a sense, bent neither one way nor the other, as will best manifest the legislative intent."). As such, to the extent purpose can be considered, it counts against Defendants' unduly cribbed interpretation. *Cf. Ortiz*, 28 F.3d at 339 (looking to the NVRA's historical focus on the problem of under-registration, as explained below, to help resolve "[a]ny doubt that the record leaves regarding the burden of re-registration" under 52 U.S.C. § 10301).

As the NVRA's second section declares and as the legislative history attests, its primary purpose was to "increase the number of eligible citizens" to register to vote. 52 U.S.C. § 20501(b)(1)–(2); H.R. Rep. No. 103-9, at 2; S. Rep. No. 103-6, at 13; *see also supra* Part II.B. Historically, "[r]egistration rules were introduced in most states in the latter part of the 19th Century as a means of enforcing voting requirements in response to immigration, urbanization, and, in the South, the enfranchisement of African-Americans under the Fifteenth Amendment to the U.S. Constitution." R. S. Montjoy, *The National Voter Registration Act of 1993*, 5 S.C. Policy Forum 4, 7 (1994). With the NVRA, Congress addressed this past by attempting to

ensure (1) that no state would be able to restrict its agency registration program, and (2) that all states would have an agency registration program that would not discriminate against a distinct portion of the population. H.R. CONF. REP. NO. 103-66, at 19 (1993). With this end in mind, Section 7 was designed so as to increase registration of "the poor and persons with disabilities who do not have driver's licenses and will not come into contract with the other princip[al] place[s] to register under this Act." *Id.* Registration accuracy was an explicitly stated goal of the NVRA,[63] but "increas[ing] voter registration" was an equally cognizable purpose of the NVRA in general and Section 7 in particular. ROBERT T. REAGAN, FEDERAL JUDICIAL CENTER, MOTOR VOTER: THE NATIONAL VOTER REGISTRATION ACT 1 (2014). It was hoped that, after the NVRA, "the excuse of the difficulty of registration" would "no longer" overshadow "federal elections." 29 WEEKLY COMP. PRES. DOC. 914; *see also, e.g.*, 139 CONG. REC. H488 (daily ed. Feb. 4, 1993) (remarks of Rep. Meek) ("There are 70 million eligible voters who are not registered because of the burdensome registration policies and procedures which we have in this country."); 139 CONG. REC. S2470 (daily ed. Mar. 5, 1993) (remarks of Sen. Bradley) (stating that 40 percent of the voting-age population cannot vote "because obstacles are placed in the path of them registering to vote.").

Without any textual foundation, *see supra* Part V.B.2, restricting the reach of Section 7(a)(6) to only in-person transactions would directly undermine this aim's realization. If this Court now adopts the SOS' current reading, voting registration opportunities would suddenly be limited to in-person visits in a world in which many applications for services and public assistance occur online or by telephone. *See* U.S. ELECTION ASSISTANCE COMM'N, 2012

---

[63] Defendants have made no argument based on this purpose at any single point throughout these proceedings.

STATUTORY OVERVIEW REPORT 23 (1993); U.S. ELECTION ASSISTANCE COMM'N, THE IMPACT OF THE NATIONAL VOTER REGISTRATION ACT OF 1993 ON THE ADMINISTRATION OF ELECTIONS FOR FEDERAL OFFICE 2011-2012: A REPORT TO THE 113TH CONGRESS 7 (1993). Conversely, a construction of Section 7(a)(6) which encompasses remote transactions better comports with this objective, maximizing opportunities for voter registration in this more virtual world. *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1331–32; *cf. Ortiz*, 28 F.3d at 339 ("During the debates, supporters of the bill repeatedly expressed the view that practical and procedural obstacles, and not a lack of desire to participate, were primarily responsible for the unfortunate fact that roughly 70 million eligible voters in this country (about 40 percent of the voting-age population) had failed to register."). In fact, though "voter registration in most states is still largely paper-based," Michael Halberstam, *Beyond Transparency: Rethinking Election Reform from an Open Government Perspectiv*e, 38 SEATTLE U. L. REV. 1007, 1037–38 (2014–15), the SOS once favored this exact construction, (*See, e.g.*, Doc. 382-1 at 2, 4; Doc. 382 at 5). And, tellingly, neither DCFS nor DHH chose to appeal the *Scott* Court as to this issue despite the fact that it reached the same conclusion. (Doc. 436 at 20–21, 25, 30, 33–34, No. 2:11-cv-00926-JTM-JCW.) Indeed, multiple states have concurred with this natural construal, *Federal Election Practices and Procedures: Hearings Before the Committee on Governmental Affairs and United States Senate*, 107th Cong. 53, 61 (2001), without much marked partisan uproar, *compare* WALDMAN, *supra*, at 170, *with* ROYCE CROCKER, CONGRESSIONAL RESEARCH SERV., THE NATIONAL VOTER REGISTRATION ACT OF 1993: HISTORY, IMPLEMENTATION, AND EFFECTS 21–22 (2013). Hence, even if Section 7(a)(6)'s import was somehow unclear, the construction that this Court now implements is consistent with and furthers the objectives of both the NVRA's and Section

7(a)(6), and its selection would be necessitated by the pertinent provision's "well-known and obvious purposes," *Tower Credit, Inc. v. Schott*, 550 B.R. 299, 301 (M.D. La. 2016).

## 4.    Application: Remaining Issues—Absurdity and Mootness

As a final argument against this reading, the SOS emphasizes its absurdity and impracticality. (*See, e.g.*, Doc. 336-5 at 12.) True, "[t]he plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242 (alterations in original) (internal quotation marks omitted). However, "when words have a clear definition, and all other contextual clues support that meaning, the canons cannot properly defeat Congress's decision to draft broad legislation." *Yates v. United States*, 135 S. Ct. 1074, 1097, 191 L. Ed. 2d 64, 92 (2015). The result may be harsh or illogical and even impose expensive burdens on the unsuspecting, as the NVRA arguably does, *see* CROCKER, *supra*, at 7–8. Even so, the plain text must govern, *see, e.g.*, *Lamie*, 540 U.S. at 538; *Cent. Trust Co.*, 454 U.S. at 360, and the imposition of an onerous obligation cannot meet the high threshold for disregarding the purportedly costly "import of Congress' chosen words," *Lamie*, 540 U.S. at 538. *See, e.g.*, SCALIA & GARNER, *supra*, at 234–39; *Iselin*, 270 U.S. at 251; *Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit, LLC*, 615 F.3d 790, 792 (7th Cir. 2010); *Spivey v. Vertrue, Inc.*, 528 F.3d 982 (7th Cir. 2008). As the Seventh Circuit has well explained, "[t]he [absurdity] canon is limited to solving problems in exposition, as opposed to the harshness that a well-written but poorly conceived statute may produce"; "[o]therwise judges would have entirely too much leeway to follow their own policy preferences by declaring that the legislative choice is harsh or jarring." *United States v. Logan*, 453 F.3d 804, 806 (7th Cir. 2006); *see also, e.g.*, ADRIAN

VERMEULE, JUDGING UNDER UNCERTAINTY 57-59 (2006); John Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387 (2003). On more than one occasion, the SOS has urged this Court not to rewrite the NVRA. (*See, e.g.*, Doc. 336-5 at 17–18.) By rejecting his attempt to affix an omitted phrase onto clear statutory language borrowed from other subsections, this Court now heeds his advice.

At the same time, this Court rejects the US' mootness argument. (Doc. 382 at 2–6; *see supra* Part III.D.) Presently, the US contends the SOS has conceded this point based on the McRitchie Deposition. (*Id.*) But, Defendants contest this fact, and this Court will not now disregard this decisively obvious disagreement. (*See* Doc. 395 at 3–8.) The fact that various state entities have previously conceded the applicability of the NVRA to remote transactions, moreover, cannot moot this issue of statutory interpretation. Whatever his agency has previously averred, the SOS now declares differently, (Doc. 336-5 at 8–13), joined by DCFS and DHH, (*See, e.g.*, Doc. 38 at 12–13). Thus, the dispute is real, the stakes clear, with Defendants determined to defy the US' construal of the exact same statute. Here, because "the relief sought would, if granted, make a difference to the legal interests of the parties," this case cannot be regarded as moot. *See, e.g.*, *Air Line Pilots Assn., Int'l v. UAL Corp.*, 897 F.2d 1394, 1396 (7th Cir. 1990) (relying on *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S. Ct. 402, 404, 30 L. Ed. 2d 413, 415 (1971)); *see also, e.g.*, *Nasatka v. Delta Scientific Corp.*, 58 F.3d 1578, 1580–81 (Fed. Cir. 1995); *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 884 (9th Cir. 1992).

**C.      STATUTORY CONSTRUCTION: DEFENDANTS' ALLEGED PAST AND ONGOING NONCOMPLIANCE WITH THE NVRA**

Three separate issues are raised by the US' MSJ and Defendants' responses. First, Defendants argue that the NVRA requires no more than "reasonable effort[s]" at achieving "substantial compliance," while the US points to an absence of statutory support for this standard. Second, both DCFS and DHH insist on their absence of liability for any NVRA-violations by any LGE; naturally, the US disagrees. Third, as *res judicata* precludes Defendants from re-litigating the factual and legal determinations made by the *Scott* Court and with its recently discovered evidence indicating Defendants' past and ongoing noncompliance, the US argues that Rule 56 demands judgment in its favor. Defendants, of course, disagree. This Court considers each argument in order.

**1.      Section 7's Standard**

***a.      Statutory Criterion***

Section 7(a)(6) speaks without qualification and ambiguity as to a state's discrete responsibilities. It reads:

> A voter registration agency that is an office for such service or assistance in addition to conducting voter registration shall  . . .
>
> (A)      distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance –
>> (i)      the mail voter registration application form described" in § 20508(a)(2) . . .
> (B)      provide . . . [a certain type of voter registration form] . . .; and
> (C)      provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

52 U.S.C. § 20506(a)(6)(A)–(C); *Valdez*, 676 F.3d at 944. Section 11 grants the US the right

"[to] bring a civil action in an appropriate district court for such declaratory or injunctive relief

as is necessary to carry out this Act." 52 U.S.C. § 20510(a). Quite plainly, nowhere in Section 7

does a statutory "substantial compliance" or "reasonable effort" touchstone appear, as

Defendants have impliedly acknowledged. (*See, e.g.*, Doc. 436 at 34, No. 2:11-cv-00926-JTM-

JCW.)

      With ease, Congress could have modified the verbs "distribute" and "provide" in §

20506(a)(6) with the adverb "reasonably" or predicate liability on substantial noncompliance. In

fact, it has done precisely this in dozens of statutes. *See, e.g.*, 10 U.S.C. § 2684a(d)(7)

("substantially comply"); 11 U.S.C. § 523(c)(2) ("reasonably comply"); 12 U.S.C. § 1703(e)

("substantially complied with such regulations in good faith"); 15 U.S.C. §§ 634(f)(1)(A)

("substantially complied"); 16 U.S.C. § 1371(a)(5)(B)(i) ("substantially complied"); 42 U.S.C.

§§ 254c-6(a)(3)(A)(iii) ("reasonable efforts"), 609(a)(8)(A)(i)(III) ("substantially comply"); 44

U.S.C. § 3507(j)(1)(B) ("reasonably comply"). Indeed, it even did so in Section 8 of the NVRA.

52 U.S.C. § 20507(a)(4); *Velez*, 813 F.3d at 10 n.14.

      But, in Section 7(a)(6) of the NVRA, no such precise language or even tangential

synonym appears. *Cf. United States v. Agrawal*, 726 F.3d 235, 261 (2d Cir. 2013) (concluding

that when, "in numbered subsections, the statutory text so exhaustively details the means by

which theft can be committed that one can only conclude that Congress intended the means

provisions of the . . . [Economic Esponiage Act] to reach as broadly as human ingenuity could

conceive to accomplish theft").

      From the NVRA's text, then, two conclusions follow. First, Congress inputted a

"reasonable effort" standard in another section of the same law; second, it has regularly placed

such standards in sundry laws, including the NVRA's eighth section, when inclined to do so, rather than relying upon the federal courts to discern or construct such a standard in stray bits of inherently problematic legislative history. Therefore, as precedent demands, the absence of any such mitigating language in Section 7(a)(6), the provision germane to this suit, must be deemed deliberate, and Congress' choice not to inscribe such familiar and common terms must be accorded absolute deference. *See, e.g.*, *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S. Ct. 1757, 1761, 128 L. Ed. 2d 556, 563 (1994); *Gregory v. Ashcroft*, 501 U.S. 452, 467, 111 S. Ct. 2395, 2404, 115 L. Ed. 2d 410, 428 (1991); *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100–01, 111 S. Ct. 1138, 1148, 113 L. Ed. 2d 68, 84–85 (1991); *Miller*, 394 F.2d at 350. Otherwise, a court would have denuded those qualifiers of significance and, by rendering Congress' chosen language superfluous, flout its burden to accord any possible and reasonable weight to a statute's every word. *Negonsott v. Samuels*, 507 U.S. 99, 106, 133 S. Ct. 1119, 1149, 122 L. Ed 2d 457 (1993); *see also, e.g.*, *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112, 111 S. Ct. 2166, 2171–72, 115 L. Ed. 2d 96 (1991); *United States v. Aleynikov*, 676 F.3d 71, 81 (2d Cir. 2012). No such interpretive feat is permitted, as a court cannot use the canons "to import" rather than "remove" ambiguity where "the meaning of the [relevant] words considered severally is not in doubt." *Russell Motor Car Co.*, 261 U.S. at 520.

In accordance with these precepts, and in light of the NVRA's plainness, this Court reads Section 7 to prescribe strict compliance with its commands, finding no support for any other standard in the NVRA's plain and unambiguous language. *Cf., e.g.*, *Marseilles Homeowners Condo. Ass'n v. Fid. Nat'l Ins. Co.*, 542 F.3d 1053, 1056 (5th Cir. 2008) (rejecting a plaintiff's "theory of substantial compliance" as barred by an insurance policy's unqualified language and case law construing unambiguous terms as requiring "strict compliance"); *Magness v. Russian*

*Fed'n*, 247 F.3d 609, 615 (5th Cir. 2001) ("We conclude that the provisions for service of process upon a foreign state or political subdivision of a foreign state outlined in section 1608(a) can only be satisfied by strict compliance."); *Lucey v. Colvin*, No. 2:15-cv-01476-LDG-PAL, 2016 U.S. Dist. LEXIS 43598, at *2 (D. Nev. Mar. 31, 2016) (holding that "strict compliance with the rules governing manner of service is required"); *cf. Hutson v. Bass*, 426 N.E.2d 749, 774 (N.Y. 1981) (contending that "[i]t is wholly immaterial that the courts might reasonably conclude that what they perceive as the ultimate legislative objectives might better be achieved by more flexible prescriptions" when the legislature has erected a "rigid framework").[64] As another court stated, "[a]dherence to the plain meaning rule is not simply a matter of judicial craftsmanship" but of duty. *In re Phila. Newspapers, LLC*, 418 B.R. 548, 558 (E.D. Pa. 2009). And borrowing adjectives and adverbs cannot but offend it.

### b.    *Defendants' Insufficient Counters*

Conceding the absence of such qualifiers as "reasonable" or "substantial," Defendants direct this Court both to snippets within the NVRA's legislative history and to the narrow ambit of the First Injunction. (*See, e.g.*, Doc. 398 at 5–6; Doc. 399 at 5–6.) However, their reliance on these sources is insupportable for two reasons. First, as Defendants themselves argued as to the relationship between Sections 4 and 7, *see supra* Part V.B, courts may not "resort to legislative history to cloud a statutory text that is clear," *Ratzlaf v. United States*, 510 U.S. 135, 147–48, 114 S. Ct. 655, 662, 126 L. Ed. 2d 615, 626 (1994), *rev'd on other grounds*; *see also, e.g., Davis*, 489

---

[64] It should be noted that the Fifth Circuit has implied "a demonstrated desire to comply" can affect the operation of the NVRA's notice requirement, set forth in § 20510(b)(1), as to private plaintiffs. *Scott*, 771 F.3d at 836.

U.S. at 808–09 n.3 ("Legislative history is irrelevant to the interpretation of an unambiguous statute.").

Here, Section 7(a)(6) does not establish "reasonable effort" or "substantial compliance" as sufficient. Such language is not in the statute; nothing within the NVRA's thirteen sections disturbs this pregnant silence. *See, e.g.*, *Abrego v. Dow Chem. Co.*, 443 F.3d 676, 683 (9th Cir. 2006) ("[C]onsideration of legislative history is appropriate where statutory language is ambiguous" and differentiating between "ambiguity" and "silence"); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005) ("[W]hen the legislative history stands by itself, as a naked expression of 'intent' unconnected to any enacted text, it has no more force than an opinion poll of legislators."); *Kearns v. Ford Motor Co.*, No. CV 05-5644 GAF (JTLx), 2005 U.S. Dist. LEXIS 41614, at *12, 2005 WL 3967998, at *4 (C.D. Cal. Nov. 21, 2005) ("Silence on . . . [an] issue does not equate to ambiguity.").

Obliged to do no more than interpret and apply Section 7(a)(6) alone, this Court cannot amend it by introducing into its plain text a foreign standard. *See McMellon v. United States*, 387 F.3d 329, 358–59 (4th Cir. 2004) (Niemeyer, dissenting in part). Just as it cannot invent one, this Court cannot transpose one from conference and committee reports.[65] *See, e.g.*, *Conn. Nat'l*

---

[65] Even if this Court felt bound to weigh the legislative history, it does not find it to be as unambiguous as Defendants maintain. As Defendants note, (*See, e.g.*, Doc. 399 at 7 n.21), the Senate Report does declare: "[P]rivate enforcement can encourage action to assure that a reasonable effort is undertaken to achieve . . . [the NVRA's] objective in all States." S. REP. No. 103-6 at 21. Even Defendants concede an initial problem with their reliance on this language, as the report here refers to "private initiative" that exists "[i]n addition to criminal enforcement."[65] *Id.* Beyond this lone reference, every other mention of a reasonable effort deals with Section 6, the one section in the enacted NVRA in which this standard appears. *Id.* at 18–19, 31–32; *accord* H.R. REP. No. 103-9, at 15. Meanwhile, the House's own report did not construe § 20510(b) to effectuate a "reasonable efforts" standard: "Subsection (b) provides a private right of action to any person who is aggrieved by *a* violation of this Act." H.R. REP. No. 103-9, at 20 (emphasis added).

*Bank v. Germain*, 503 U.S. 249, 254, 112 S. Ct. 1146, 1149–50, 117 L. Ed. 2d 391, 397 (1992); *GE v. EPA*, 360 F.3d 188, 191 (D.C. Cir. 2004).

Second, Defendants seem to have mischaracterized the *Scott* Court's ruling. As its findings reveal, that court never concluded that Defendants' "substantial compliance" satisfied the NVRA. Rather, this fact did no more than mitigate against a certain remedy, i.e. monitoring, with this court specifically concluding: "Ultimately, this Court finds that because Defendants are only in substantial compliance, and *not in full compliance*, there is some potential danger that future violations may occur." (Doc. 436 at 34, No. 2:11-cv-00926-JTM-JCW (emphasis added).) Once it is fairly perused, the *Scott* Court actually decided the very opposite of what the Defendants have contended. In page after page, it stressed Defendants' failure to achieve "full compliance with the [NVRA's] mandates" and left no doubt about such failings' illegality under this strict statute; Defendants' substantial compliance and reasonable efforts swayed the *Scott* Court only as to the remedy that it ultimately fashioned. (*Id.* at 25, 27, 34.) Like the *Scott* Court, this Court will not revise the NVRA and require no more than substantial compliance and reasonable effort by Defendants. However harsh or impractical such a standard may strike the Parties,[66] Section 7's unambiguous and plain meaning must govern. *See, e.g.*, *Lamie*, 540 U.S. at 538; *Cent. Trust Co.*, 454 U.S. at 360.

## 2.      DHH's Liability for LGEs' Actions

Just as this state cannot evade its obligations under federal law by means of delegation, *see supra* Part V.A.2, neither can DHH do so by private contract. *See, e.g.*, *United States*, 255 F.

---

[66] Revealingly, Defendants' complaints echo those made by a *minority* of the Senate's committee responsible for the NVRA's drafting. *See* S. REP. NO. 103-6, at 57. The minority, of course, lost in the bill's final calculus.

Supp. 2d at 78; *Harkless*, 545 F.3d at 452. In this state, the LGEs serve as DHH's appointed agents, (Doc. 398 at 29–33), and DHH's Secretary bears the ultimate responsibility for the "policy, development, implementation, and monitoring of the statewide human services system to assure the provision of the delivery of behavioral health and developmental disabilities services," LA. R.S. § 28:919A. Under state law, as DHH must "*implement* . . . the statewide human services system," it is expected to construct and maintain this very system. *Id.* (emphasis added); *Implement*, OXFORD ENGLISH DICTIONARY ONLINE.

Under the NVRA, an entity providing "behavioral health and developmental disabilities services" must be classified as a VRA. 52 U.S.C. § 20506(a). Read in conjunction, both Louisiana law and the NVRA compel this Court to hold DHH responsible for the violations of its chosen agents when the power to appoint, to monitor, and to maintain rests upon it alone and when each agent receives payment from LA by virtue of its contracts. Other courts have similarly ruled as to Medicaid service providers, local benefits offices, state university disability services offices, and other seemingly independent or ostensibly inapposite entities, and the private character of these entities did not absolve the state or the relevant agency of responsibility when public functions were performed. *See, e.g.*, *Harkless*, 545 F.3d at 452; *True the Vote*, 43 F. Supp. 3d at 713; *United States*, 535 F.3d at 849*; Nat'l Coalition for Students with Disabilities Educ. & Legal Defense Fund v. Taft*, No. 2:00-cv-1300, 2002 U.S. Dist. LEXIS 22376, at *8–10, 2002 WL 31409443, at *3 (S.D. Ohio Aug. 2, 2002); *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 120 (2d Cir. 2000); *Gilmore*, 152 F.3d at 293–94. With these opinions, this Court agrees and holds DHH responsible for the LGE's misdeed.

3.     **Propriety of Summary Judgment**

Rule 56 requires a court to enter judgment for a movant whenever "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014). Here, the Parties do agree on certain facts—that DHH and DCFS were not in full compliance prior to the *Scott* Matter. (*See, e.g.*, Doc. 398; Doc. 399; Doc. 402.) However, they dispute the extent to which Defendants have failed to comply since *Scott* or ensured compliance by every program under their purview. (*Compare* Doc. 360-1, *with, e.g.*, Doc. 398; Doc. 399; Doc. 420.) Of course, as this Court has now concluded, even minor noncompliance contravenes the NVRA. *See supra* Part V.C.1.

As such, only a few facts matter to ascertaining the existence of an actionable violation. First, Defendants have conceded that "isolated instances" of noncompliance persist, *see supra* Parts III.B, III.E, V.A.1, and not even the *Scott* Court found them to be in "strict compliance" with the NVRA, (Doc. 436 at 34, No. 2:11-cv-00926-JTM-JCW). In addition, Defendants have acknowledged that multiple violations pre-dating the First Injunction were not actually ligated in *Scott*, and the *Scott* Court certainly could not have determined the significance of the post-*Scott* violations that Defendants themselves concede have taken place. (*See, e.g.*, Doc. 398 at 9; Doc. 399 at 9; Doc. 402 at 7.) By definition, even a fraction of such established and incontestable facts would entitle the US to relief pursuant to § 20510(a) based on the plain meaning of § 20506(a)(6).

Yet, the US now seeks a remedy denied to the *Scott* Plaintiffs: ongoing monitoring of the various Defendants' NVRA efforts. Where a state or its subordinate agencies "openly and plainly refuses to comply with the NVRA," such monitoring may be proper. *True the Vote*, 43 F. Supp. 3d at 715 (construing *Miller*, 129 F.3d at 837). Indeed, other plaintiffs have requested it, and other courts have recognized this particular's remedy special value to securing the NVRA's aims. *See Valdez v. Herrera,* Civ. No. 09-668 JCH/DJS, 2012 U.S. Dist. LEXIS 177639, at *17–18 (D.N.M. Mar. 21, 2012); *Ass'n of Cmty. Orgs. for Reform Now v. Scott*, No. 08-CV-4084-NKL, 2008 U.S. Dist. LEXIS 53580, at *27–29, 2008 WL 2787931, at *8 (W.D. Mo. July 15, 2008). Historically, when NVRA violations have been suitably proven, as they have been here, courts have not hesitated to compel states to submit plans for full and prompt compliance. *See, e.g.*, *Condon v. Reno*, 913 F. Supp. 946, 949, 960 (D.S.C. 1995).

Even so, where the degree of noncompliance remains disputed, it can rarely be said as a matter of law that this most intrusive of remedies should be imposed. *Cf. Or. State Med. Soc'y*, 343 U.S. at 333. Plaintiff proffers a disturbing tale of rampant and substantial violations by multiple state actors, (Doc. 360-1), and, if accepted, this evidence would support the imposition of a broader injunction than the *Scott* Court considered. In contrast, Defendants counter Plaintiff's litany with a profession of their good faith and an acknowledgement of only the most minor defects since the First Injunction was entered, (Doc. 398; Doc. 399; Doc. 407). Especially when set beside the US' accumulated record, Defendants' proffered evidence is more than a scintilla, *Little*, 37 F.3d at 1075. Most assuredly, to pick the former over the latter and to conclude that only persistent and ongoing monitoring would effectuate the NVRA's purposes would require this Court to make a factual determination, not a legal one, and attribute an utter

lack of credibility to several witness' sworn filings. A factfinder may eventually do so, but this Court cannot under Rule 56.

In such cases, caution is due, for when such a far-reaching injunction is threatened, proportionality greatly matters, and a remedy must be carefully tailored to achieve the federal law's ends in the least obtrusive possible manner. *Cf. Scott*, 2016 U.S. App. LEXIS 10919, at *15, 2016 WL 3345277, at *5 (reminding the *Scott* Court that "an injunction may not encompass more conduct than was requested or exceed the legal basis of the lawsuit"). Undeniably, the dramatic remedy requested may eventually be demonstrated to be proper and essential, but it is has not yet been conclusively and incontestably shown to be the proper means of rectifying Defendants' proved shortcomings. So convinced, even as it finds Defendants to have violated the NVRA, this Court cannot grant the remedy that the US has requested under Rule 56.

### D.      PROBLEM PRESENTED BY MCRITCHIE'S ERRATA

Rather unexpectedly, one more issue has arisen during the Parties' last round of briefing. In the US' Opposition to Schedler's MSJ, the Government had relied on the deposition testimony of the SOS' Rule 30(b)(6) designee, McRitchie, to buttress its contention that no live dispute now exists as to the NVRA's coverage over remote transactions. (Doc. 420 at 1; *see also* Doc. 382 at 3–6.) According to the transcript, McRitchie testified that "as early as 2007, the SOS had instructed VRAs that 'voter registration is always offered,' regardless of the mode of transaction." (Doc. 420 at 1–2; *see also* Doc. 382-2.) But, Schedler's MSJ Reply, (Doc. 395), points the Court to a corrected version of McRitchie's testimony: "In 2011, all training was limited to in person transactions." (Doc. 395 at 9–10; *see also* Doc. 420 at 2.) Focusing on the same provision, the US characterizes this change as verboten under Rule 30(e), (Doc. 420 at 2–

3), while the SOS defends its propriety, (Doc. 423 at 3–4). Per precedent and law, neither side can win this argument based on the few facts now available.

Rule 30(e) allows a deponent to review a deposition transcript and "[i]f there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." FED. R. CIV. P. 30(e); *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 480 (5th Cir. 2012).[67] In this rule's construction, the federal courts have split into two camps. A majority point to Rule 30(e)'s plain terms and therefore permit deponents to make "changes that contradict the original answers given, even if those changes are not supported by convincing explanations, as long as the deponent complies with the instructions provided within the rule itself for making such changes." *Poole v. Gorthon Lines AB*, 908 F. Supp. 2d 778, 785–86 (W.D. La. 2012). A substantial and growing minority, however, "hold that Rule 30(e) is to be used for corrective, and not contradictory, changes." *Hambleton Bros. Lumber Co. v. Balkin Enters.*, 397 F.3d 1217, 1225–26 (9th Cir. 2005) (collecting cases); *accord, e.g.*, *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002); *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000). A vision animates this school: if a deponent can freely revise their testimony afterward, the deposition has become a "take home examination," and its utility as a discovery device wholly forfeited. *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992); *see*

---

[67] Schedler describes this case as follows:

> The Fifth Circuit . . .  observed that witnesses sometimes make substantive missteps in deposition testimony which may be corrected with an errata sheet, provided there is no indication of unreasonable and vexatious effort to multiply proceedings.

(Doc. 423 at 3.) By so doing, the Secretary oversells this case, as the Fifth Circuit did not restrict a court's discretionary power to strike an errata sheet solely to "unreasonable *and* vexatious" instances. *Gonzalez*, 689 F.3d at 480 (emphasis added). Indeed, the Fifth Circuit actually upheld the district court's decision that an attorney had contravened Rule 30(e). *Id.*

*also Garcia*, 299 F.3d at 1242 n.5 (quoting *Greenway*, 144 F.R.D. at 325); *cf. Cavanaugh v. Wainstein*, No. 05-123 (GK), 2007 U.S. Dist. LEXIS 40242, at *33, 2007 WL 1601723, at *10 (D.D.C. June 4, 2007).

Regardless of the side chosen, even when a statement explaining the change has been proffered, a district court enjoys the discretion to order that a deposition be reopened so that the revised answers may be followed up on and the reason for the corrections explored. *Poole*, 908 F. Supp. 2d at 786. As McRitchie's changes affect the substantive implications of her sworn testimony, this Court believes this result coheres with the purposes of both Rule 30 and Rule 31. Accordingly, as specified in this Ruling's conclusion, *see infra* Part VI, Schedler will be ordered to make McRitchie available for a second deposition on a certain date so that the reasons for her changes can be subjected to proper scrutiny.


## VI.    CONCLUSION

Long ago, the Supreme Court "recognized the elementary proposition upon which our structure of civil rights is based: '[The] political franchise of voting is . . . a fundamental political right, because [it is] preservative of all rights.'" *City of Mobile v. Bolden*, 446 U.S. 55, 115, 100 S. Ct. 1490, 1525–26, 64 L. Ed. 2d 47, 89 (1980) (Marshall, J., dissenting) (quoting *Yick Wo*, 118 U.S. at 370). Again and again, that theme has been invoked. *Reynolds*, 377 U.S. at 561–62. And, again and again, courts, scholars, and politicians have emphasized this link between voting and civil rights. *See* 52 U.S.C. § 20501; THE FEDERALIST NO. 52, at 354; WALDMAN, *supra*, at 170.

Passed in 1993, the NVRA represents one such congressional effort to safeguard and expand this republican right in language bare and clear. Once their many arguments have been distilled and their many motions perused, one issue lies at this case's core: to what extent, if any,

does Section 7 of the NVRA apply to these Defendants in light of its terms and another court's adjudication of Defendants' past—and admitted—violations. Through this thicket, well-settled jurisprudence provides a compass. The *Scott* Matter cannot bind the US, and while this case has not been mooted, the Defendants are bound in full both by the *Scott* Court's findings and to Section 7's unambiguously discrete and varied mandates. However impractical it may strike Defendants, the NVRA must be read to cover remote transactions and to require strict compliance. Only Congress can concoct a new standard by means of legislation, either expressly circumscribing the NVRA's scope or affirming its language's natural implications. But, until it decides to act, a line in a single report will not do.

Nonetheless, despite the cogency of the evidence produced by the US, enough uncertainty beclouds the record to foreclose its victory under Rule 56 as to the remedy requested. Before permanent monitoring may be compelled, judgments regarding credibility and weight must still be made, for the US now seeks far more than the permanent injunction awarded by the *Scott* Court. Conversely, to the extent the US now seeks an order declaring Defendants in violation of Section 7 of the NVRA, that request must be granted, for violations have indisputably persisted even in *Scott*'s aftermath. Although they may be minor, they are nonetheless violations.

Accordingly, for the aforementioned reasons, this Court ORDERS as follows:

1. The five Dispositive Motions filed by the Defendants—the Motion for Partial Summary Judgment, (Doc. 336); the Motion to Dismiss Based on Res Judicata, Collateral Estoppel or Mootness, (Doc. 340); the Motion to Dismiss Pursuant to Rule 12(b)(1), (Doc. 341); the Motion to Dismiss by Secretary of State for Lack of Subject

Matter Jurisdiction, (Doc. 342); and the Motion to Dismiss Pursuant to Rule 12(c), (Doc. 345)—are **DENIED**.

2. The United States' Motion for Summary Judgment, (Doc. 346), is **GRANTED IN PART** and **DENIED IN PART**. This Court finds that Defendants have violated Section 7 of the NVRA, but the nature and extent of those violatiosn remain issues to be tried. Therefore, this Court will not order any monitoring at this time. Instead, on or before <u>**September 7, 2016**</u>, at <u>**5:00 p.m.**</u>, Plaintiff and Defendants must submit simultaneous briefs regarding the remedies that they propose and how they propose to adjudicate any and all remaining issues. Each Party's brief may not exceed ten pages, and DCFS and DHH may file only one shared brief. If further briefing or argument is deemed necessary, this Court will either solicit briefs or schedule a hearing.

3. On or before <u>**September 7, 2016**</u>, at <u>**5:00 p.m.**</u>, the Parties must submit a single joint document specifically listing and succinctly describing *every* alleged violation of the NVRA that either post-dates *Scott* or was not adjudicated by the *Scott* Court. For every alleged violation, numbered and identified, DCFS and DHH, together, and SOS may respond in detail; "deny" will be deemed insufficient. Each party must cite to specific portions of the record as support for the allegations or its denial. The required format appears as an appendix to this Ruling. No amendment to this document will be allowed absent this Court's authorization.

4. On or before <u>**September 7, 2016**</u>, at <u>**5:00 p.m.**</u>, the Secretary of State is to make Ms. Catherine McRitchie available for deposition by the United States at his own expense. During this examination, the United States may freely explore any and all issues related to her recently submitted errata.

5.   A status conference in this matter is scheduled for **September 30, 2016**, at **9:00 a.m.**

for the purpose of selecting a trial date.

Signed in Baton Rouge, Louisiana, on July 26, 2016.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**APPENDIX**

| | **Alleged Violation** | **Response**<br>**(DCFS and DHH)** | **Response**<br>**(SOS)** |
|---|---|---|---|
| 1. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 2. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 3. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 4. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 5. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 6. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 7. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 8. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 9. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 10. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 11. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 12. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 13. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 14. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 15. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 16. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 17. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 18. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 19. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |
| 20. | [Description.] (Doc [] at [].) | [Response(s).] (Doc [] at [].) | [Response(s).] (Doc [] at [].) |

. . .